UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,
AND
ALLSTATE PROPERTY & CASUALTY INSURANCE
COMPANY,

     Plaintiffs,

vs.

EPIONE MEDICAL, P.C.,
APAK CHIROPRACTIC, P.C.,
MICHAEL Y. JACOBI, D.O.,
ALEKSANDR MOSTOVOY, D.C.,
WELLMART RX, INC.,
SIMON DAVYDOV,
RUSLAN NEKTALOV a/k/a RUSS NEKTA,
EMANUEL DAVID a/k/a EMANUEL DAVYDOV a/k/a
EMIK DAVYDOV,
STELLA RAYTSIN,
ELENA MUMIN-AKHUNOV,
PRACTICE WIZ, INC.,
MBCC SUPPORT LTD. d/b/a BILLING PROS, AND
INNOVATIVE BUSINESS STRATEGIES, INC.,

     Defendants.

C.A. No.

---

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

1

# I.    INTRODUCTION

1.    This action involves a multifaceted scheme to defraud Allstate.

2.    The scheme was designed to exploit the generous medical benefits available under New York's No-Fault laws, which provide medical expense coverage of at least $50,000.00 to each person involved in an automobile accident.

3.    The scheme was carried out through several different entities named Epione Medical, P.C. ("Epione"), APAK Chiropractic, P.C. ("APAK"), and Wellmart Rx, Inc. ("Wellmart").

4.    Epione and APAK (collectively, the "PC Defendants") are professional service corporations ("PCs") that were illegally owned, operated, and controlled by Defendants Simon Davydov ("Davydov"), Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov ("David"), Stella Raytsin ("Raytsin"), and Elena Mumin-Akhunov ("Mumin-Akhunov") (collectively, the "Manager Defendants").

5.    Wellmart is a pharmacy owned by Defendants Simon Davydov ("Davydov") and Ruslan Nektalov a/k/a Russ Nekta ("Nektalov").

6.    The first facet of the scheme involves a medical clinic located on Hempstead Avenue in Queens Village, New York ("Queens Village Clinic").

7.    The Manager Defendants controlled the Queens Village Clinic.

8.    None of the Manager Defendants are licensed to provide medical services in New York.

9.    As alleged herein, the Manager Defendants recruited Defendants Michael Y. Jacobi, D.O. ("Jacobi") and Aleksandr Mostovoy, D.C. ("Mostovoy") (collectively, the "Healthcare Provider Defendants") to become medical providers at the Queens Village Clinic.

10.     Jacobi was induced to organize Epione as a physician-owned PC, and Mostovoy was induced to organize APAK as a chiropractor-owned PC.

11.     Epione and APAK were then installed as billing providers at the Queens Village Clinic.

12.     The Manager Defendants controlled the PC Defendants using several different companies, including Defendants Practice Wiz, Inc. ("Practice Wiz"), MBCC Support Ltd. d/b/a Billing Pros ("Billing Pros"), and Innovative Business Strategies, Inc. ("IBS") (collectively, the "Management Companies").

13.     As alleged herein, the Management Companies enabled the Manager Defendants' siphoning of professional fees and profits from the PC Defendants.

14.     The Manager Defendants used their position of power over the PC Defendants to control patient care and maximize revenue by causing them to bill for an array of unnecessary, excessive, and clinically worthless tests and treatments.

15.     The Manager Defendants' control of the PC Defendants was illegal because only licensed medical professionals such as physicians and chiropractors may own, control, or profit from medical PCs.

16.     The second facet of the scheme involves Wellmart, which is a pharmacy enterprise that was fueled, in part, by the Manager Defendants' illegal control of the PC Defendants and the Queens Village Clinic.

17.     As alleged herein, patients of the Queens Village Clinic were evaluated and then prescribed a broad range of medications that were unnecessary, expensive, unwanted, unproven, and often ineffective.

18.     The prescriptions were channeled to Wellmart—an arrangement made possible by the Manager Defendants' unlawful influence and control over the prescribers, such as Jacobi, Epione, and several others.

19.     Wellmart capitalized on this illegal conduct by billing Allstate for these unnecessary and unlawful prescriptions.

20.     The scheme worked overall because patients are permitted to assign their No-Fault benefits to medical providers and pharmacies.

21.     All of the patients served by Epione, APAK, and Wellmart were persons who were eligible for No-Fault coverage under an insurance policy issued by Allstate ("Claimants" or "Allstate Claimants").

22.     The assignments of No-Fault benefits enabled Epione, APAK, and Wellmart to seek payment directly from Allstate.

23.     The Defendants used the U.S. Mail to transmit Epione's, APAK's, and Wellmart's records, bills, and No-Fault claim documents to Allstate.

24.     The documents mailed to Allstate warranted that Epione, APAK, and Wellmart were eligible to seek and collect No-Fault benefit payments.

25.     The warranties in Epione's and APAK's records were false because the entities were illegally owned and controlled by the Manager Defendants, and because the records also misrepresented and omitted material facts about the services, including the actual provider of treatment.

26.     The warranties in Wellmart's records were false because the medications were not medically necessary, and because the medications were prescribed according to improper financial relationships between Wellmart and the prescribing providers, such as Jacobi, Epione, and others.

27.     Throughout the course of this scheme, the Defendants used the U.S. Mail to submit No-Fault claims to Allstate even though they knew that Epione, APAK, and Wellmart were not eligible for reimbursement under New York's No-Fault laws.

28.     Allstate reasonably relied on the facial validity of the Defendants' documents—and the representations contained therein—when paying No-Fault claims submitted by (or on behalf of) Epione, APAK, and Wellmart.

29.     As set out below, Epione, APAK, and Wellmart were never eligible to seek or collect No-Fault benefit payments from Allstate for the following reasons:

    a.  Epione and APAK were unlawfully operated, managed, and controlled by persons not lawfully authorized to (i) provide medical or chiropractic services, (ii) own or control a professional service corporation authorized to provide medical or chiropractic services, or (iii) profit from a professional service corporation organized to provide medical or chiropractic services;

    b.  Epione and APAK unlawfully split their professional fees and profits with persons not licensed to provide medical or chiropractic services;

    c.  Epione billed Allstate for tests and treatment that were (i) not medically necessary, (ii) provided pursuant to a predetermined protocol, (iii) not rendered as represented (if rendered at all), (iv) intentionally inflated or misrepresented to justify the continuation of medical treatment, and (v) purposely designed to financially enrich the Manager Defendants at the expense of patient care;

    d.  Wellmart billed Allstate for medications that were (i) not medically necessary, (ii) prescribed according to improper financial relationships between Wellmart and the prescribing providers, including Jacobi, Epione, and others, (iii) repeatedly

dispensed in excessive amounts that were harmful to patients, (iv) charged at inflated amounts and not billed in accordance with the fee schedule, (v) never specifically formulated for individual patients, and (vi) mass produced and dispensed in violation of applicable regulatory and licensing requirements.

30.     By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; and (c) unjust enrichment.

31.     This action seeks actual damages of more than $1,682,127.00, which represent No-Fault benefit payments that Allstate was wrongfully induced to make to Epione, APAK, and Wellmart during the course of this scheme.

32.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay or reimburse the PC Defendants (or their agents) in connection with any No-Fault benefit claims that have been submitted to Allstate because: (a) the PC Defendants were unlawfully owned and controlled by laypersons (i.e., Davydov, David, Raytsin, and Mumin-Akhunov); (b) the PC Defendants unlawfully channeled their professional fees and profits to Davydov, David, Raytsin, and/or Mumin-Akhunov through a series of agreements; (c) the PC Defendants unlawfully billed for tests and treatment that were rendered by independent contractors rather than employees of the PC Defendants; and (d) Epione billed Allstate for tests and treatment that were medically unnecessary, excessive, and clinically worthless, and, in some cases, never actually rendered at all.

33.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay or reimburse Wellmart (or its agents) in connection with any No-Fault benefit claims that have been submitted to Allstate because Wellmart, at all relevant times, submitted, or

caused to be submitted, claims for pharmacy services that were excessive, not medically necessary, provided pursuant to a predetermined protocol designed solely to ensure financial enrichment, and submitted in violation of one or more regulatory and licensing requirements applicable to pharmacies, thus rendering Wellmart completely ineligible to receive reimbursement under New York's No-Fault laws.

34. All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

35. The Defendants' fraudulent scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the Defendants.

36. In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many instances obtained—payment for the medical and pharmacy services that were not compensable under New York's No-Fault laws.

37. The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

38. Allstate estimates that the Defendants purposely submitted to Allstate hundreds of bills on behalf of Epione, APAK, and Wellmart knowing that the bills were not compensable under New York's No-Fault laws.

## II.    THE PARTIES

### A.    PLAINTIFFS

39.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

40.    At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were authorized to conduct business in the State of New York.

### B.    DEFENDANTS

#### 1.    Healthcare Provider Defendants

##### a.    *Michael Y. Jacobi, D.O.*

41.    Michael Y. Jacobi, D.O. ("Jacobi") resides in and is a citizen of the State of New York.

42.    Jacobi is a physician who, at all relevant times, has been licensed to practice medicine in the State of New York.

43.    Jacobi participated in this scheme by (a) providing (or purporting to provide) medically unnecessary treatment and services to patients of Epione, (b) prescribing unnecessary and excessive medications that were billed to Allstate by Wellmart, and (c) creating and submitting (or causing the creation and submission of) treatment records, peer-review rebuttals, and independent medical exam ("IME") rebuttals that falsely supported the charges for the medical treatment and services and prescriptions submitted to Allstate.

44.     Jacobi also participated in this scheme by (a) serving as the sham owner of Epione, (b) falsely holding himself out to the public and to Allstate as Epione's sole officer, director, and shareholder, and (c) allowing Davydov, David, Raytsin, and Mumin-Akhunov to operate and control Epione, and siphon its professional fees and profits, in violation of New York law.

45.     Jacobi participated in the operation of the Epione enterprise by signing—or lending his name to—Epione's corporate and ownership documents, as well as Epione's treatment records and invoices; therefore, Jacobi is responsible for the fraudulent and non-compensable medical services that were billed to Allstate under New York's No-Fault laws.

### b.     *Aleksandr Mostovoy, D.C.*

46.     Aleksandr Mostovoy, D.C. ("Mostovoy") resides in and is a citizen of the State of New York.

47.     Mostovoy is a chiropractor who, at all relevant times, has been licensed to practice chiropractic in the State of New York.

48.     Mostovoy participated in this scheme by billing for chiropractic services in connection with patients of APAK.

49.     Mostovoy also participated in this scheme by (a) serving as the sham owner of APAK, (b) falsely holding himself out to the public and to Allstate as APAK's sole officer, director, and shareholder, and (c) allowing Davydov, David, Raytsin, and Mumin-Akhunov to operate and control APAK, and siphon its professional fees and profits, in violation of New York law.

50.     Mostovoy participated in the operation of the APAK enterprise by signing—or lending his name to—APAK's corporate and ownership documents, as well as APAK's treatment

records and invoices; therefore, Mostovoy is responsible for the fraudulent and non-compensable chiropractic services that were billed to Allstate under New York's No-Fault laws.

### 2. PC Defendants

#### a. *Epione Medical, P.C.*

51.     Epione is organized as a physician-owned professional corporation under New York law with a principal place of business located at 218-08 Hempstead Avenue, 2nd Floor, Queens Village, New York 11429.

52.     At all relevant times, Jacobi falsely purported to be the sole officer, director, and shareholder of Epione.

53.     As set out below, Davydov, David, Raytsin, and Mumin-Akhunov participated in the operation and management of the Epione enterprise by exerting unlawful control over Jacobi and Epione, including Epione's professional fees and profits.

54.     As part of this scheme, Epione was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Epione was unlawfully operated and controlled by laypersons.

55.     Because Epione was unlawfully operated and controlled by laypersons, and thus operated in direct violation of N.Y. Bus. Corp. Law § 1508, Epione was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

#### b. *APAK Chiropractic, P.C.*

56.     APAK is organized as a chiropractor-owned professional corporation under New York law with a principal place of business located at 218-02 Hempstead Avenue, 2nd Floor, Queens Village, New York 11429.

57.     At all relevant times, Mostovoy falsely purported to be the sole officer, director, and shareholder of APAK.

58.     As set out below, Davydov, David, Raytsin, and Mumin-Akhunov participated in the operation and management of the APAK enterprise by exerting unlawful control over Mostovoy and APAK, including APAK's professional fees and profits.

59.     As part of this scheme, APAK was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though APAK was unlawfully operated and controlled by laypersons.

60.     Because APAK was unlawfully operated and controlled by laypersons, and thus operated in direct violation of N.Y. Bus. Corp. Law § 1508, APAK was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 3.     Manager Defendants

#### a.     *Simon Davydov*

61.     Simon Davydov ("Davydov") resides in and is a citizen of the State of New York.

62.     Davydov does not hold a medical or chiropractic license, and is therefore not authorized to practice medicine or chiropractic in the State of New York.

63.     Davydov maintains ownership or controlling interests in several Management Companies, including Practice Wiz and Billing Pros.

64.     As set out below, Davydov used Practice Wiz and Billing Pros as a way to control the PC Defendants.

65.     At all relevant times, Davydov, individually and through Practice Wiz and/or Billing Pros, participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including their professional fees and profits.

66.     As part of this scheme, Davydov caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

67.     Davydov participated in the operation and management of the Epione and APAK enterprises by, among other things, (a) controlling and conducting Epione's and APAK's affairs, (b) causing Epione and APAK to seek and collect payments for non-compensable medical services, and (c) siphoning Epione's and APAK's professional fees and profits for his own personal use.

68.     Davydov also owns Wellmart.

69.     As alleged herein, Davydov exerted influence and control over prescribers such as Jacobi, Epione, and others by having them prescribe medically unnecessary drugs to Allstate Claimants.  Davydov also ensured that the prescriptions were funneled to Wellmart.

70.     Davydov caused Wellmart to aggressively seek and collect payments from Allstate under New York's No-Fault laws for these medically unnecessary drugs and medications.

71.     Davydov participated in the operation and management of the Wellmart enterprise by (a) owning Wellmart, (b) facilitating unlawful prescription arrangements between Wellmart and prescribers (including Jacobi and Epione), and (c) causing Wellmart to submit false and fraudulent No-Fault benefit claims to Allstate.

72.     Therefore, Davydov is responsible for the fraudulent and non-compensable medical services and pharmacy services that were billed to Allstate under New York's No-Fault law by Epione, APAK, and Wellmart.

### b. *Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov*

73.     Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov ("David") resides in and is a citizen of the State of New York.

74.     David does not hold a medical or chiropractic license, and is therefore not authorized to practice medicine or chiropractic in the State of New York.

75.     David maintains an ownership and/or controlling interest in Defendant IBS.

76.     As set out below, David used IBS as a way to control the PC Defendants.

77.     At all relevant times, David, individually and through IBS, participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including their professional fees and profits.

78.     As part of this scheme, David caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

79.     David participated in the operation and management of the Epione and APAK enterprises by, among other things, (a) controlling and conducting Epione's and APAK's affairs, (b) causing Epione and APAK to seek and collect payments for non-compensable medical services, and (c) siphoning Epione's and APAK's professional fees and profits for his own personal use.

80.     Therefore, David is responsible for the fraudulent and non-compensable services that were billed to Allstate under New York's No-Fault law by Epione and APAK.

### c. *Stella Raytsin*

81.     Stella Raytsin ("Raytsin") resides in and is a citizen of the State of New York.

82.     Raytsin does not hold a medical or chiropractic license, and is therefore not authorized to practice medicine or chiropractic in the State of New York.

83.     At all relevant times, Raytsin was employed by Epione as an administrator. Raytsin was also a technician for the range of motion testing that was billed for by Epione.

84.     During the relevant period, upon information and belief, Raytsin also was an employee of Defendant Billing Pros.

85.     Upon information and belief, Raytsin is married to Davydov.

86.     At all relevant times, Raytsin participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including their professional fees and profits.

87.     As part of this scheme, Raytsin caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

88.     In addition to participating in the fraudulent testing that was billed for by Epione, Raytsin also participated in the operation and management of the Epione and APAK enterprises by, among other things, (a) controlling and conducting Epione's and APAK's affairs, (b) causing Epione and APAK to seek and collect payments for non-compensable medical services, and (c) siphoning Epione's and APAK's professional fees and profits for her own personal use.

89.     Therefore, Raytsin is responsible for the fraudulent and non-compensable services that were billed to Allstate under New York's No-Fault law by Epione and APAK.

**d.**     *Elena Mumin-Akhunov*

90.     Elena Mumin-Akhunov ("Mumin-Akhunov") resides in and is a citizen of the State of New York.

91.     Mumin-Akhunov does not hold a medical or chiropractic license, and is therefore not authorized to practice medicine or chiropractic in the State of New York.

92.     Mumin-Akhunov is the owner of Defendant Billing Pros.

93.     As set out below, Mumin-Akhunov used Billing Pros as a way to control the PC Defendants.

94.     At all relevant times, Mumin-Akhunov, individually and through Billing Pros, participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including their professional fees and profits.

95.     As part of this scheme, Mumin-Akhunov caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

96.     Mumin-Akhunov participated in the operation and management of the Epione and APAK enterprises by, among other things, (a) controlling and conducting Epione's and APAK's affairs, (b) causing Epione and APAK to seek and collect payments for non-compensable medical services, and (c) siphoning Epione's and APAK's professional fees and profits for her own personal use.

97.     Therefore, Mumin-Akhunov is responsible for the fraudulent and non-compensable services that were billed to Allstate under New York's No-Fault law by Epione and APAK.

4.     **Management Companies**

a.     ***Practice Wiz, Inc.***

98.     Practice Wiz, Inc. ("Practice Wiz") is a domestic corporation organized under New York law.

99. Practice Wiz's principal place of business is located at 25 Horseshoe Lane, Roslyn Heights, New York 11577, which is a residential address used by Davydov and Raytsin during the relevant period.

100. Davydov is the President of Practice Wiz.

101. Practice Wiz was purposely organized by Davydov to provide, or purport to provide, certain "business consulting" services to APAK during the relevant period.

102. Davydov caused Practice Wiz to enter into a medical practice consulting agreement with APAK, which was designed to give Davydov control over APAK and its finances.

103. During the relevant period, Davydov knowingly used Practice Wiz to unlawfully operate and control APAK, and to share in the professional fees and profits collected by APAK.

104. During the relevant period, Practice Wiz also diverted funds to IBS for the benefit of David, including funds obtained through Practice Wiz's agreement and relationship with APAK.

### b. *MBCC Support Ltd. d/b/a Billing Pros*

105. MBCC Support Ltd. d/b/a Billing Pros ("Billing Pros") is a domestic corporation organized under New York law.

106. Billing Pros' principal place of business is located at 98-76 Queens Blvd, Suite 2H, Rego Park, New York 11374.

107. Billing Pros also provided services during the relevant period from the medical offices located at 218-08 Hempstead Avenue, 2nd Floor, Queens Village, New York 11429.

108. Mumin-Akhunov is the President of Billing Pros.

109. Davydov also maintains an ownership and/or controlling interest in Billing Pros.

110. Upon information and belief, Raytsin is a former employee of Billing Pros.

111.   Mumin-Akhunov and Davydov caused Epione and APAK to enter into billing service agreements with Billing Pros—agreements that were designed to give Mumin-Akhunov and Davydov control over Epione and APAK and their finances.

112.   During the relevant period, Mumin-Akhunov and Davydov knowingly used Billing Pros to unlawfully operate and control the PC Defendants, and to share in the professional fees and profits collected by the PC Defendants.

### c.     *Innovative Business Strategies, Inc.*

113.   Innovative Business Strategies, Inc. ("IBS") is a domestic business corporation organized under New York law.

114.   IBS's principal place of business is located at 229 Chrystie Street, Apt. PH 12, New York, New York 10002, which is a residential address used by David during the relevant period.

115.   David maintains an ownership and/or controlling interest in IBS.

116.   David caused Epione and APAK to enter into verbal agreements with IBS purportedly for the provision of marketing services, and these agreements were purposely structured to give David control over the operation and finances of Epione and APAK.

117.   During the relevant period, David knowingly used IBS to unlawfully operate and control the PC Defendants, and to share in the professional fees and profits collected by the PC Defendants.

### 5.     **Wellmart Defendants**

### a.     *Wellmart Rx, Inc.*

118.   Wellmart Rx, Inc. ("Wellmart") is a domestic business corporation organized under the laws of the State of New York.

119.     During the relevant period, Wellmart maintained its principal place of business at 219-13 Jamaica Avenue, Queens Village, New York 11428.

120.     Wellmart became a registered pharmacy in New York on October 9, 2015.

121.     As part of this scheme, Allstate Claimants were made to enter into assignment of benefit agreements with Wellmart, which gave Wellmart the right to seek payments directly from Allstate—payments that were funded using the Allstate Claimants' available No-Fault insurance coverage.

122.     Following the execution of these assignment of benefit agreements, Wellmart billed for medications that were purportedly dispensed to Allstate Claimants.

123.     The medications billed for by Wellmart were not medically necessary.

124.     Wellmart then sought and collected No-Fault benefit payments from Allstate in connection with overly inflated charges for prescription and over-the-counter medications.

125.     As alleged herein, Wellmart was never lawfully eligible to receive such No-Fault benefit payments from Allstate because of the Defendants' unlawful conduct.

**b.**     *Ruslan Nektalov a/k/a Russ Nekta*

126.     Ruslan Nektalov a/k/a Russ Nekta ("Nektalov") resides in and is a citizen of the State of New York.

127.     Nektalov was the Vice President and Secretary of Wellmart during the relevant period, according to the New York State Board of Pharmacy.

128.     Nektalov has also held himself out as the President of Wellmart during the relevant period.

129.     Nektalov controlled the day-to-day operations of Wellmart during the relevant period, including the handling of Wellmart's mail.

130. Nektalov was also involved in channeling prescriptions to Wellmart for fulfillment, including prescriptions written by or through Jacobi, Epione, and others.

131. Nektalov caused Wellmart to aggressively seek and collect payments from Allstate under New York's No-Fault laws for these medically unnecessary medications.

132. Nektalov participated in the operation and management of the Wellmart enterprise by (a) owning Wellmart, (b) facilitating unlawful prescription arrangements between Wellmart and prescribers (including Jacobi and Epione), and (c) causing Wellmart to submit false and fraudulent No-Fault benefit claims to Allstate.

133. Therefore, Nektalov is responsible for the fraudulent and non-compensable billing that Wellmart submitted to Allstate seeking payment under New York's No-Fault laws.

## III.   JURISDICTION AND VENUE

134. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

135. Supplemental jurisdiction over Allstate's state law claims is proper pursuant to 28 U.S.C. § 1367.

136. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

137. At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

138. The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

139. The allegations and causes of action set forth herein arise from (a) the Defendants' unlawful acts committed in the State of New York, and (b) the fraudulent and non-compensable billing that the Defendants generated and submitted from within the State of New York seeking payment under New York's No-Fault laws; therefore, there is no question that there exists a substantial relationship or connection between the State of New York, the transactions at issue, and Allstate's causes of action.

## IV. APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A. GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS

140. Allstate underwrites automobile insurance in the State of New York.

141. New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary medical services and pharmacy services.

142. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Allstate claimants.

143. Under the New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

144. "Basic economic loss" is defined to include "all necessary expenses" for medical services and pharmacy services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

145. No-Fault benefits include at least $50,000.00 per eligible person for reasonable expenses that are incurred for necessary medical services and pharmacy services.

146. A patient can assign his/her No-Fault benefits to medical providers and pharmacies.

147.     Pursuant to a duly executed assignment, medical providers and pharmacies may submit claims directly to an insurance company and receive payment for necessary medical or pharmacy services rendered, using the claim form required by the New York State Department of Financial Services f/k/a New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

148.     NF-3 forms are important documents in the insurance industry.  They certify that the provider's or pharmacy's request for payment is not materially false, misleading, or fraudulent.  11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

149.     Indeed, the NF-3 forms submitted by medical providers and pharmacies must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime…

N.Y. Ins. Law § 403(d).

150.     A medical provider or pharmacy makes a material misrepresentation when it submits an NF-3 form that either omits or misrepresents material information about its eligibility to seek or collect payment under New York's No-Fault laws.

151.     A medical provider's or pharmacy's omission or misrepresentation of material facts can take many forms, including false or misleading information about (a) the ownership of a PC seeking payment, (b) the identity of the actual provider of the service, or (c) the medications billed for by the pharmacy.

152.    A medical provider's representations about PC ownership and control are material because New York law requires that all professional medical service corporations be owned and controlled by appropriately licensed medical professionals. *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

153.    Additionally, a medical provider's representations about the actual provider of the billed-for services are material because, under New York law, a medical provider operating as a PC is only eligible for compensation if the billed-for services are provided by an owner or employee of the PC.

154.    Therefore, if a PC uses independent contractors, instead of employees, to provide medical services, then the PC is not eligible to seek or collect payment under New York's No-Fault laws.

155.    It also is a material misrepresentation to submit NF-3 forms for treatment, testing, and other services that: (a) are never provided; or (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided.

**B.      UNLAWFUL CONTROL OF PROFESSIONAL SERVICE CORPORATIONS**

156.    In New York, only a licensed physician may: (a) practice medicine; (b) own and control a PC authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable in this case—economic benefit from physician services.

157.    Likewise, under New York law, only licensed chiropractors may: (a) practice chiropractic; (b) own and control a PC organized to practice chiropractic; (c) employ and supervise other chiropractors; and (d) derive—absent statutory exceptions not applicable in this case— economic benefit from the delivery of chiropractic services.

158.   New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

159.   New York Business Corporation Law § 1504 provides that no professional service corporation ("PC") may render professional services except through individuals authorized by law to render such professional services.

160.   New York Business Corporation Law § 1507 prohibits a PC from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the PC is authorized to practice.

161.   Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a PC unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

162.   Under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

163.   Similarly, under Rule 29.1(b)(4) of the Board of Regents, chiropractors are prohibited from permitting any person to share in the fees for professional services, other than a partner, employee, associate in a professional firm or corporation, professional subcontractor or

consultant authorized to practice the same profession, or a legally authorized trainee practicing under the supervision of a licensed practitioner. 8 N.Y.C.R.R. § 29.1(b)(4).

164. Additionally, pursuant to New York Education Law § 6509-a, it is professional misconduct for chiropractors to engage in the division or sharing of professional fees with a person not licensed or otherwise authorized to practice chiropractic.

165. Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatment not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

166. Moreover, for a provider of medical services to be eligible to bill for and collect No-Fault benefit payments from an insurer pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault laws, a PC is not eligible to bill or collect for services that were rendered by persons who are not direct employees of the PC, such as independent contractors.

167. In New York, insurers are not precluded from seeking affirmative recovery against individuals and entities that have violated the above statutes and regulations.

168. In *State Farm Mutual Automobile Insurance Company v. Mallela*, 827 N.E.2d 758 (N.Y. 2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional medical services that are fraudulently incorporated under New York Business Corporations Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional medical services that

the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

169. When determining a medical provider's reimbursement eligibility under New York's No-Fault laws, insurers are allowed to "look beyond the face of licensing documents to identify willful and material failure to abide by state and local law," such as actual ownership of the practice by an unlicensed individual. *Mallela*, 827 N.E.2d at 761.

170. In a recent decision, the New York Court of Appeals made clear that *Mallela* does not require a finding of fraud for an insurer to withhold payments to a medical service corporation improperly controlled by non-physicians. *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 128 N.E.3d 153, 163 (N.Y. 2019) ("A corporate practice that shows 'willful and material failure to abide by' licensing and incorporation statutes may support a finding that the provider is not an eligible recipient of reimbursement under 11 N.Y.C.R.R. § 65-3.16(a)(12) without meeting the traditional elements of common-law fraud." (internal citation omitted)). Moreover, the Court of Appeals emphasized that the primary consideration in determining a PC's eligibility for No-Fault reimbursement was the "*[c]ontrol* of a professional corporation by nonprofessionals" as opposed to the nonprofessionals' improper fee splitting with the PC. *Id.* at 164 (emphasis added).

171. In the matter *Metroscan Imaging, P.C. v. GEICO Insurance Company*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), the court held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

172. Moreover, in terms of the fees charged by medical providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

173. The Fee Schedule is used by medical providers and insurers to determine the level of reimbursement payable on legitimate claims.

174. Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for…medical…surgical…prescription drug…physical therapy…[and] any other professional health services."

175. In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

176. Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault laws] and the workers' compensation law with respect to the charges for the professional health services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

177. As detailed below, the Defendants violated one or more of these New York statutes and regulations through the operation and management of the PC Defendants.

### D. REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER NEW YORK'S NO-FAULT LAWS

178. Compensation for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle encompasses all "necessary expenses" for medical services— including prescription medication.

179. The Fee Schedule applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq*.

180. In terms of charges submitted by pharmacies for brand name prescription drugs, 12 N.Y.C.R.R. § 440.5(a) states that a provider may charge no more than the Average Wholesale

Price ("AWP") for the national drug code ("NDC") for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

181. Under 12 N.Y.C.R.R. § 440.2(a), AWP means the average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed.

182. The NDC is a unique 10-digit, 3-segment numeric identifier assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged. Each NDC number has a corresponding AWP, which identifies the price.

183. For charges submitted by pharmacies for generic prescription drugs, 12 N.Y.C.R.R. § 440.5(a) states that a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

184. In terms of charges submitted by pharmacies for Compounded Products, 12 N.Y.C.R.R. §§ 440.5(a) and (d) states that the maximum amount that a provider may charge for medically necessary compounded medications is determined at the ingredient level.

185. For each brand name drug included in a Compounded Product, a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

186. For each generic drug included in a Compounded Product, a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

## E.    LAWS APPLICABLE TO COMPOUNDED PRODUCTS

187.   The United States Food and Drug Administration ("FDA") is authorized to oversee the safety of food, drugs, and cosmetics under the Federal Food, Drug, and Cosmetic Act ("FDCA").

188.   Used primarily for pain management, compounded medications contain either a single active drug in an inactive base or several active drugs.

189.   Compounded medications are prepared and dispensed by compounding pharmacies, which are registered by the New York State Department of Education, with limited FDA oversight.

190.   Under New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

191.   If any person, firm, corporation, or association is a "manufacturer" or "outsourcing facility" and seeks to register as such with the New York State Department of Education in the manner required by New York Education Law § 6808, then such person, firm, corporation, or association must also register with the FDA and be listed as a manufacturer or outsourcing facility on the FDA's website.

192.   Indeed, compounded drugs are generally not FDA approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process that applies to new drugs.

193. Moreover, compounded medications are not subject to the rigorous drug review process that all commercially available prescription drugs must undergo to demonstrate safety and effectiveness prior to receiving FDA approval.

194. Further, compounded medications generally do not have standardized dosages and duration for use, and the protocols for preparing each compound are not necessarily standardized.

195. For all of these reasons, compounded preparations are likely to have batch-to-batch variability, and their sterility and purity cannot be guaranteed.

196. In terms of compounded pain topical medications, such as those prepared and dispensed by Wellmart, these compounded medications have not been proven (with rare exceptions) to be more effective than commercially-available, manufactured drugs.

197. In fact, compounded pain topical medications have not been approved for safety and efficacy by the FDA.

198. However, under 21 U.S.C. § 353a, pharmacies may engage in compounding if the drug is compounded for an identified individual patient based on the receipt of a valid prescription or a notation, approved by the prescribing practitioner on the prescription order, that a compounded product is necessary for the identified patient.

199. When compounded pain topical medications meet these requirements of Section 353a and are compounded for an individual patient, they can be exempted from the requirement, among others, that they obtain FDA approval. *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [this section] is effective with respect to such drug.").

200. When Congress adopted this provision of the FDCA governing compounding, its express intent was to "ensure continued availability of compounded drug products as a component

of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.).

201. As Congress stated at the time, the "exemptions in [the section] are limited to compounding for an individual patient based on the medical need of such patient for the particular drug compound. To qualify for exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient." S. Rep. No. 105-43, at 67-68 (1997).

## V. FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

### A. HISTORY OF THE DEFENDANTS' FRAUDULENT ACTIVITY

202. The Defendants are no strangers to No-Fault fraud schemes.

203. Indeed, each of the Defendants have been active participants in various fraudulent schemes aimed at taking advantage of New York's No-Fault laws.

204. For instance, Davydov and David previously masterminded a scheme to defraud involving the illegal ownership and control of a medical PC, and the recruitment of a licensed physician to serve as the nominal owner of the PC. *Gov't Empls. Ins. Co., et al. v. Hollis Medical Care, P.C., et al.*, C.A. No. 1:10-cv-04341-ILG-RML (E.D.N.Y.).

205.    Additionally, Mostovoy previously confessed to criminal charges arising from his participation in a scheme to defraud No-Fault insurers, which involved bogus chiropratic treatment and billing for services not rendered in connection with a different facility located in Queens. *See State of New York v. Mostovoy*, Complaint No. 2010QN53300 (N.Y. Crim. Ct., Queens Cnty.).

206.    Unfortunately, Davydov, David, and Mostovoy were not deterred by their prior misconduct.

207.    Davydov hatched a new scheme shortly thereafter involving the illegal operation and control of the Queens Village Clinic.

208.    The Defendants' scheme was concealed but eventually discovered.

209.    The Defendants have already faced litigation in connection with their new scheme. *See Gov't Empls. Ins. Co., et al. v. Epione Medical, P.C., et al.*, C.A. No. 1:18-cv-03159-SJ-SJB (E.D.N.Y.) and *Gov't Empls. Ins. Co., et al. v. Wellmart Rx, Inc., et al.*, C.A. No. 1:19-cv-04414-KAM-RLM (E.D.N.Y.).

210.    The *Epione Medical* action warrants discussion given its factual similarities to this action.

211.    As alleged in *Epione Medical*, Davydov mastermined yet another scheme, this time involving the Queens Village Clinic.

212.    As alleged in *Epione Medical*, Davydov conspired with Raytsin and Mumin-Akhunov to illegally own, operate, and control the medical providers that operated from the Queens Village Clinic, including PCs that were nominally owned by Jacobi and Mostovoy.

213.    As alleged in *Epione Medical*, the PCs were illegally owned and controlled by laypersons, and were also caused to engage in medical billing fraud involving unnecessary, excessive, and falsely charged medical services.

214.    The *Wellmart* action also warrants discussion because it demonstrates how the Defendants were able to utilize their control of Jacobi to expand the boundaries of this scheme.

215.    As alleged in *Wellmart*, Davydov and his business partner, Nektalov, opened a pharmacy named Wellmart Rx, Inc. shortly after Jacobi and Epione were installed at the Queens Village Clinic.

216.    As alleged in *Wellmart*, Davydov and Nektalov utilized their control of and relationships with Jacobi and other physicians to generate bogus prescriptions and false billing for pharmacy claims involving Compounded Products, Diclofenac Sodium Gel 3%, and other drugs.

217.    As alleged in *Wellmart*, the Defendants created collusive arrangements between Wellmart and several prescribing providers, including Jacobi, which were intended to facilitate the channeling of formulaic and medically unnecessary prescriptions to Wellmart for fulfillment.

218.    As demonstrated by their prior history, Davydov and his co-defendants have proven that they will go to great lengths to bilk the New York No-Fault system by taking control of medical providers, and then using the facial validity of the providers' PCs to exploit patients by delivering bogus services and engaging in fraudulent billing.

219.    This scheme contains many of the same hallmarks as the Defendants' prior schemes, including illegal control of a medical facility and its providers, sham agreements designed to siphon money from the PC Defendants, and fraudulent billing for independent contractors and services that were never actually rendered.

220.    This action is intended to stop the Defendants' scheme in its tracks to prevent the infliction of further injury upon Allstate, injured persons, and the general public.

B.    **THE DEFENDANTS ARE ALL CONNECTED**

221.    The Defendants are connected in several ways.

222. This scheme was designed to make it appear that the PC Defendants and Wellmart were independent of each other even though they operated under the control of Davydov and the Manager Defendants.

223. Although formed to look like legitmate and independent entities, the reality is that Epione, APAK, and Wellmart were under common control, which can be established by looking behind the entities' public filings and agreements, and evaluating the way that they were operated.

### 1. The Queens Village Clinic

224. The Queens Village Clinic (the "Clinic") is located on the second floor of the structure located at 218-02–218-08 Hempstead Avenue, in Queens Village, New York.

225. The Defendants designed the Queens Village Clinic to make it appear, on paper, that Epione and APAK were operated independently.

226. APAK purported to operate from the second floor of 218-02 Hempstead Avenue, while Epione purported to operate from the second floor of 218-08 Hempstead Avenue.

227. The addresses of APAK and Epione—which were represented on the NF-3 invoices submitted to Allstate—were deliberately made different to create the appearance of separation even though there is no actual distinction between these office spaces.

228. According to Mostovoy, the providers, including Epione, at the Queens Village Clinic "occupy the whole second floor" and he is free to to use any part of this space.

229. The Clinic itself bears no indication of separate medical practices; in fact, the building bears nothing more than the phrase "Medical Practice," which is generically emblazoned across the exterior of the building:



230. The other part of the Clinic simply casts the facility as a "Multi-Specialty Physical Rehab & Pain Management" practice:



231.     There is nothing to differentiate between the providers operating at the Queens Village Clinic.

232.     Even the Clinic's patients are unsure who they treated with.

233.     Patients of the Queens Village Clinic are led to believe that all of the billed-for services (i.e., physician, chiropractic, acupuncture, orthopedic, and physical therapy services) are delivered through the same homogenous practice (i.e., Epione).

234.     Patients were evaluated by Jacobi, and given orders to undergo a variety of treatments at the Queens Village Clinic, yet they had no idea that the services were actually being billed by a series of different entities, such as Epione and APAK.

235.     Operating the Clinic using a different provider for each specific discipline allowed Davydov and the Manager Defendants to spread each patient's medical billing across several different companies, which enabled them to reduce the risk of exposure by having all the services billed under Epione.

## 2.     Uniform Operation of Epione and APAK

236.     The providers of the Queens Village Clinic operate as one practice under the same umbrella.

237.     For example, a now-defunct website for Epione previously advertised services offered at the Queens Village Clinic without specifically differentiating between any of the purportedly independent providers, including Mostovoy and APAK.

238.     Rather, this website, under the heading "Our Doctors," identified Jacobi, along with Mostovoy, an acupuncturist, and two surgeons, and created the appearance that all of these providers treated patients under the umbrella of Epione as one large multi-disciplinary practice.

239.     According to Jacobi, he "believe[d]" that the website was created "by the marketing people."

240. Jacobi admitted that Epione never provided chiropractic, acupuncture, or orthopedic services to patients despite the representations on the website; instead, these other services were offered by other providers operating at the Clinic.

241. Epione and APAK also share the same telephone number.

242. The NF-3 forms submitted to Allstate by Epione and APAK each identify their telephone number as 718-749-5308.

243. Indeed, according to Mostovoy, and the terms of the sublease agreement between Epione and APAK, APAK shares this telephone number with others and it is not "exclusive" to APAK.

244. Epione and APAK also share the same administrative personnel, which further demonstrates the lack of independence between them.

245. Epione and APAK also use the same management companies, including Billing Pros and IBS, which are owned and operated by one or more of the Manager Defendants.

246. Jacobi and Mostovoy had no meaningful choice in whether to retain the services of the Management Companies for the PC Defendants.

247. The PC Defendants were not independently operated and controlled by Jacobi and Mostovoy, but rather were unlawfully operated and controlled by Daydov and the Manager Defendants in furtherance of this scheme.

3. **Davydov's Control Over Providers Installed at the Queens Village Clinic**

248. Davydov is the ringleader of this scheme, and is the common link among the Defendants.

249. According to Jacobi, his wife was contacted by Raytsin (who is believed to be Davydov's wife) about an opportunity to join an existing medical practice at the Queens Village Clinic.

250. Jacobi testified that "they" were looking for a physician at the Queens Village Clinic because the previous physician treating patients at this location was terminally ill.

251. When asked to clarify who "they" were, Jacobi stated that it was non-party Khaled Ahmed Aaga, PT ("Aaga"), the leaseholder, who was looking to sublease space to a physician at the Queens Village Clinic.

252. Mostovoy also testified that Aaga, who then operated at the Queens Village Clinic through Imperial Rehab PT, P.C. ("Imperial Rehab"), offered him the opportunity to sublease space at the Queens Village Clinic.

253. Jacobi's and Mostovoy's testimony misrepresented material facts about Aaga and his control over the Queens Village Clinic; in fact, Aaga abruptly ended his association with the Queens Village Clinic, but the Clinic's operation was not impeded and Jacobi and Epione were installed as the tenant on the master lease.

254. Upon information and belief, Davydov and the other Manager Defendants operated and controlled the Queens Village Clinic and were the true owners of Imperial Rehab; Aaga was merely the nominal owner of Imperial Rehab, and he simply followed the directions given by Davydov.

255. Jacobi and Mostovoy were treated the same way when they joined the Queens Village Clinic—they were installed as the respective owners of Epione and APAK, but they ceded operational control of the PCs to Davydov, David, Raytsin, and Mumin-Akhunov.

256. As explained in further detail below, Davydov, David, Raytsin, and Mumin-Akhunov caused Epione and APAK to enter into sham agreements with the Management Companies, including Practice Wiz, IBS, and Billing Pros.

257. The Manager Defendants used these agreements—though ostensibly for the provision of certain services, such as marketing, consulting, and billing services—as a way to control the PC Defendants and siphon their professional fees and profits; indeed, the agreements projected a façade of legitimacy over the relationship between the PC Defendants and the Management Companies even though they actually enabled the Manager Defendants to take Epione's and APAK's income and convert it for their personal use.

258. Davydov also has a demonstrated connection or relationship with David, Raytsin, and Mumin-Akhunov.

259. As explained above, Davydov and David previously conspired to unlawfully operate and control a professional medical corporation (i.e., Hollis Medical Care, P.C.).

260. Therefore, it was a natural transition for Davydov to again team up with David in the course of exerting unlawful control over professional service corporations at the Queens Village Clinic, including Epione and APAK.

261. As noted above, Davydov is believed to be married to Raytsin, who has a history of serving as an administrator for providers operating at the Queens Village Clinic and who provides significant services to Epione.

262. Davydov participated in the operation and control of Billing Pros, of which Mumin-Akhunov is President, and which purported to provide services to both Epione and APAK during the relevant period.

263. According to Jacobi, Davydov was present at the Queens Village Clinic approximately once per month and "probably works for…Billing Pros."

264. This enabled Davydov to exert control over Jacobi and Epione, including the treatment of patients.

265. Specifically, Davydov, along with his business partner Nektalov, seized upon Davydov's ability to direct Jacobi, over whom Davydov exercised control, to write medically unnecessary and formulaic prescriptions for drugs and medications by establishing a licensed pharmacy (i.e., Wellmart) to fill these prescriptions and charge for the drugs and medications dispensed to Epione's patients.

266. To facilitate a steady exchange of prescriptions and drugs and medications between Wellmart and Epione, Davydov and Nektalov ensured that Wellmart was located just half a mile away from Epione's location at the Queens Village Clinic.

267. Indeed, Jacobi testified that Wellmart would deliver drugs and medications prescribed by him to the Queens Village Clinic to be picked up by the Epione patients at the front desk.

268. According to Allstate Claimants who were prescribed drugs and medications by Jacobi (or someone acting under his direction or control) at Epione, they uniformly were delivered with the drugs and medication dispensed by Wellmart by the Queens Village Clinic receptionist.

269. As explained in further detail below, the unlawful scheme spearheaded by Davydov through the Queens Village Clinic resulted in the submission of charges to Allstate for medically unnecessary treatment and services and medically unnecessary, unwanted, and ineffective drugs and medications.

270.   Davydov and his co-conspirators caused Jacobi, Mostovoy, Epione, APAK, and Wellmart to submit these false and fraudulent claims for No-Fault reimbursement to Allstate for the financial benefit of Davydov, Nektalov, David, Raytsin, and Mumin-Akhunov in violation of New York law.

## C.   UNLAWFUL OPERATION AND CONTROL OF THE PC DEFENDANTS

271.   New York's No-Fault system is designed to provide patients and medical providers with compensation for the provision of medical services, and is also designed to require prompt payment of claims.

272.   As a result, the submission of bills by medical service providers for facially valid services will often result in prompt payment from a No-Fault insurer.

273.   However, New York's No-Fault laws and enacting regulations are clear that providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet any New York State or local licensing requirement necessary to perform such service in New York.

274.   As explained below, the Defendants, throughout the course of this scheme, took advantage of New York's No-Fault system by (a) operating the PC Defendants in violation of one or more applicable New York state licensing requirements governing the provision of professional physician and chiropractic services, and (b) in certain instances, creating and submitting (or causing to be created and submitted) to Allstate false and fraudulent treatment records and invoices demanding payment for medical services.

### 1.    Unlawful Operation and Control of Epione Medical, P.C.

275.   Jacobi was recruited to join the Queens Village Clinic to replace its departing physical therapy provider (i.e., Aaga and Imperial Rehab).

40

276.    According to Jacobi, Raytsin contacted his wife about an opportunity to sublease space and begin treating patients.

277.    Jacobi joined the Clinic, entered into a subleasing agreement with Aaga and Imperial Rehab, and eventually was permitted to just "take over" the position of tenant on the master lease for the Queens Village Clinic—all without conducting any due diligence whatsoever.

278.    Jacobi incorporated Epione for the purpose of joining the Queens Village Clinic, and using Epione to bill for services purportedly provided to the Clinic's patients.

279.    Jacobi, through Epione, assumed a series of subleases that the departing provider (non-parties Aaga and Imperial Rehab) had entered into with other providers, including APAK.

280.    Again, Jacobi caused Epione to assume these subleases without conducting any due diligence whatsoever.

281.    The sham nature of the subleases is clear because several of the obligations assumed by Jacobi and Epione under the subleases make no sense.

282.    For example, the sublease between Epione and APAK requires Epione to provide administrative support employees even though Epione did not actually have any employees at that time.

283.    The subleases also required Epione to provide APAK and the Clinic's other subtenant providers with equipment even though Epione did not actually own any equipment when the subleases were signed.

284.    Raytsin's invitation to join the Queens Village Clinic provided Jacobi the opportunity to join a turnkey practice without having to invest any time, effort, or money in organizing a practice, acquiring equipment and personnel, generating referrals, and building a patient base.

285. Indeed, Jacobi incurred no meaningful start-up costs when forming Epione and joining the Queens Village Clinic.

286. All of the equipment used by Jacobi and Epione was already in place at the Clinic.

287. Jacobi was not required to purchase the departing provider's practice, yet he and Epione were still able to acquire, at little-to-no cost, the prior provider's patient base, telephone number, professional and administrative employees, lease and sublease agreements, and marketing and billing agreements.

288. In fact, Jacobi was unable produce any documents or provide any meaningful explanations about the transactions with the Clinic's departing provider when questioned.

289. All of the agreements were allegedly verbal, and Jacobi could not recall any specific details about the terms of the agreements or the amount(s) of any payment(s) exchanged with the Clinic's departing provider.

290. Overall, the Manager Defendants recruited Jacobi to join the Queens Village Clinic to simply take-over and continue the existing practice.

291. Epione was formed as a PC, and then used as a tool to allow the Manager Defendants to continue their unlawful operation and control of the Queens Village Clinic.

292. Indeed, Jacobi immediately absorbed all of the existing patients through Epione when he joined the Queens Village Clinic at the end of August 2014, as demonstrated by the following:

| Patient Initials | Claim No. | Last Date of Service with Imperial Rehab | First Date of Service with Epione |
|---|---|---|---|
| M.M. | 0329833627 | 8/27/2014 | 9/10/2014 |
| J.V. | 0333172492 | 8/27/2014 | 10/2/2014 |

| Patient Initials | Claim No. | Last Date of Service with Imperial Rehab | First Date of Service with Epione |
|---|---|---|---|
| M.V. | 0333172492 | 8/28/2014 | 9/11/2014 |
| R.P. | 0331529321 | 8/26/2014 | 9/15/2014 |
| T.M. | 0331529321 | 8/26/2014 | 9/15/2014 |
| D.H. | 0326899498 | 8/27/2014 | 9/11/2014 |
| S.G. | 0327591228 | 8/29/2014 | 9/10/2014 |
| D.C. | 0319194221 | 8/26/2014 | 9/2/2014 |

293. Epione also seamlessly adopted the outgoing provider's patient treatment and recordkeeping templates and protocols when the outgoing provider finally left the Clinic.

294. Epione also absorbed the departing provider's employees, such Raytsin.

295. According to Jacobi, Raytsin "helps [him] out in many ways" and manages "certain things" with respect to Epione— Raytsin has "experience" and "knows much more about the office and how the things and that go."

296. Raytsin also worked as a technician that provided range of motion testing to Epione patients.

297. Jacobi and Epione also inherited the departing provider's relationships and obligations with the Manager Defendants and their companies, including marketing and billing agreements with IBS and Billing Pros.

298. Jacobi testified that IBS performs marketing services for Epione, and that he "probably" learned of IBS from "other providers" at the Queens Village Clinic.

299. Jacobi identified the person that he worked with through IBS as Emik Davydov, who is also known as Emanuel David and Emanuel Davydov.

300.    Epione pays IBS $12,500 per month for marketing services pursuant to a verbal agreement, although Jacobi had difficulty recalling the exact amount paid for these services or the nature of the agreement between IBS and Epione.

301.    Jacobi also was unsure exactly what services IBS performed on behalf of Epione that would justify payments totaling the $150,000 per year in "marketing" fees paid to IBS.

302.    For instance, Jacobi generally stated that IBS advertised Epione to other physicians and attorneys through newspapers, the internet, and events.

303.    According to Jacobi, IBS performed such marketing services by "sponsor[ing] lunches, I guess."

304.    Jacobi could not explain IBS's functions further and referred all questions regarding details to David.

305.    Similarly, Jacobi also immediately entered into an agreement with Billing Pros on July 3, 2014 approximately one month after incorporating Epione on June 5, 2014.

306.    Despite having used Billing Pros continuously since the very beginning of Epione, Jacobi struggled to even remember the first name of the person with whom he negotiated the agreement and who purportedly performed services on behalf of Billing Pros at the Queens Village Clinic (i.e., Mumin-Akhunov).

307.    Billing Pros is located at the Queens Village Clinic, and subleases space at the Queens Village Clinic from Epione at a rate of $500 per month, including use of equipment and personnel.

308.    Additionally, Jacobi testified that Epione had never treated patients at any other location other than the Queens Village Clinic, and thus was clearly unaware that Epione actually

did submit charges for treatment purportedly provided to patients at another location at 92-08 Jamaica Avenue, Woodhaven, New York during the relevant period.

309. Overall, despite holding himself out as the sole owner of Epione, Jacobi's testimony displays nothing more than a superficial understanding of Epione's business operations and relationships with the Manager Defendants.

310. Thus, it is apparent that Jacobi was not the true owner of Epione, but, rather, a mere figure head of the Queens Village Clinic installed by the Manager Defendants to create the false impression that Jacobi was the sole shareholder of Epione, when, in actuality, the Manager Defendants assumed unlawful control over the operation and management of Epione, in part through sham agreements that the Manager Defendants induced Jacobi to enter into on behalf of Epione for marketing and billing services.

311. In addition to exerting unlawful control over Epione, the Manager Defendants also controlled the treatment of Epione's patients by requiring Jacobi and the other persons working for Epione to (a) order diagnostic tests that were not medically necessary, and (b) prescribe expensive medications to be dispensed by a pharmacy under Davydov's and Nektalov's ownership and control.

312. Indeed, many Epione patients were prescribed medications that they neither wanted or needed, and these prescriptions were purposely directed to, and purportedly dispensed by, Wellmart.

313. Upon information and belief, Davydov required that all, or nearly all, of Epione's patients be given prescriptions for these medications—regardless of want or medical need—with the intent that certain of the prescriptions be directed to, and purportedly dispensed by, Wellmart.

314.    As explained more fully below, Davydov specifically required the prescription of Compounded Products and Diclofenac Sodium 3% Gel because the prevailing Fee Schedule allowed the pharmacy to charge prices that far-exceeded the pharmacy's actual acquisition costs for these drugs and medications.

315.    Accordingly, there was a huge profit motive behind the indiscriminate prescribing and dispensing of these medications.

316.    Because Epione was owned and controlled by laypersons (i.e., Davydov, David, Raytsin, and Mumin-Akhunov) instead of by its supposed owner (i.e., Jacobi), Epione was operated in violation of New York law and was therefore ineligible to seek or collect No-Fault benefit payments under Insurance Law § 5102(a)(1).

### 2.    Unlawful Operation of APAK Chiropractic, P.C.

317.    Mostovoy was desperate to rebuild his failed chiropractic practice before he started working at the Queens Village Clinic.

318.    Mostovoy was previously criminally charged with providing and billing for medically unnecessary chiropractic treatment to patients, as well as billing for treatment that was never provided.

319.    Mostovoy jumped at the chance to join the Queens Village Clinic when given the opportunity to sublease space from the Clinic's then-primary provider—non-party Aaga.

320.    Mostovoy and Aaga completed the transaction without doing any due diligence whatsoever—Mostovoy simply accepted the deal because it "sounded reasonable."

321.    The sublease enabled Mostovoy to begin operating APAK immediately because all of the equipment was already installed.

322. Even though Mostovoy formed APAK before entering the sublease, he ceded control of APAK once he joined the Queens Village Clinic.

323. Mostovoy had previously established a patient base through APAK, but none of the patients followed him to the Queens Village Clinic.

324. Instead, Mostovoy provided chiropractic services to the Clinic's patients, and the services were billed under APAK.

325. Mostovoy and APAK stopped having their own patients once they began operating at the Queens Village Clinic.

326. Mostovoy also lost control over APAK's revenue and finances once he began operating at the Queens Village Clinic.

327. Mostovoy immediately entered into a series of agreements that were structured between APAK and several entities owned by Davydov, David, and Mumin-Akhunov.

328. For example, Mostovoy caused APAK to enter into a verbal marketing "agreement" with a company named IBS despite not knowing anything about the company, including the full name of its owner (Defendant Emanuel Davydov, who is also known as "Emik Davydov" and "Emanuel David"):

```
13        Q.    Who is your marketing company?

14        A.    It's called IBS.

15        Q.    What does that stand for?

16        A.    I have no idea.

17        Q.    Who is the owner of IBS?

18        A.    His name is Emmanuel.

19        Q.    That is it?

20        A.    I don't know his last name.

21        Q.    How long has IBS been marketing
22   for you?

23        A.    Since the beginning.
```

329.   Mostovoy and APAK paid IBS $9,500 every month for "marketing" services; however, when questioned, Mostovoy gave a non-specific response when asked to describe the goods and services provided to APAK by IBS in exchange for those payments:

```
 1                    MOSTOVOY
 2        Q.    What services do they provide?
 3        A.    They market to doctors and
 4   lawyers.
 5        Q.    What's the nature of how they
 6   market?
 7        A.    You have to ask them.
 8        Q.    You're not aware of what they
 9   do?
10        A.    I am aware they do fliers and
11   pamphlets, and go and speak and market my
12   business.  I am getting a lot of clients
13   from this company; from them, from their
14   services.
```

330.   The agreement between APAK and IBS was a sham—it existed only to disguise the Manager Defendants' siphoning of money from APAK.

331.   Mostovoy also caused APAK to transact with another company owned by David named Web Pro Services Inc ("Web Pro").

332.   Mostovoy supposedly hired David to create a website, which was located at www.chirotreat.com.

333.   David purportedly created the website under an arrangement between APAK and Web Pro.

334.   The website was paid for by Mostovovy and APAK, but it never mentions APAK by name.

335.   The website also points users to an e-mail address that Mostovoy "didn't use much."

336.   Mostovoy and APAK had no control over the website, yet APAK paid Web Pro $3,750 per month for website maintenance.

337.   The provision of website services to APAK was a phony cover to disguise the Manager Defendants' siphoning of money from APAK.

338.   APAK's agreements were not limited to companies owned by David.

339.   Mostovoy also developed a relationship with Davydov when he joined the Queens Village Clinic:

```
1                   MOSTOVOY
2         A.    I have a practice consultant
3    called Practice Wiz.  His name is Simon
4    Davidoff.
5         Q.    Can you specify what they do?
6         A.    He is my business coach.  He is
7    my consultant.
```

340.   Mostovoy and Davydov entered an agreement obligating APAK to pay Practice Wiz $8,000 each month for business coaching and administration.

341.   This agreement gave Davydov—under the guise of "business coach"—total control over APAK's business operations, including its billing, collection, and finances.

342.   Mostovoy also had APAK enter into a billing agreement with Billing Pros when he joined the Queens Village Clinic.

343.   Billing Pros was owned by Defendant Mumin-Akhunov.

344. Mostovoy was introduced to Billing Pros by Aaga when he began practicing at the Queens Village Clinic.

345. Mostovoy never searched for any other billing companies before entering the APAK-Billing Pros agreement.

346. APAK was forced to pay Billing Pros between $4,000 and $5,000 per month for billing services.

347. The APAK-Billing Pros agreement was designed as another way for the Manager Defendants to extract money from APAK.

348. For example, on average, approximately 14% of the monthly fee paid by APAK was for the use of billing software used by Billing Pros.

349. The software fee was a sham charge, especially where Epione also paid Billing Pros the same fee—sometime twice each month—to use the same billing software.

350. APAK was controlled by laypersons (i.e., Davydov, David, and Mumin-Akhunov) instead of by its supposed owner (i.e., Mostovoy) during the entire relevant period.

351. Accordingly, APAK was operated in violation of New York law, and was therefore ineligible to seek or collect No-Fault benefit payments under Insurance Law § 5102(a)(1).

**D. FRAUDULENT BILLING FOR SERVICES PROVIDED BY INDEPENDENT CONTRACTORS**

352. The Defendants engaged in unlawful billing by materially misrepresenting the employment relationship between the PC Defendants and the persons listed as the "treating provider" on the PC Defendants' bills.

353. The PC Defendants are only eligible for reimbursement under New York's No-Fault laws if the billed-for services are provided by an owner or employee of the company.

354. Under New York's No-Fault laws, a provider is not eligible to receive No-Fault reimbursement if it uses independent contractors, instead of employees, to provide medical services. *See* DOI Opinion Letters, annexed hereto as Exhibit 1.

355. APAK and Epione billed Allstate for services purportedly provided by independent contractors.

356. For example, Jacobi admits that he retains a professional staffing agency to provide licensed personnel for Epione.

357. The providers are employed by the staffing agency, not Epione.

358. However, Epione's NF-3 forms materially misrepresent the employment status of these providers.

359. The following chart lists representative examples of fraudulent NF-3 forms that Epione submitted to Allstate through the U.S. Mail in furtherance of this scheme:

| Claimant | Claim No. | Date of Service | Physical Therapist | Identified as Employee on NF-3 | Amount Paid by Allstate |
|----------|-----------|-----------------|--------------------|--------------------------------|-------------------------|
| L.P. | 0410414296 | 5/20/2016 | David Salib, PT | Yes | $50.70 |
| V.B. | 0418556445 | 9/6/2016 | Sujeong Gong, PT | Yes | $67.60 |
| J.D. | 0426548251 | 9/19/2016 | Nancy Zaghloul Zakaria Sadek, PT | Yes | $42.51 |
| J.D. | 0426548251 | 9/21/2016 | Nancy Zaghloul Zakaria Sadek, PT | Yes | $42.51 |
| J.D. | 0426548251 | 9/26/2016 | Nancy Zaghloul Zakaria Sadek, PT | Yes | $67.60 |
| J.D. | 0426548251 | 10/3/2016 | Nancy Zaghloul | Yes | $67.60 |

| Claimant | Claim No. | Date of Service | Physical Therapist | Identified as Employee on NF-3 | Amount Paid by Allstate |
|---|---|---|---|---|---|
| | | | Zakaria Sadek, PT | | |
| J.D. | 0426548251 | 10/6/2016 | Nancy Zaghloul Zakaria Sadek, PT | Yes | $67.60 |
| J.D. | 0426548251 | 10/7/2016 | Nancy Zaghloul Zakaria Sadek, PT | Yes | $67.60 |
| J.D. | 0426548251 | 10/10/2016 | Nancy Zaghloul Zakaria Sadek, PT | Yes | $67.60 |
| T.P. | 0472694504 | 8/21/2017 | Rhea A. Cabrera, PT | Yes | $38.73 |
| T.P. | 0472694504 | 8/22/2017 | Rhea A. Cabrera, PT | Yes | $61.60 |
| T.P. | 0472694504 | 8/24/2017 | Rhea A. Cabrera, PT | Yes | $61.60 |
| T.P. | 0472694504 | 8/28/2017 | Rhea A. Cabrera, PT | Yes | $61.60 |
| T.P. | 0472694504 | 8/30/2017 | Rhea A. Cabrera, PT | Yes | $61.60 |
| T.P. | 0472694504 | 8/31/2017 | Rhea A. Cabrera, PT | Yes | $61.60 |
| C.L. | 0500106331 | 6/25/2018 | Ali S. Ismail, PT | Yes | $67.60 |
| G.M. | 0506381474 | 6/27/2018 | Ali S. Ismail, PT | Yes | $67.60 |
| G.M. | 0506381474 | 8/6/2018 | Han Na Yoo, PT | Yes | $67.60 |
| G.M. | 0506381474 | 8/7/2018 | Han Na Yoo, PT | Yes | $67.60 |
| N.G. | 0513708818 | 10/17/2018 | Elbert Castaneda, PT | Yes | $67.60 |

360.     Likewise, Mostovoy also admits that he retained non-employee providers for APAK during the relevant period:

```
20                          Does
21   Apak Chiropractic have any employees?
22        A.    No.
23        Q.    It has never employed any
24   chiropractors?
25        A.    As subcontracts.
```

\*\*\*

```
10        Q.    You said you may subcontract
11   someone if you want to miss a day of work?
12        A.    I go to a website called
13   NYCC.edu.  It's an employment site where
14   chiropractors post ads.
```

\*\*\*

```
24        Q.    How would you pay that person?
25        A.    Pay them with 1099.
```

361.    APAK has no employees, as admitted by Mostovoy.

362.    However, APAK submitted NF-3 forms to Allstate that materially misrepresented

the treating provider:

363.    APAK's NF-3 forms are false and misleading because none of these other treating

chiropractors were employed by APAK during the relevant period.

364.    Instead, the treating chiropractors were either independent contractors, or

employees of other companies.

365.    The following chart lists representative examples of fraudulent NF-3 forms that

APAK submitted to Allstate through the U.S. Mail in furtherance of this scheme:

| Claimant | Claim No. | Date of Service | Name of Treating Chiropractor | Identified as Employee on NF-3 | Amount Paid by Allstate |
|---|---|---|---|---|---|
| M.W. | 0439413329 | 1/8/2017 | Glenn Whitney, DC | Yes | $34.68 |
| G.W. | 0483594024 | 12/3/2017 | Glenn Whitney, DC | Yes | $43.11 |
| G.W. | 0483594024 | 2/18/2018 | Glenn Whitney, DC | Yes | $43.11 |
| C.L. | 0500106331 | 5/13/2018 | Glenn Whitney, DC | Yes | $34.68 |
| C.L. | 0500106331 | 5/6/2018 | Glenn Whitney, DC | Yes | $34.68 |
| C.L. | 0500106331 | 6/10/2018 | Glenn Whitney, DC | Yes | $34.68 |
| C.L. | 0500106331 | 7/27/2018 | Nirvana Seepurshad, DC | Yes | $46.24 |

| Claimant | Claim No. | Date of Service | Name of Treating Chiropractor | Identified as Employee on NF-3 | Amount Paid by Allstate |
|---|---|---|---|---|---|
| C.L. | 0500106331 | 7/16/2018 | Nirvana Seepurshad, DC | Yes | $46.24 |
| C.L. | 0500106331 | 7/1/2018 | Glenn Whitney, DC | Yes | $46.24 |
| G.M. | 0506381474 | 7/19/2018 | Nirvana Seepurshad, DC | Yes | $41.04 |
| G.M. | 0506381474 | 7/17/2018 | Nirvana Seepurshad, DC | Yes | $41.04 |
| K.M. | 0525340410 | 2/15/2019 | Patricia Lindor, DC | Yes | $46.24 |
| K.M. | 0525340410 | 2/18/2019 | Patricia Lindor, DC | Yes | $46.24 |
| K.M. | 0525340410 | 2/19/2019 | Patricia Lindor, DC | Yes | $46.24 |
| S.F. | 0531553857 | 2/15/2019 | Patricia Lindor, DC | Yes | $46.24 |
| S.F. | 0531553857 | 2/19/2019 | Patricia Lindor, DC | Yes | $46.24 |
| S.F. | 0531553857 | 2/20/2019 | Patricia Lindor, DC | Yes | $46.24 |
| S.F. | 0531553857 | 2/21/2019 | Patricia Lindor, DC | Yes | $46.24 |
| S.R. | 0531553857 | 2/15/2019 | Patricia Lindor, DC | Yes | $26.41 |
| S.R. | 0531553857 | 2/19/2019 | Patricia Lindor, DC | Yes | $26.41 |
| S.R. | 0531553857 | 2/20/2019 | Patricia Lindor, DC | Yes | $26.41 |
| S.R. | 0531553857 | 2/21/2019 | Patricia Lindor, DC | Yes | $26.41 |

366.     To be eligible for payment under New York's No-Fault laws, a professional service entity must be the actual provider of the service, meaning that the services must be delivered by an owner or employee of the entity.

367.     If the professional service entity retains a provider as an independent contractor rather than an employee and that contracted provider renders services to patients, then the

professional service entity is not permitted to seek payments under New York's No-Fault laws for the services rendered by the contracted provider.

368. The prohibition on reimbursement for services rendered by independent contractors arises from the fact that employees are under the supervision and control of their employer, while independent contractors are not.

369. Epione and APAK were not eligible to seek No-Fault benefit payments for services provided, or purportedly provided, by physical therapists or chiropractors who were not employees of Epione or APAK during the relevant period.

370. To the extent that Allstate paid Epione and APAK in reliance on the documents created and submitted in connection with physical therapy and chiropractic services actually provided by individuals who were not an owner or employee of Epione or APAK, Allstate is entitled to recover all payments made to Epione and APAK in connection with these services.

371. To the extent that any of the charges submitted by Epione and APAK in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Epione's and APAK's charges for services rendered by independent contractors are not compensable under New York's No-Fault laws.

E. UNLAWFUL OPERATION OF WELLMART

372. Davydov used Wellmart to broaden this scheme.

373. Davydov partnered with Nektalov and opened Wellmart in a storefront located just a half-mile from the Queens Village Clinic.

374. Davydov used his relationships with and control over physicians like Jacobi to generate a substantial volume of bogus prescriptions that could be channeled to and dispensed by Wellmart.

375. Nektalov was in charge of managing the day-to-day operations of Wellmart, while Davydov tended to controlling Jacobi and the Queens Village Clinic, and cultivating relationships with other prescribers.

376. Jacobi and the other prescribers were directed to prescribe prescription drugs to their patients, including topical compounded pain medications, diclofenac sodium gel, and pain patches.

377. Jacobi and the other prescribers were directed to channel their prescriptions to Wellmart to be dispensed.

378. The medications were not medically necessary; instead, the prescriptions were generated to enrich Davydov and Nektalov through the No-Fault billing that Wellmart was able to submit for dispensing the medications.

379. Patients were not given a chance to choose their own pharmacy.

380. Instead, Wellmart delivered the medications directly to the Queens Village Clinic, where they were dispensed to patients from the receptionist's desk.

381. Upon information and belief, the patients were never offered an option of where to fill their prescriptions, thus ensuring that Wellmart could bill for as many of the prescription drugs and medications purportedly delivered to these patients as possible.

382. In cases where a peer-review report or IME performed at the request of Allstate refuted the medical necessity of the drugs and medications dispensed by Wellmart to Allstate Claimants, Wellmart also submitted peer-review rebuttals and IME rebuttals in support of the prescription drugs and medications, including Compounded Products, that were purportedly dispensed and delivered by Wellmart.

383.     Peer-review rebuttals and IME rebuttals are sometimes submitted by a provider to establish or explain the merits of a claim.

384.     In many cases, Wellmart submitted these letters in support of actions filed against Allstate to collect payment for medical services, including the drugs and medications purportedly dispensed by Wellmart.

385.     In this case, Allstate received several peer-review rebuttals and IME rebuttals purportedly authored by the prescribing providers, including Defendant Jacobi.

386.     The rebuttal letters were false and fraudulent because they materially misrepresented the medical necessity of the billed-for drugs and medications.

387.     Additionally, despite purportedly being authored by individual providers regarding distinct patients, including Jacobi, many of these rebuttal letters contained striking similarities, including sharing verbatim language and references.

388.     For example, Jacobi purported to author a rebuttal dated January 19, 2018 to a peer review performed regarding Compound 220N prescribed by Jacobi (and billed to Allstate by Wellmart) for Epione patient and Allstate Claimant R.R. (claim no. 0417691193).

389.     However, this rebuttal bearing Jacobi's letterhead and signature also shares significant portions of its language with other rebuttal letters submitted in support of drugs and medications purportedly dispensed by Wellmart and purportedly authored by different providers regarding entirely different patients as set forth in the chart below:

| Claimant Initials | Claim No. | Author of Rebuttal | Date of Rebuttal |
|---|---|---|---|
| J.M. | 0460765654 | Leonid Shapiro, M.D. | 2/18/2020 |
| G.F. | 0482028768 | Leonid Shapiro, M.D. | 10/30/2019 |
| K.P. | 0484200894 | Leonid Shapiro, M.D. | 10/31/2019 |

| Claimant Initials | Claim No. | Author of Rebuttal | Date of Rebuttal |
|---|---|---|---|
| A.Q. | 0474386232 | Leonid Shapiro, M.D. | 10/30/2019 |
| A.L. | 0404633323 | Leonid Shapiro, M.D. | 2/17/2020 |
| B.M. | 0442628665 | Pervez Qureshi, M.D. | 9/9/2019 |
| D.G. | 0439620104 | Pervez Qureshi, M.D. | 6/29/2019 |
| D.N. | 0437661985 | Pervez Qureshi, M.D. | 12/20/2018 |
| E.B. | 0441245973 | Denny Rodriguez, M.D. | 9/18/2018 |
| M.S. | 0452106826 | Pervez Qureshi, M.D. | 11/15/2018 |
| S.P. | 0439620104 | Pervez Qureshi, M.D. | 9/13/2019 |
| M.B. | 0428149974 | Pervez Qureshi, M.D. | 6/30/2018 |
| R.B. | 0418787271 | Marvin Moy, M.D. | 7/13/2018 |

390.     Moreover, the January 19, 2018 rebuttal letter purportedly authored by Jacobi shared the exact same references as listed in each of the rebuttals purportedly authored by non-party Leonid Shapiro, M.D. that are listed in the above chart.

391.     Similarly, Jacobi purported to author another rebuttal letter dated September 11, 2019 regarding Compound 220N and ibuprofen tablets prescribed by Jacobi (and billed to Allstate by Wellmart) for Epione patient and Allstate Claimant L.L. (claim no. 0437939846).

392.     This rebuttal letter, however, shares additional significant language with a representative sample of other rebuttal letters submitted in support of drugs and medications purportedly dispensed by Wellmart and purportedly written by different providers regarding entirely different patients as set forth in the chart below:

| Claimant Initials | Claim No. | Author of Rebuttal | Date of Rebuttal |
|---|---|---|---|
| B.M. | 0442628665 | Pervez Qureshi, M.D. | 9/9/2019 |
| S.P. | 0439620104 | Pervez Qureshi, M.D. | 9/13/2019 |
| E.B. | 0441245973 | Denny Rodriguez, M.D. | 9/18/2018 |
| R.B. | 0418787271 | Marvin Moy, M.D. | 7/13/2018 |
| D.N. | 0437661985 | Pervez Qureshi, M.D. | 12/20/2018 |
| D.G. | 0439620104 | Pervez Qureshi, M.D. | 6/29/2019 |

393.    The existence of identical shared language and citations contained in the rebuttal letters across a range of providers further demonstrates the collusive connections among Wellmart, Davydov, Nektalov, and prescribing providers, including Jacobi, including actions taken by them to collect No-Fault benefit payments from Allstate.

394.    Throughout the course of this scheme, Allstate was caused to make payments to Wellmart for medications that were not medically necessary and therefore not compensable under New York's No-Fault laws.

395.    The Defendants caused Allstate to make payments to Wellmart knowing that the charges for such items were not compensable under New York law.

396.    Overall, Wellmart was never eligible to seek or collect payments from Allstate under New York's No-Fault laws because, as explained in further detail below, the pharmacy services were (a) not medically necessary, (b) prescribed pursuant to a predetermined protocol of treatment, and (c) the product of collusive and unlawful arrangements for the purpose of increasing profits.

### F.  FRAUDULENT PHARMACY SERVICES

#### 1.  Predetermined Protocol of Drugs and Medications

397.    To facilitate the prescriptions for drugs and medications to be dispensed, and billed for, by Wellmart—specifically, drugs and medications that would stand to net Davydov and Nektalov the maximum in No-Fault reimbursement—Davydov designed a predetermined protocol of drugs and medications that he induced prescribing providers, including Jacobi, to follow when prescribing drugs and medications to patients, including Allstate Claimants.

398.    To maximize their potential reimbursement, Davydov and Nektalov incorporated the most lucrative drugs and medications into this predetermined protocol, including Compounded Products, topical pain patches, and Diclofenac Sodium Gel 3%, even though these drugs and medications do not have any documented scientific or clinical efficacy in the treatment of the conditions from which the Allstate Claimants purportedly receiving these drugs and medications suffered.

399.    Indeed, one non-party physician who was caused to prescribe medically unnecessary Compounded Products and Diclofenac Sodium Gel 3% as a condition of her employment at a non-party clinic "on a protocol basis" stated in a sworn statement that she "was shocked to learn" of the exorbitant amounts that Wellmart charged for these drugs and medications that she prescribed.

400.    This physician further stated in her sworn statement that she never even personally wrote the prescriptions, but rather merely was required to sign pre-printed forms prepared by the clinic staff—or even blank forms—for various patients at the end of each of her shifts.

401.    Wellmart limited prescribing providers to certain predetermined drugs and medications, including topical gels, creams, and lotions, topical pain patches, and NSAIDs, regardless of whether patients needed, or even wanted, these drugs and medications.

402.    For example, Wellmart frequently produced and dispensed Compounded Products named "Compound 218N," "Compound 220G," "Compound 220N," "Compound 220W," and "Compound 220Y" to various patients based on formulas set forth in pre-printed prescription forms or pre-printed stamps or labels provided by Wellmart to prescribing providers.

403.    These Compounded Products were illegal.  All of them were produced using a predetermined formula, which required the use of specific drugs in preformulated amounts.

404.    Legitimate compounding involves creating medications using unique mixtures of drugs, which are specifically formulated to meet the individualized needs of the patient.

405.    There was nothing unique about the Compounded Products offered by Wellmart.

406.    The Compounded Products were branded with specific names, and each one contained a specific, predetermined mixture of drugs, as illustrated by the following:

| Compounded Product | Ingredients - Quantity |
|---|---|
| Compound 218N | Ketoprofen – 20 grams<br>Baclofen – 2 grams<br>Lidocaine – 2.5 grams<br>Cyclobenzaprine – 2 grams<br>Ibuprofen – 20 grams<br>Ethoxy Diglycol Liquid – 17.5 grams<br>Gabapentin – 6 grams<br>Pentravan Cream – 50 grams |
| Compound 220G | Flurbiprofen – 31 grams<br>Baclofen – 5 grams<br>Lidocaine – 6 grams<br>Cyclobenzaprine – 2 grams<br>Ethoxy Diglycol Liquid – 18 mL<br>Pentravan Cream – 58 grams |

| Compounded Product | Ingredients - Quantity |
|---|---|
| Compound 220N | Ketoprofen – 40 grams<br>Baclofen – 2 grams<br>Lidocaine – 2.5 grams<br>Cyclobenzaprine – 2 grams<br>Ethoxy Diglycol Liquid – 17 mL<br>Gabapentin – 6 grams<br>Pentravan Cream – 50 grams |
| Compound 220W | Flurbiprofen – 20 grams<br>Baclofen – 4 grams<br>Lidocaine – 5 grams<br>Gabapentin – 6 grams<br>Cyclobenzaprine – 2 grams<br>Ethoxy Diglycol Liquid – 15 mL<br>Pentravan Cream – 48 grams |
| Compound 220Y | Ketoprofen – 60 grams<br>Baclofen – 3 grams<br>Lidocaine – 3.75 grams<br>Cyclobenzaprine – 3 grams<br>Gabapentin – 9 grams<br>Ethoxy Diglycol Liquid – 26.25 mL<br>Pentravan Cream – 75 grams |

407.     As explained below, however, these Compounded Products billed to Allstate by Wellmart were not medically necessary and were not uniquely tailored for the needs of individual patients.

### 2.     Medically Worthless Compounded Products

408.     Licensed pharmacists or licensed physicians create compounded drugs by combining, mixing, or altering drug ingredients.

409.     In limited circumstances, a patient may require compounded drugs when commercially available drugs cannot meet that patient's specific clinical needs.

410. Thus, if deployed responsibly, compounded drugs may, in albeit limited circumstances, play a useful role in patient treatment.

411. However, the over prescribing and excessive misuse and abuse of compounded drugs carry several significant risks relating to safety, efficacy, and cost.

412. Compounded drugs are not FDA-approved, meaning that the FDA has not evaluated these products for safety, effectiveness, and quality before they are provided to patients.

413. Safety-wise, most compounded drugs are exempt from the FDA's new drug approval process, current good manufacturing practices, and other FDA requirements.

414. Further, many of the Compounded Products purportedly created and dispensed by Wellmart were clinically ineffective and unwarranted, mostly because the patient had no legitimate clinical need for the Compounded Product, or because the Compounded Product contained a combination of ingredients that were clinically ineffective in their combined form.

415. To be exempt from FDA oversight, the drugs must be compounded by a licensed pharmacist or physician for an identified individual patient, based on the receipt of a valid prescription.

416. Also, compounded drugs that are essentially copies of commercially available drug products and compounded regularly or in large amounts are not exempt from FDA regulations.

417. The restrictions on making drugs that are essentially copies of existing commercially available products ensures that patients are not unnecessarily exposed to drug products that have not been shown to be safe and effective and that may have been prepared under substandard manufacturing conditions.

418. The restrictions on compounded drugs also protect patients from the potential high expense of these specialized products.

419.     The Compounded Products purportedly prepared and dispensed by Wellmart often contained a combination of drugs, each of which was commercially available on its own.

420.     If prescribed separately in their commercially available forms, the total combined cost of the drugs would be low-to-moderate, especially because all of the drugs are available in generic form.

421.     However, with respect to the compounded topical creams and gels purportedly prepared and dispensed by Wellmart, the total combined cost of the drugs in a topical form was significantly higher.

422.     Indeed, all of the Compounded Products contain very expensive chemical ingredients for which no scientific proof exists on the extent of topical absorption and clinical efficacy.

423.     As a result, Davydov and Nektalov, in collusion with prescribing providers, including Jacobi, manipulated patients for their own financial gain by taking advantage of their patients' finite available No-Fault benefits through the prescription of, and billing for, expensive Compounded Products that were not needed and not effective.

a.     ***No Clinical Basis for Compounded Products***

424.     Davydov and Nektalov assigned specific names to the Compounded Products offered by Wellmart: Compound Rx 218N, Compound 220G, Compound 220N, Compound 220W, and Compound 220Y.

425.     Many of the drugs listed in the formulas for these Compounded Products are unproven and ineffective in treating the conditions for which they are prescribed.

426.     There are no published, peer-reviewed, controlled studies showing the effectiveness of the drug mixtures contained in the Compounded Products.

427.     In the case of some Compounded Products, there are no scientific findings showing that the drugs are capable of being absorbed, and if so, to what extent.

428.     Therefore, Compounded Products have little-to-no efficacy in treating pain caused by radiculopathy or deep joint injuries because the ingredients are not proven to even reach the affected joint or tissue.

429.     There is no scientific or clinical evidence (or FDA-approval) for the use of these ingredients, with only a few exceptions, when applied topically for pain treatment.

430.     Even if there were support for the efficacy of some ingredients used by Wellmart, there would be no legitimate basis for the combination of drugs that Wellmart put into each of its Compounded Products.

431.     Additionally, Wellmart's Compounded Products are not even necessary in the first place because there are other widely accepted and effective FDA-approved alternatives with well-documented therapeutic benefits available at a considerably lower cost.

432.     Most of the drugs contained in Wellmart's Compounded Products are available in oral formulations, while others are commercially available in different topical formulations. Indeed, there are multiple other options available from similar and related classes of drugs.

433.     Some of these alternatives have abundant and high quality evidence supporting their effectiveness for patients with musculoskeletal pain and neuropathies, are widely used among practitioners treating these conditions, and are FDA approved.

### b.     *No Unique Tailoring of Compounded Products*

434.     Compounded Products must be formulated for individual patients based upon the receipt of a valid prescription for an identified individual patient, or a notation on a prescription that a compounded product is necessary for the identified patient.  *See* 21 U.S.C. § 353a.

435. However, the Compounded Products prescribed to Allstate Claimants, and then purportedly dispensed and delivered by Wellmart, were never tailored to each claimant's unique needs, and were never necessary to address the claimant's alleged accident-related conditions.

436. The prescriptions for the Compounded Products were also not valid for several reasons.

437. First, legitimate compounded topical drugs should never be prescribed according to predetermined formulas in which the type and quantity of the drugs included never change from patient to patient.

438. Additionally, legitimate prescriptions for compounded topical drugs should not be generated by prescribers utilizing pre-set stamps or labels that recite the pharmacy's predetermined formula, especially when the stamps or labels are created by the dispensing pharmacy.

439. However, in many instances, prescribing providers prescribed Wellmart's Compounded Products—among other drugs and medications, including Diclofenac Sodium Gel 3%—using a form supplied by Wellmart.

440. Indeed, Wellmart provided the prescribers with a pre-printed, predetermined menu of Compounded Products, including Compound 220G, Compound 220N, Compound 220W, and Compound 220Y.

441. Likewise, Wellmart also provided prescribers with pre-printed labels and rubber stamps with the name and ingredients of certain of Wellmart's Compounded Products for these providers to simply apply to their own prescription forms.

442. The patient examination report forms used for patients of Epione contained certain compounded products, including Compound 218N, Compound 220N, and/or Compound 220W,

in a pre-printed checklist to facilitate Jacobi's (and those working under his direction or control's) prescribing of these pre-set formulations dispensed by Wellmart.

443. Upon information and belief, Wellmart provided Jacobi with a stamp for these Compounded Products listed in Epione's examination templates to assist Jacobi (or those working under his direction or control) in generating as many prescriptions as possible.

444. The following chart contains representative examples of the use of pre-set forms and stamps to facilitate prescriptions of the same compounded topical drugs that were purportedly dispensed by Wellmart to Allstate Claimants:

| Prescriber | Allstate Claimant | Drug or Medication Prescribed | Stamp /Form | Date of Rx |
|---|---|---|---|---|
| Radha K. Gara, M.D. | A.B. (claim no. 0431082980) | Compound Rx 220W | Form | 10/6/2016 |
| Michael Y. Jacobi, D.O. | A.C. (claim no. 0460654890) | Compound Rx 220N | Stamp | 4/20/2017 |
| Claudia H. Geris, PA | A.J. (claim no. 0462397141) | Compound Rx 220W | Form | 7/6/2017 |
| Denny Rodriguez, M.D. | A.C. (claim no. 0459014734) | Compound 220Y | Form | 7/28/2017 |
| Michael Y. Jacobi, D.O. | A.C. (claim no. 0471841072) | Compound Rx 220N | Stamp | 8/24/2017 |
| Michael Y. Jacobi, D.O. | B.J. (claim no. 0415776483) | Compound Rx 220N | Stamp | 6/3/2016 |
| Michael Y. Jacobi, D.O. | B.F. (claim no. 0401255203) | Compound Rx 220N | Stamp | 4/1/2016 |
| Michael Y. Jacobi, D.O. | B.A. (claim no. 0397228032) | Compound Rx 220W | Stamp | 4/27/2016 |
| Conrad Cean, M.D. | B.J. (claim no. 0446196452) | Compound 220Y | Form | 5/16/2017 |
| Michael Y. Jacobi, D.O. | C.C. (claim no. 0441604923) | Compound Rx 220W | Stamp | 2/20/2017 |
| Michael Y. Jacobi, D.O. | C.L. (claim no. 0451787303) | Compound Rx 220N | Stamp | 3/29/2017 |
| Michael Y. Jacobi, D.O. | C.B. (claim no. 0443253851) | Compound Rx 220N | Stamp | 1/30/2017 |
| Michael Y. Jacobi, D.O. | C.C. (claim no. 0454154865) | Compound Rx 220W | Stamp | 5/4/2017 |
| Radha K. Gara, M.D. | F.M. (claim no. 0442639746) | Compound 220G | Form | 2/21/2017 |

| Prescriber | Allstate Claimant | Drug or Medication Prescribed | Stamp /Form | Date of Rx |
|---|---|---|---|---|
| Michael Y. Jacobi, D.O. | F.U. (claim no. 0437674682) | Compound Rx 220W | Stamp | 12/29/2016 |
| Michael Y. Jacobi, D.O. | F.F. (claim no. 0442640900) | Compound Rx 220W | Stamp | 1/18/2017 |
| Michael Y. Jacobi, D.O. | G.T. (claim no. 0455608521) | Compound Rx 220N | Stamp | 5/11/2017 |
| Michael Y. Jacobi, D.O. | G.H. (claim no. 0458044062) | Compound Rx 220N | Stamp | 6/2/2017 |
| Michael Y. Jacobi, D.O. | G.H. (claim no. 0470181504) | Compound Rx 220N | Stamp | 8/22/2017 |
| Michael Y. Jacobi, D.O. | I.J. (claim no. 0468757513) | Compound Rx 220W | Stamp | 8/18/2017 |
| Denny Rodriguez, M.D. | I.B. (claim no. 0473929610) | Compound 220Y | Form | 9/18/2017 |
| Conrad Cean, M.D. | J.G. (claim no. 0454552456) | Compound 220Y | Form | 5/9/2017 |
| Michael Y. Jacobi, D.O. | J.H. (claim no. 0423534049) | Compound Rx 220N | Stamp | 1/12/2017 |
| Michael Y. Jacobi, D.O. | K.M. (claim no. 0452991268) | Compound Rx 220W | Stamp | 4/14/2017 |
| Michael Y. Jacobi, D.O. | G.W. (claim no. 0483594024) | Compound Rx 220N | Stamp | 11/29/2017 |
| Michael Y. Jacobi, D.O. | L.G. (claim no. 0406210815) | Compound Rx 220N | Stamp | 4/28/2016 |
| Janet Hebroni, PA | M.Y. (claim no. 0420805475) | Compound 220N | Form | 2/14/2017 |
| Michael Y. Jacobi, D.O. | M.C. (claim no. 0445325137) | Compound Rx 220N | Stamp | 2/8/2017 |
| Michael Y. Jacobi, D.O. | M.C. (claim no. 0419423652) | Compound Rx 220W | Stamp | 7/21/2016 |
| Michael Y. Jacobi, D.O. | M.C. (claim no. 0451003305) | Compound Rx 220N | Stamp | 4/20/2017 |
| Conrad Cean, M.D. | M.S. (claim no. 0452106826) | Compound 220W | Form | 4/3/2017 |
| Michael Y. Jacobi, D.O. | N.B. (claim no. 0434111514) | Compound Rx 220N | Stamp | 11/9/2016 |
| Michael Y. Jacobi, D.O. | O.V. (claim no. 0452273386) | Compound Rx 220N | Stamp | 4/21/2017 |
| Michael Y. Jacobi, D.O. | R.R. (claim no. 0417691193) | Compound Rx 220N | Stamp | 6/16/2016 |
| Denny Rodriguez, M.D. | R.D. (claim no. 0445301666) | Compound 220Y | Form | 2/15/2017 |
| Beena Ghazal, PA | R.F. (claim no. 0440780617) | Compound 220N | Form | 2/15/2017 |

| Prescriber | Allstate Claimant | Drug or Medication Prescribed | Stamp /Form | Date of Rx |
|---|---|---|---|---|
| Michael Y. Jacobi, D.O. | S.A. (claim no. 0440780617) | Compound Rx 220W | Stamp | 12/29/2016 |
| Michael Y. Jacobi, D.O. | S.R. (claim no. 0446443830) | Compound Rx 220N | Stamp | 2/24/2017 |
| Michael Y. Jacobi, D.O. | K.G. (claim no. 0398874248) | Compound Rx 218N | Stamp | 2/2/2016 |
| Michael Y. Jacobi, D.O. | S.C. (claim no. 0392463105) | Compound Rx 218N | Stamp | 11/24/2015 |

445. Therefore, in direct conflict with the purpose of compounding, the Allstate Claimants' prescribing providers are steered into prescribing Compounded Products that are predetermined and pre-formulated in set amounts.

446. As a result of the predetermined nature of the Compounded Products offered by Wellmart, Allstate Claimants were provided with identical Compounded Products, which were never tailored to their unique circumstances.

447. Prescribers like Defendant Jacobi (or individuals acting under his direction or control) were instructed to prescribe these medications to their patients, and then deliver the prescriptions to Wellmart.

448. None of these prescriptions identify why a compound was necessary or why a commercially available FDA-approved drug would not be appropriate or reference any patient condition that necessitates the prescribed drug, let alone a compound of any kind.

449. Rather, the pre-printed prescription forms merely contain a boilerplate statement of medical necessity stating: "Side effects associated with oral administration can often be avoided when medications are used topically. When medications are administered topically, they are not absorbed through the gastrointestinal system and do not undergo first-pass hepatic metabolism.

Topical creams/patches will be used in conjunction with lower doses of oral medications to prevent dependence and side effects of oral medications."

450.    However, this statement is inaccurate and not based in science whereas there remains a risk of combined toxicity through the concomitant use of the topical medications and oral medications.

451.    Moreover, this essentially meaningless statement is not tailored to the unique needs of any patient, and does not provide any specific justification for the prescription of a Compounded Product for that particular patient, such as the patient's allergy to an inactive ingredient (e.g., a dye) in a commercially available drug that warrants a special formulation of that drug to eliminate the offending ingredient or other conditions, such as ingestion or digestion problems, that prevent the safe and effective use of commercially available drugs, thus warranting the creation of a special formulation of the drugs to meet the patient's specific clinical needs.

452.    Overall, the dispensing of the Wellmart Compounded Products was never the product of a prescription necessary to address the unique needs of any individual patient; rather, these items were provided across many patients by different prescribing providers, including Jacobi, without regard to the particular circumstances of any one patient.

453.    In reality, the Compounded Products prescribed, and billed for, during this scheme were purportedly dispensed without any regard for the specific needs of any individual patient.

454.    As such, the Compounded Products were "new" drugs that required FDA approval, but Wellmart never sought or received such approval for any of the Compounded Products.

455.    By manufacturing and distributing its mass-produced drugs under the guise of purported compounds exempt from FDA approval, Wellmart deliberately sought to avoid the FDA approval regime intended to protect the health and safety of patients.

456. Likewise, because the Wellmart Compounded Products were not individualized, were not tailored to the unique characteristics of each Allstate Claimant, were not provided pursuant to legitimate prescriptions, and were apparently compounded in pre-set, predetermined quantities, Wellmart was never exempt from the applicable New York state licensing requirements.

457. As a result, Davydov, Nektalov, and Wellmart violated one or more applicable state licensing requirements when billing for the Compounded Products purportedly dispensed and delivered to Allstate Claimants.

c. ***Unlawful Template Prescriptions for Compounded Products***

458. Many of the Compounded Products were dispensed and delivered to Allstate Claimants by Wellmart based on a predetermined, pre-formulated prescription.

459. Moreover, these predetermined, pre-formulated prescriptions were utilized by a wide number of providers operating in the New York metropolitan area.

460. Here, the form prescriptions issued for Wellmart's Compounded Products violate provisions of New York law whose purpose is clearly to prevent the kinds of practices these prescriptions represent.

461. Indeed, the listing of multiple predetermined drugs and medications, including Compounded Products, from which providers can select violates New York Education Law § 6810(7)(a). *See* N.Y. Educ. Law § 6810(7)(a) ("No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug. No drug shall be dispensed by a pharmacist when such prescription form includes any other drug.").

462. Additionally, none of the form prescriptions contain the following language required on every prescription in New York: "THIS PRESCRIPTION WILL BE FILLED

GENERICALLY UNLESS PRESCRIBER WRITES 'd a w' IN THE BOX BELOW." N.Y. Educ. Law § 6810(6)(a).

463. Thus, Wellmart's use of form prescriptions directly violates New York law, and unduly (a) directs/influences prescribing decisions, (b) limits the Allstate Claimants' choices, and (c) hinders effective healthcare.

### d.       *Fraudulent Billing for Compounded Products*

464. Davydov and Nektalov also defrauded Allstate by causing Wellmart to submit massively inflated charges to Allstate when seeking payment for Compounded Products purportedly dispensed and delivered to Allstate Claimants.

465. Under New York's No-Fault laws, reimbursement for a medically necessary Compounded Product is calculated based upon the price of each drug included in the formula for the Compounded Product.

466. The Compounded Products were deliberately formulated using several different ingredient drugs as a means to manipulate New York's No-Fault laws.

467. Utilizing several drugs in each formula allowed Wellmart to unduly multiply the cost of each Compounded Product.

468. As detailed below, Davydov and Nektalov, through Wellmart, engaged in widespread, abusive billing tactics during the course of this scheme.

469. In many instances, Davydov and Nektalov caused Wellmart to submit charges in excess of the prevailing Fee Schedule.

470. Knowing that the AWP of the ingredient drugs was inflated and that the prices charged came nowhere close to their actual acquisition costs, Davydov and Nektalov nevertheless sought to dispense as many Compounded Products as possible.

471.     Regardless of whether the Compounded Products were actually necessary (which they never were), the prices charged by Wellmart for just one of the Compounded Products ranged in price from approximately $910.00 to in excess of $1,610.00.

472.     Even if these Compounded Products were necessary (which they never were), the sheer cost imposed upon the Allstate Claimants was designed to cause the rapid depletion of their available No-Fault benefits, especially where the Allstate Claimants' prescriptions for the Compounded Products called for refills.

473.     However, the injuries caused to the Allstate Claimants—and, in turn, to Allstate as the party responsible for making payment—were always compounded by the fact that Wellmart's charges were, in many instances, (a) in excess of what was allowed under the Fee Schedule, and (b) unlawful.

**e.     *Specific Examples of Fraudulent Billing for Medically Unnecessary and Falsely Charged Compounded Products***

**i.     Patient F.B. (claim no. 0446692139)**

474.     Patient F.B. was purportedly involved in a motor vehicle accident on February 20, 2017.

475.     Approximately one week later, on February 28, 2017, F.B. presented to non-party Radha Gara, M.D. ("Gara") for an initial examination.

476.     According to the report of this initial visit submitted to Allstate, F.B. complained of pain to the spine and bilateral knees.

477.     That same day, Gara prescribed Compound 220G, Levatio patches, and 550 mg of oral NSAID Naproxen (i.e., Aleve) to F.B. using the Wellmart pre-printed "Prescription Order Form."

478.     However, having just initiated treatment following the motor vehicle accident that allegedly occurred little more than a week prior, F.B. was not afforded sufficient time to undergo conservative treatment before being prescribed a Compounded Product and pain patches.

479.     The Compound 220G product circled on the pre-printed form contained predetermined ingredients in certain set quantities.

480.     Gara did not make any alterations to these ingredients or quantities, and thus the Compound 220G product prescribed for F.B. was not specifically tailored to his individual needs.

481.     Wellmart charged Allstate $1,572.10 for the Compound 220G purportedly dispensed to F.B. on February 28, 2017.

482.     Even assuming that Wellmart's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Wellmart lawfully billed Allstate in accordance with the prevailing Fee Schedule, Wellmart would have only been lawfully entitled to charge and collect $1,253.68 for the Compound 220G product purportedly dispensed to Allstate Claimant F.B., provided that this Compounded Product was necessary to treat any of F.B.'s accident-related injuries, which it was not.

483.     Accordingly, because (a) the prescription and dispensing of the Compound 220G Compounded Product to F.B. was not medically necessary for the treatment of F.B.'s reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Wellmart in connection with the purported provision of this Compounded Product were fraudulent and excessive, Wellmart's reimbursement demands mailed to Allstate in connection with F.B. are not compensable under New York's No-Fault laws.

484.     To the extent that Allstate was caused to make payments related to this Compound 220G Compounded Product purportedly dispensed and delivered to F.B., Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the Defendants, including Wellmart, in connection with this Compound 220G Compounded Product.

485.     Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Wellmart in connection with this Compound 220G remain unpaid, Allstate is under no obligation to make any future payments in connection with this transaction because the Compound 220G Compounded Product (a) was never medically necessary for the treatment of F.B.'s accident-related injuries, and/or (b) was fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### ii.     Patient K.G. (claim no. 0398874248)

486.     K.G. was purportedly involved in a motor vehicle accident on January 18, 2016.

487.     Soon after, on February 2, 2016, K.G. presented to Defendant Jacobi at Epione for an initial examination.

488.     According to the report of this initial visit submitted to Allstate, K.G. complained of pain to his neck, mid back, lower back, right shoulder, and right knee.

489.     Jacobi circled several medications pre-printed on the Epione initial examination form to be prescribed to K.G., including Flexeril (a muscle relaxant), Tylenol, and Compound Rx 218N.

490.     Compound Rx 218N was the only Compounded Product printed on the initial examination form.

491.     That same day, on February 2, 2016, little more than two (2) weeks since K.G. was purportedly injured in a motor vehicle accident, Jacobi used a pre-printed stamp applied to his

prescription pad to prescribe Compound Rx 218N to K.G. using predetermined ingredients and quantities.

492.     Based on the prescription of this predetermined Compounded Product to K.G. without any alterations, it is clear that the Compound Rx 218N was not individually tailored to K.G.'s particular needs.

493.     Moreover, Jacobi immediately prescribed this ineffective—and expensive— Compounded Product to K.G. on K.G.'s initial visit before K.G. was afforded sufficient time to undergo conservative treatment.

494.     Indeed, Wellmart charged Allstate $910.59 for the Compound Rx 218N dispensed to K.G. on February 3, 2016.

495.     Even assuming that Wellmart's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Wellmart lawfully billed Allstate in accordance with the prevailing Fee Schedule, Wellmart would have only been lawfully entitled to charge and collect $728.48 for the Compound Rx 218N Compounded Product purportedly dispensed to Allstate Claimant K.G., provided that this Compounded Product was necessary to treat any of K.G.'s accident-related injuries, which it was not.

496.     Accordingly, because (a) the prescription and dispensing of the Compound Rx 218N Compounded Product to K.G. was not medically necessary for the treatment of K.G.'s reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Wellmart in connection with the purported provision of this Compounded Product were fraudulent and excessive, Wellmart's reimbursement demands mailed to Allstate in connection with K.G. are not compensable under New York's No-Fault laws.

497.    To the extent that Allstate was caused to make payments related to this Compound Rx 218N Compounded Product purportedly dispensed and delivered to K.G., Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the Defendants, including Wellmart, in connection with this Compound Rx 218N Compounded Product.

498.    Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Wellmart in connection with this Compound Rx 218N remain unpaid, Allstate is under no obligation to make any future payments in connection with this transaction because the Compound Rx 218N Compounded Product (a) was never medically necessary for the treatment of K.G.'s accident-related injuries, and/or (b) was fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### iii.    Patient S.T. (claim no. 0392421616)

499.    S.T. was purportedly involved in a motor vehicle accident on November 21, 2015.

500.    Several days later, on November 25, 2015, S.T. presented to Defendant Jacobi at Epione for an initial examination with complaints of pain to several areas, including the neck, mid back, and lower back, according to the report of this initial examination submitted to Allstate.

501.    According to the report of this initial visit submitted to Allstate, Jacobi circled Compound Rx 218N pre-printed on Epione's initial examination form to be prescribed to S.T.

502.    Compound Rx 218N was the only Compounded Product printed on the initial examination form.

503.    That same day, just days after S.T. allegedly was involved in a motor vehicle accident, Jacobi prescribed the Compound Rx 218N to S.T. using a pre-printed stamp applied to Jacobi's prescription pad using predetermined ingredients and quantities.

504. Based on the prescription of this predetermined Compounded Product to S.T. without any alterations, it is clear that the Compound Rx 218N was not individually tailored to S.T.'s particular needs.

505. Moreover, Jacobi immediately prescribed this ineffective—and expensive— Compounded Product to S.T. on S.T.'s initial visit before S.T. was afforded sufficient time to undergo conservative treatment.

506. Indeed, Wellmart charged Allstate $936.25 for the Compound Rx 218N Compounded Product purportedly dispensed to S.T. on November 30, 2015.

507. Even assuming that Wellmart's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Wellmart lawfully billed Allstate in accordance with the prevailing Fee Schedule, Wellmart would have only been lawfully entitled to charge and collect $624.36 for the Compound Rx 218N Compounded Product purportedly dispensed to Allstate Claimant S.T., provided that this Compounded Product was necessary to treat any of S.T.'s accident-related injuries, which it was not.

508. Accordingly, because (a) the prescription and dispensing of the Compound Rx 218N Compounded Product to S.T. was not medically necessary for the treatment of S.T.'s reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Wellmart in connection with the purported provision of this Compounded Product were fraudulent and excessive, Wellmart's reimbursement demands mailed to Allstate in connection with S.T. are not compensable under New York's No-Fault laws.

509. To the extent that Allstate was caused to make payments related to this Compound Rx 218N Compounded Product purportedly dispensed and delivered to S.T., Allstate is entitled to

recover all such payments made to, or for the benefit of, one or more of the Defendants, including Wellmart, in connection with this Compound Rx 218N Compounded Product.

510.     Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Wellmart in connection with this Compound Rx 218N Compounded Product remain unpaid, Allstate is under no obligation to make any future payments in connection with this transaction because the Compound Rx 218N Compounded Product (a) was never medically necessary for the treatment of S.T.'s accident-related injuries, and/or (b) was fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### iv.     Patient R.D. (claim no. 0445301666)

511.     R.D. was purportedly involved in a motor vehicle accident on January 31, 2017.

512.     Approximately two (2) weeks later, on February 15, 2017, R.D. presented to Denny X. Rodriguez, M.D. ("Rodriguez") at Ralph Ave. Medical, P.C. for an initial examination with complaints of pain to his neck, lower back, shoulders, and knees according to the report of this examination submitted to Allstate.

513.     That same day, using Wellmart's pre-printed "Prescription Order Form," Rodriguez prescribed to R.D. several medications offered by Wellmart, including Compound 220Y, 550 mg of oral NSAID Naproxen (i.e., Aleve), and 20 mg of proton-pump inhibitor Nexium.

514.     However, having just initiated treatment following the motor vehicle accident that allegedly occurred just two (2) weeks prior, R.D. was not afforded sufficient time to undergo conservative treatment before being prescribed a Compounded Product.

515.     The Compound 220Y product circled on the pre-printed form by Rodriguez contained predetermined ingredients in certain set quantities.

516.     Rodriguez did not make any alterations to these ingredients or quantities, and thus the Compound 220Y product prescribed for R.D. was not specifically tailored to his individual needs.

517.     Wellmart charged Allstate $1,610.29 for the Compound 220Y Compounded Product purportedly dispensed to R.D. on February 22, 2017.

518.     Even assuming that Wellmart's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Wellmart lawfully billed Allstate in accordance with the prevailing Fee Schedule, Wellmart would have only been lawfully entitled to charge and collect $1,284.24 for the Compound 220Y Compounded Product purportedly dispensed to Allstate Claimant R.D., provided that this Compounded Product was necessary to treat any of R.D.'s accident-related injuries, which it was not.

519.     Accordingly, because (a) the prescription and dispensing of the Compound 220Y Compounded Product to R.D. was not medically necessary for the treatment of R.D.'s reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Wellmart in connection with the purported provision of this Compounded Product were fraudulent and excessive, Wellmart's reimbursement demands mailed to Allstate in connection with R.D. are not compensable under New York's No-Fault laws.

520.     To the extent that Allstate was caused to make payments related to this Compound 220Y Compounded Product purportedly dispensed and delivered to R.D., Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the Defendants, including Wellmart, in connection with this Compound 220Y Compounded Product.

521. Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Wellmart in connection with this Compound 220Y remain unpaid, Allstate is under no obligation to make any future payments in connection with this transaction because the Compound 220Y Compounded Product (a) was never medically necessary for the treatment of R.D.'s accident-related injuries, and/or (b) was fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### v. Patient S.S. (claim no. 0439365941)

522. S.S. was purportedly involved in a motor vehicle accident on December 15, 2016.

523. Defendant presented to Jacobi at Epione just days later on December 19, 2016 for an initial examination with complaints of headaches, neck and mid back pain, and pain to the shoulders, knees, and ankle according to the report of this examination submitted to Allstate.

524. Jacobi also circled several medications pre-printed on Epione's initial examination form to be prescribed to S.S., including Compound Rx 218N, Tylenol, and Flexeril.

525. Compound Rx 218N was the only Compounded Product printed on the initial examination form.

526. However, despite indicating a prescription for Compound Rx 218N on the initial examination form, that same day, Jacobi actually prescribed Compound 220N for S.S. using a pre-printed stamp applied to Jacobi's prescription pad reflecting predetermined ingredients and quantities.

527. Based on the prescription of this predetermined Compounded Product to S.S. without any alterations, it is clear that the Compound 220N Compounded Product was not individually tailored to S.S.'s particular needs.

528. Moreover, Jacobi immediately prescribed this ineffective—and expensive—Compounded Product to S.S. on S.S.'s initial visit before S.S. was afforded sufficient time to undergo conservative treatment.

529. Indeed, Wellmart charged Allstate $1,075.19 for the Compound 220N Compounded Product purportedly dispensed to S.S. on December 22, 2016.

530. Even assuming that Wellmart's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Wellmart lawfully billed Allstate in accordance with the prevailing Fee Schedule, Wellmart would have only been lawfully entitled to charge and collect $856.16 for the Compound 220N Compounded Product purportedly dispensed to Allstate Claimant S.S., provided that this Compounded Product was necessary to treat any of S.S.'s accident-related injuries, which it was not.

531. Accordingly, because (a) the prescription and dispensing of the Compound 220N Compounded Product to S.S. was not medically necessary for the treatment of S.S.'s reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Wellmart in connection with the purported provision of this Compounded Product were fraudulent and excessive, Wellmart's reimbursement demands mailed to Allstate in connection with S.S. are not compensable under New York's No-Fault laws.

532. To the extent that Allstate was caused to make payments related to this Compound 220N Compounded Product purportedly dispensed and delivered to S.S., Allstate is entitled to recover all such payments made to, or for the benefit of, one or more of the Defendants, including Wellmart, in connection with this Compound 220N Compounded Product.

533.     Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Wellmart in connection with this Compound 220N Compounded Product remain unpaid, Allstate is under no obligation to make any future payments in connection with this transaction because the Compound 220N Compounded Product (a) was never medically necessary for the treatment of S.S.'s accident-related injuries, and/or (b) was fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### vi.     Patient M.J. (claim no. 0452224330)

534.     M.J. was purportedly involved in a motor vehicle accident on April 7, 2017.

535.     On April 11, 2017, M.J. presented to Rutland Medical, P.C. for an initial examination with complaints neck pain, low back pain, and knee pain according to the report of this examination submitted to Allstate.

536.     M.J. again presented for a follow-up examination at Rutland Medical approximately two (2) months later on June 12, 2017 with, according to the report of this examination submitted to Allstate, continuing complaints of neck pain, low back pain, and right knee pain.

537.     The report of this examination also bears an imprint of the ingredients and quantities for a Compounded Product named Compound Rx 220W, which was applied using a pre-set rubber stamp, to be prescribed to M.J.

538.     The report does not provide any specific rationale for the prescription of this Compounded Product, such as M.J.'s inability to tolerate alternative forms of medication.

539.     That same day, Janet Hebroni, PA prescribed Compound 220W to M.J. by circling the option for this Compounded Product on Wellmart's pre-printed "Prescription Order Form."

540. The Compound 220W product circled on the pre-printed form contained predetermined ingredients in certain set quantities.

541. Based on the prescription of this predetermined Compounded Product to M.J. without any alterations, it is clear that the Compound 220W Compounded Product was not individually tailored to M.J.'s particular needs.

542. Despite Compound 220W not being a legitimate product compounded for M.J.'s specific individualized needs, Wellmart charged Allstate $1,465.39 for the Compound 220W Compounded Product purportedly dispensed to M.J. on June 23, 2017.

543. Even assuming that Wellmart's documents reflect legitimate NDCs for the included drugs, and even assuming that the corresponding AWPs associated with the drugs supplied by Medisca and Fagron, Inc. were not fraudulent or inflated, had Wellmart lawfully billed Allstate in accordance with the prevailing Fee Schedule, Wellmart would have only been lawfully entitled to charge and collect $1,168.31 for the Compound 220N Compounded Product purportedly dispensed to Allstate Claimant M.J., provided that this Compounded Product was necessary to treat any of M.J.'s accident-related injuries, which it was not.

544. Accordingly, because (a) the prescription and dispensing of the Compound 220W Compounded Product to M.J. was not medically necessary for the treatment of M.J.'s reported accident-related injuries, and (b) the charges submitted to Allstate by, or on behalf of, Wellmart in connection with the purported provision of this Compounded Product were fraudulent and excessive, Wellmart's reimbursement demands mailed to Allstate in connection with M.J. are not compensable under New York's No-Fault laws.

545. To the extent that Allstate was caused to make payments related to this Compound 220W Compounded Product purportedly dispensed and delivered to M.J., Allstate is entitled to

recover all such payments made to, or for the benefit of, one or more of the Defendants, including Wellmart, in connection with this Compound 220W Compounded Product.

546.    Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, Wellmart in connection with this Compound 220W Compounded Product remain unpaid, Allstate is under no obligation to make any future payments in connection with this transaction because the Compound 220W Compounded Product (a) was never medically necessary for the treatment of M.J.'s accident-related injuries, and/or (b) was fraudulently and excessively charged, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### 3.    Billing for Medically Worthless Topical Pain Patches

547.    As part of its protocol of drugs and medications marketed to prescribing providers and dispensed to patients, Wellmart offered a selection of topical pain patches, including Levatio patches, MenCaps patches, and Terocin patches (collectively, "Topical Pain Patches").

548.    The Topical Pain Patches are topical analgesics, which can be used to temporarily relieve minor muscle and joint aches and pains when applied to the skin.

549.    The Topical Pain Patches all contain menthol (methyl salicylate) as the primary ingredient.

550.    The Topical Pain Patches also may contain capsaicin (a topical analgesic derived from chili peppers) or lidocaine.

551.    The efficacy of the Topical Pain Patches is very doubtful.

552.    Indeed, none of the Topical Pain Patches are FDA-approved drug products.

553.    The Topical Pain Patches are not supported for use in patients with multiple and deep joint injuries.

554. Moreover, the evidence does not support the use of such Topical Pain Patches (i.e., rebufacients) for acute injuries or chronic conditions.

555. Nonetheless, Wellmart incorporated such unnecessary, and expensive, Topical Pain Patches into its repertoire of drugs and medications dispensed to patients, including Allstate Claimants, as a means to unlawfully inflate its profits from the fraudulent scheme described herein.

### a. *False Billing For Non-Prescription Drugs*

556. New York's No-Fault laws permit reimbursement for prescription drugs, but claimants—and/or their assignees—have no right to claim No-Fault reimbursement for over-the-counter drugs, which can be dispensed without a prescription.

557. Over-the-counter drugs and products that can be purchased without a prescription are not covered expenses under New York's No-Fault laws.

558. Despite this prohibition, Wellmart has knowingly and intentionally demanded payment from Allstate, under New York's No-Fault laws, for over-the-counter medications, including MenCaps patches and Terocin patches and lotion purportedly dispensed and delivered to Allstate Claimants.

559. Additionally, Wellmart knowingly and intentionally demanded payment from Allstate, under New York's No-Fault laws, for medications, including Levatio patches purportedly dispensed and delivered to Allstate Claimants that were marketed as "Rx Only," when, in fact, these drugs are not FDA-approved and do not actually require a prescription.

560. Wellmart's purported dispensing of these over-the-counter and non-prescription products to Allstate Claimants is a major component of the Defendants' scheme to defraud Allstate.

561.     Indeed, because Levatio patches, MenCaps patches, and Terocin patches and lotion do not actually require a prescription, they are not covered drug items under New York's No-Fault laws.

562.     Even though charges for the Levatio patches, MenCaps patches, and Terocin patches and lotion are not reimbursable under New York's No-Fault laws, Wellmart has dispensed these products to Allstate Claimants, and has sought—pursuant to assignment of benefit agreements with these claimants—No-Fault benefit reimbursement from Allstate.

563.     By advancing charges for Levatio patches, MenCaps patches, and Terocin patches and lotion in terms of the product's AWP, Wellmart took purposeful steps to make it appear that the products were eligible for coverage under the No-Fault laws.

564.     The charges for these products are false and fraudulent because the products are not covered under New York's No-Fault laws.

565.     However, even if they were covered, the charges for these products are still false because, as explained above, the products are medically unnecessary and unwarranted.

566.     Moreover, when Allstate has denied Wellmart's claims for the Levatio patches, MenCaps patches, and Terocin patches and lotion, Wellmart has aggressively pursued payment from Allstate, typically through the filing of private arbitrations pursuant to New York Insurance Law § 5106, knowing that the charges for the Levatio patches, MenCaps patches, and Terocin patches and lotion are not reimbursable under New York's No-Fault laws.

567.     To the extent that Allstate was caused to make payments related to any Levatio patches, MenCaps patches, or Terocin products purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, Wellmart in connection with these falsely-charged, over-the-counter items.

568.     Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, the Defendants in connection with these Levatio patches, MenCaps patches, and Terocin patches and lotion remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these Levatio patches, MenCaps patches, and Terocin patches and lotion are not eligible for reimbursement under New York's No-Fault laws, and even if these over-the-counter items were eligible for reimbursement, these items were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries.

**b.     *Excessive Billing for Topical Pain Patches***

569.     Wellmart's claims for the Topical Pain Patches are also false because even if the products were eligible for coverage and were medically necessary, the charges for these products are still grossly excessive and fraudulent.

570.     If covered, New York's No-Fault laws require pharmacies to charge covered prescription drugs according to the drug's AWP on the date of dispensing, minus a reduction of 12% or 20% depending on whether the drug is brand name or generic.

571.     Thus, Wellmart's charges for the Topical Pain Patches were in excess of the amounts permitted to be charged under the No-Fault laws.

572.     For example, Wellmart charged Allstate between $3,866.00 and $4,370.00 for ninety (90) Terocin pain patches dispensed to an Allstate Claimant during the relevant period.

573.     Similarly, Wellmart charged Allstate $3,250.56 for sixty (60) Levatio patches dispensed to an Allstate Claimant during the relevant period.

574.     Likewise, Wellmart charged Allstate $3,768.47 for ninety (90) MenCaps patches dispensed to an Allstate Claimant during the relevant period.

575.    This manner of charging for the dispensing of the Topical Pain Patches is significant because many of these charges were in excess of the amount allowed to be charged under the Fee Schedule.

576.    For instance, the allowable per-unit charge for Terocin pain patches (NDC 50488-1001-01) was $42.60 as of July 1, 2015 and $48.50 as of February 27, 2017.  Therefore, the charge per unit under the applicable Fee Schedule (assuming that the Terocin pain patches were permitted to be charged under the Fee Schedule, which they were not) for this brand name product as of July 1, 2015 was $37.49 and as of February 27, 2017 was $42.68.

577.    Likewise, the allowable per-unit charge for MenCaps patches (NDC 50488-1701-01) was $41.73333 as of July 1, 2015.  Therefore, the charge per unit under the applicable Fee Schedule for this brand-name product as of July 1, 2015 was $36.73.

578.    Additionally, the allowable per-unit charge for Levatio patches (NDC 69512-0010-02) was 54.09267 as of March 1, 2015.  Therefore, the charge per unit under the applicable Fee Schedule for this product as of March 1, 2015 was $43.27.

579.    Another topical pain patch dispensed by Wellmart, lidocaine 5% pain patches, were also frequently charged by Wellmart at costs that grossly exceeded the amounts at which equivalent over-the-counter lidocaine 4% patches are available for purchase.

580.    Specifically, Wellmart typically dispensed generic lidocaine 5% pain patches in quantities of thirty (30), sixty (60), and ninety (90) patches at a cost of approximately $10.00 per patch.

581.    However, an equivalent over-the-counter lidocaine 4% patch is available for purchase at a cost of approximately $2.50 per patch.

582.     Therefore, Wellmart intentionally induced prescribing providers, including Jacobi, to prescribe these lidocaine 5% pain patches to be dispensed by Wellmart as a means to charge a substantial mark up over an equivalent commercially available product accessible to patients at a substantially lower cost.

583.     When Allstate has denied Wellmart's claims for the excessively charged Topical Pain Patches, Wellmart has aggressively pursued payment from Allstate, typically through the filing of private arbitrations pursuant to New York Insurance Law § 5106, knowing that the charges for the Topical Pain Patches are not reimbursable under New York's No-Fault laws.

584.     To the extent that Allstate was caused to make payments related to any Topical Pain Patches purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, Wellmart in connection with these excessively charged items.

585.     Moreover, to the extent that any of the charges submitted to Allstate by, or on behalf of, the Defendants in connection with these Topical Pain Patches remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these Topical Pain Patches were never medically necessary for the treatment of the Allstate Claimants' accident-related injuries.

**4.     Billing for Medically Unnecessary and Ineffective Diclofenac Sodium Gel 3%**

586.     Wellmart frequently dispensed medically unnecessary Diclofenac Sodium Gel 3% to patients during the relevant period regardless of whether the patient even wanted or needed the medication.

587.    Wellmart regularly charged Allstate in excess of $1,000.00 for each 100 grams of Diclofenac Sodium Gel 3% dispensed even though this medication is not effective or approved for the treatment of the patients' conditions.

588.    Each prescription for Diclofenac Sodium Gel 3% filled by Wellmart often called for 200 grams, thus resulting in Wellmart billing over $2,300.00 for the Diclofenac Sodium Gel 3% dispensed to Allstate Claimants.

589.    Diclofenac Sodium Gel 3% is FDA-approved for the topical treatment of a skin condition called actinic keratosis, which is characterized by rough, scaly lesions caused by long-term sun exposure.

590.    Diclofenac Sodium Gel 3% is not approved for use topically in the treatment of traumatic pain or arthritic pain.

591.    Even though Diclofenac Sodium Gel 1%, a non-steroidal anti-inflammatory drug (NSAID), may be effective in the treatment of pain in the peripheral joints, such as the hand or knee, it has no proven efficacy for pain relief for larger and deeper joints, such as the spine or shoulder.

592.    Moreover, neither Diclofenac Sodium Gel 1% nor Diclofenac Sodium Gel 3% are effective for complaints of pain to multiple areas of the body.

593.    Merely because Diclofenac Gel 3% is triple the concentration of Diclofenac Sodium Gel 1%, it does not mean that Diclofenac Sodium Gel 3% has triple the effectiveness for the treatment of joint pain, for which Diclofenac Sodium Gel 3% has not been evaluated.

594.    Thus, not only does Diclofenac Sodium Gel 3% lack proven efficacy for pain relief, but Diclofenac Sodium Gel 3% is substantially more toxic topically and systematically than Diclofenac Sodium Gel 1%.

595.    Indeed, because Diclofenac Sodium Gel 3% is intended for use in treating a skin condition, it is designed for minimal depth of absorption to keep the drug in the skin to optimize treatment of actinic keratosis.

596.    Moreover, the use of Diclofenac Sodium Gel 3% in patients without actinic keratosis exposes the patients to increased and unnecessary risks, such as for skin irritation, hypersensitivity, and photosensitivity.

597.    For example, patients using Diclofenac Sodium Gel 3% may experience redness, scaling, or a burning sensation.

598.    Therefore, Wellmart was not eligible for No-Fault reimbursement for the Diclofenac Sodium Gel 3% purportedly dispensed to Allstate Claimants because this drug was not medically necessary or effective in treating the Claimants' complaints of pain.

a.      ***Inflated and Excessive Billing for Diclofenac Sodium Gel 3%***

599.    Wellmart induced medical providers to prescribe Diclofenac Sodium Gel 3% to be dispensed by Wellmart as a means to inflate the amounts sought by—and, in some instances, received by—Wellmart from Allstate.

600.    For example, the amounts permissible under the No-Fault Fee Schedule for generic Diclofenac Sodium Gel 3% are far higher than the amounts permissible for generic Diclofenac Sodium Gel 1% (even assuming that either of these products was medically necessary and effective to treat the patients' pain, which they were not).

601.    Specifically, the Diclofenac Sodium Gel 3% purportedly dispensed by Wellmart under NDC 00168-0844-01 and NDC 68462-0355-94 has an AWP of 11.7946 per unit, while the Diclofenac Sodium Gel 3% dispensed by Wellmart under NDC 00115-1483-61 has an AWP of 11.3228 per unit.

602.     Meanwhile, the highest AWP of available generic Diclofenac Sodium Gel 1% is only 0.58340 per unit.

603.     Therefore, when patients were prescribed 200 grams of Diclofenac Sodium Gel 1%, Wellmart could only charge a total of $93.34 for each prescription.

604.     However, when patients were prescribed 200 grams of generic Diclofenac Sodium Gel 3%, Wellmart could charge over $1,800.00 for each prescription.

605.     Accordingly, it is clear that Wellmart was motivated by profit to ensure that prescribers ordered Diclofenac Sodium Gel 3% for their patients instead of the less expensive Diclofenac Sodium Gel 1% even though the 3% preparation is neither approved nor effective at treating joint pain.

### b.     *Specific Examples of Fraudulent Billing for Medically Unnecessary Diclofenac Sodium Gel 3%*

#### i.     Patient J.W. (claim no. 0498920859)

606.     J.W. was purportedly involved in a motor vehicle accident on April 15, 2018.

607.     On May 1, 2018, J.W. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Wellmart that same day.

608.     However, on May 1, 2018, J.W. complained of purported injuries to her bilateral shoulders, lower back, neck, and chest according to a report of an examination submitted to Allstate.

609.     Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat J.W.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the shoulder or spine.

610.     Moreover, in addition to not being effective or indicated for J.W.'s shoulder and spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put J.W. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing J.W. to topical medication intended to treat skin lesions.

611.     Nonetheless, Wellmart submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) purportedly dispensed on May 1, 2018 in the amount of $2,358.00 with the disclaimer that this amount did not reflect the 20% reduction required for generic products such as the Diclofenac Sodium Gel 3%.

612.     Because the Diclofenac Sodium Gel 3% dispensed to J.W. by Wellmart was medically unnecessary and ineffective, Wellmart's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to J.W. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

613.     To the extent that Allstate paid Wellmart in reliance on the documents created and submitted in connection with the Diclofenac Sodium Gel 3% purportedly dispensed to J.W., Allstate is entitled to recover all payments made to Wellmart in connection with these services, including, but not limited to, the payments listed in Exhibit 2.

614.     To the extent that any of the charges submitted by Wellmart in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Wellmart's charges are not compensable under New York's No-Fault laws.

### ii.     Patient S.H. (claim no. 0504308388)

615.     S.H. was purportedly involved in a motor vehicle accident on June 1, 2018.

616.     On June 5, 2018, S.H. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Wellmart on June 18, 2018.

617.    However, on June 5, 2018, S.H. purportedly complained of neck pain and lower back pain and was diagnosed with cervical, lumbar, and thoracic sprain/strain rather than any injury to a peripheral joint according to the report of an examination submitted to Allstate.

618.    Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat S.H.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

619.    Moreover, in addition to not being effective or indicated for S.H.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put S.H. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing S.H. to a topical medication intended to treat skin lesions.

620.    Nonetheless, Wellmart submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) purportedly dispensed on June 18, 2018, as well as for the refill dispensed on July 17, 2018 in the amount of $2,358.00 with the disclaimer that that this amount did not reflect the 20% reduction required for generic products such as the Diclofenac Sodium Gel 3%.

621.    Because the Diclofenac Sodium Gel 3% dispensed to S.H. by Wellmart was medically unnecessary and ineffective, Wellmart's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to S.H. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

622.    To the extent that Allstate paid Wellmart in reliance on the documents created and submitted in connection with the Diclofenac Sodium Gel 3% purportedly dispensed to S.H., Allstate is entitled to recover all payments made to Wellmart in connection with these services, including, but not limited to, the payments listed in Exhibit 2.

623.     To the extent that any of the charges submitted by Wellmart in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Wellmart's charges are not compensable under New York's No-Fault laws.

### iii.     Patient J.P. (claim no. 0504308388)

624.     J.P. was purportedly involved in a motor vehicle accident on June 1, 2018.

625.     On June 5, 2018, J.P. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Wellmart on June 20, 2018.

626.     However, on June 5, 2018, J.P. reportedly complained of neck pain and lower back pain and was diagnosed with cervical, lumbar, and thoracic sprain/strain rather than any injury to a peripheral joint according to a report of an examination submitted to Allstate.

627.     Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat J.P.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

628.     Moreover, in addition to not being effective or indicated for J.P.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put J.P. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing J.P. to a topical medication intended to treat skin lesions.

629.     Nonetheless, Wellmart submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) dispensed on June 20, 2018, as well as for the refill dispensed on July 19, 2018, in the amounts of $2,358.00 with the disclaimer that this amount did not reflect the 20% reduction required for generic products such as the Diclofenac Sodium Gel 3%.

630.     Because the Diclofenac Sodium Gel 3% dispensed to J.P. by Wellmart was medically unnecessary and ineffective, Wellmart's charges for the Diclofenac Sodium Gel 3%

purportedly dispensed to J.P. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

631.    To the extent that Allstate paid Wellmart in reliance on the documents created and submitted in connection with the Diclofenac Sodium Gel 3% purportedly dispensed to J.P., Allstate is entitled to recover all payments made to Wellmart in connection with these services, including, but not limited to, the payments listed in Exhibit 2.

632.    To the extent that any of the charges submitted by Wellmart in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Wellmart's charges are not compensable under New York's No-Fault laws.

### iv.    Patient L.T. (claim no. 0489759232)

633.    L.T. was purportedly involved in a motor vehicle accident on January 19, 2018.

634.    On January 29, 2019, L.T. was prescribed 100 grams of Diclofenac Sodium Gel 3%, which was dispensed by Wellmart on February 12, 2018.

635.    However, the pre-printed prescription form through which the Diclofenac Sodium Gel 3% was prescribed clearly indicates that the body parts allegedly injured by L.T. were her shoulder and back rather than any peripheral joint.

636.    Similarly, at an April 18, 2018 follow-up examination, L.T. complained of headaches, cervical spine pain, and lumbar spine pain according to the report of this examination submitted to Allstate.

637.    Despite these complaints, L.T. was prescribed 200 grams of Diclofenac Sodium Gel 3%, which was dispensed by Wellmart on April 23, 2018.

638.     At a May 30, 2018 follow-up examination, L.T. again complained of headaches, cervical spine pain, and lumbar spine pain according to the report of this examination submitted to Allstate.

639.     Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat L.T.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine.

640.     That day, however, L.T. was again prescribed 100 grams of Diclofenac Sodium Gel 3% with one refill, which purportedly was dispensed by Wellmart on June 6, 2018 and July 19, 2018.

641.     Moreover, in addition to not being effective or indicated for L.T.'s spinal pain, the use of the more toxic Diclofenac Sodium Gel 3% put L.T. at risk for skin irritation, hypersensitivity, and photosensitivity by exposing L.T. to a topical medication intended to treat skin lesions.

642.     Nonetheless, Wellmart submitted inflated charges to Allstate for the 100 grams of Diclofenac Sodium Gel 3% (NDC 68462-0355-94) and (NDC 00168-0844-01) dispensed on February 12, 2018, June 6, 2018, and July 19, 2018 in the amounts of $1,179.00, with the disclaimer that that these amounts did not reflect the 20% reduction required for generic products such as the Diclofenac Sodium Gel 3%.

643.     Wellmart also submitted inflated charges to Allstate for the 200 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) dispensed on April 23, 2018 in the amount of $2,358.00.

644.     Because the Diclofenac Sodium Gel 3% dispensed to L.T. by Wellmart was medically unnecessary and ineffective, Wellmart's charges for the Diclofenac Sodium Gel 3%

purportedly dispensed to L.T. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

645. To the extent that Allstate paid Wellmart in reliance on the documents created and submitted in connection with the Diclofenac Sodium Gel 3% purportedly dispensed to L.T., Allstate is entitled to recover all payments made to Wellmart in connection with these services, including, but not limited to, the payments listed in Exhibit 2.

646. To the extent that any of the charges submitted by Wellmart in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Wellmart's charges are not compensable under New York's No-Fault laws.

### v. Patient M.G. (claim no. 0493222681)

647. M.G. was purportedly involved in a motor vehicle accident on February 24, 2018.

648. On March 6, 2018, Defendant Jacobi prescribed J.P. with 200 grams of Diclofenac Sodium Gel 3%, which purportedly was dispensed by Wellmart that same day.

649. However, on March 6, 2018, M.G. presented to Jacobi for an initial evaluation with complaints of neck pain, lower back pain, and right shoulder pain and was diagnosed with cervical and lumbar sprains as well as shoulder sprains/strains according to the report of this evaluation submitted to Allstate.

650. Therefore, even Diclofenac Sodium Gel 1% would not have been effective or indicated to treat M.G.'s spine as Diclofenac Sodium Gel 1% is only indicated for joints such as the hand or knee rather than joints that are covered by large muscle masses such as the spine or shoulder.

651. Moreover, in addition to not being effective or indicated for M.G.'s spinal and shoulder pain, the use of the more toxic Diclofenac Sodium Gel 3% put M.G. at risk for skin

irritation, hypersensitivity, and photosensitivity by exposing M.G. to a topical medication intended to treat skin lesions.

652.    Nonetheless, Wellmart submitted inflated charges to Allstate for the 100 grams of Diclofenac Sodium Gel 3% (NDC 00168-0844-01) purportedly dispensed on March 6, 2018, in the amount of $1,179.00.

653.    Because the Diclofenac Sodium Gel 3% dispensed to M.G. by Wellmart was medically unnecessary and ineffective, Wellmart's charges for the Diclofenac Sodium Gel 3% purportedly dispensed to M.G. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

654.    To the extent that Allstate paid Wellmart in reliance on the documents created and submitted in connection with the Diclofenac Sodium Gel 3% purportedly dispensed to M.G., Allstate is entitled to recover all payments made to Wellmart in connection with these services, including, but not limited to, the payments listed in Exhibit 2.

655.    To the extent that any of the charges submitted by Wellmart in connection with these services remain unpaid, Allstate has no further obligation to make payment in connection with these services because Wellmart's charges are not compensable under New York's No-Fault laws.

### 5.    Inflated and Excessive Billing for Prescription Drugs

656.    In addition to their unlawful charges for the Compounded Products (as described in the examples set forth above), Wellmart also engaged in unlawful, excessive, and deceptive billing practices in connection with the dispensing and delivery of prescription drugs to Allstate Claimants.

657.    In many cases, when Allstate Claimants were prescribed Compounded Products, those same claimants were also prescribed an array of other prescription drugs.

658. However, the charges submitted to Allstate for those prescription drugs were unlawful and grossly excessive.

659. For example, as demonstrated in the following table, when Wellmart purportedly dispensed and delivered certain prescription drugs to Allstate Claimants, Wellmart submitted charges that were in excess of the drug's AWP:

| Claimant Initials | Claim No. | Drug Name | NDC | AWP (per unit) | Charge (per unit) | % of Charges over AWP |
|---|---|---|---|---|---|---|
| K.G. | 0398874248 | Acetaminophen/Codeine | 00093015001 | 0.3614 | 0.4443 | 22.95% |
| S.S. | 0439365941 | Cyclobenzaprine | 10702000610 | 1.7226 | 2.00078 | 16.15% |
| S.T. | 0398874248 | Cyclobenzaprine | 10702000610 | 1.7226 | 1.8897 | 9.70% |
| B.F. | 0401255203 | Cyclobenzaprine | 10702000610 | 1.7226 | 1.8897 | 9.70% |
| Q.D. | 0407038397 | Cyclobenzaprine | 10702000610 | 1.7226 | 1.96095 | 13.84% |
| I.G. | 0431259696 | Cyclobenzaprine | 69512054110 | 1.7226 | 10.0167 | 484.49% |
| C.B. | 0443253851 | Cyclobenzaprine | 10702000610 | 1.7226 | 1.8897 | 9.70% |
| M.W. | 0439413329 | Cyclobenzaprine | 10702000610 | 1.7226 | 1.8897 | 9.70% |
| S.D. | 0407038397 | Naproxen | 53746019401 | 3.5653 | 3.64867 | 2.34% |
| Y.W. | 0392150751 | Naproxen | 68462019005 | 1.1925 | 1.27533 | 6.95% |
| A.M. | 0384475745 | Naproxen | 53746019401 | 3.5653 | 3.64867 | 2.34% |
| L.L. | 0437939846 | Ibuprofen | 67877032005 | 0.5153 | 0.5663 | 9.90% |
| F.F. | 0442640900 | Ibuprofen | 67877032005 | 0.5153 | 0.55944 | 8.57% |
| M.C. | 0445325137 | Ibuprofen | 67877032005 | 0.5153 | 0.55944 | 8.57% |
| L.P. | 0410414296 | Baclofen | 00832102400 | 2.471 | 5.27533 | 113.49% |
| S.D. | 0407038397 | Tramadol | 10370022111 | 4.707 | 5.06429 | 7.59% |

660. To compound their already unlawful and excessive billing for these prescription drugs, Wellmart's charges for each of the following medications exceeded the Fee Schedule's lawful allowable charges by substantial percentages:

| Claimant Initials | Claim No. | Drug Name | NDC | Charge (per unit) | Amount Allowed under Fee Schedule (per unit) | % In Excess of Fee Schedule |
|---|---|---|---|---|---|---|
| K.G. | 0398874248 | Acetaminophen/Codeine | 00093015001 | 0.44433 | 0.28912 | 53.68% |
| S.S. | 0439365941 | Cyclobenzaprine | 10702000610 | 2.00078 | 1.37808 | 45.19% |
| S.T. | 0398874248 | Cyclobenzaprine | 10702000610 | 1.88967 | 1.37808 | 37.12% |
| B.F. | 0401255203 | Cyclobenzaprine | 10702000610 | 1.88967 | 1.37808 | 37.12% |
| Q.D. | 0407038397 | Cyclobenzaprine | 10702000610 | 1.96095 | 1.37808 | 42.30% |
| I.G. | 0431259696 | Cyclobenzaprine | 69512054110 | 10.0167 | 1.37808 | 626.86% |
| C.B. | 0443253851 | Cyclobenzaprine | 10702000610 | 1.88967 | 1.37808 | 37.12% |
| M.W. | 0439413329 | Cyclobenzaprine | 10702000610 | 1.88967 | 1.37808 | 37.12% |
| S.D. | 0407038397 | Naproxen | 53746019401 | 3.64867 | 2.85224 | 27.92% |
| Y.W. | 0392150751 | Naproxen | 68462019005 | 1.27533 | 0.954 | 33.68% |
| A.M. | 0384475745 | Naproxen | 53746019401 | 3.64867 | 2.85224 | 27.92% |
| L.L. | 0437939846 | Ibuprofen | 67877032005 | 0.5663 | 0.41224 | 37.37% |
| F.F. | 0442640900 | Ibuprofen | 67877032005 | 0.55944 | 0.41224 | 35.71% |
| M.C. | 0445325137 | Ibuprofen | 67877032005 | 0.55944 | 0.41224 | 35.71% |
| M.A. | 0416323772 | Ibuprofen | 69512060090 | 7.81111 | 6.204448 | 25.90% |
| M.J. | 0452224330 | Ibuprofen | 69512080090 | 7.81111 | 6.204448 | 25.90% |
| A.H. | 0466822749 | Ibuprofen | 69512060090 | 7.81111 | 6.204448 | 25.90% |
| R.R. | 0440062669 | Ibuprofen | 69512060090 | 7.81111 | 6.204448 | 25.90% |
| L.P. | 0410414296 | Baclofen | 00832102400 | 5.27533 | 1.9768 | 166.86% |
| S.D. | 0407038397 | Tramadol | 10370022111 | 5.06429 | 3.7656 | 34.49% |

661.    Accordingly, it is clear that Wellmart has unlawfully and grossly overcharged Allstate in connection with these and other prescription drugs.

662.    Overall, and by way of example, Wellmart and those working on its behalf unlawfully overcharged Allstate by the following amounts each and every time that these prescription drugs were dispensed and delivered to an Allstate Claimant.  All of these charges are grossly excessive, and are designed to (a) induce Allstate to pay Wellmart more than lawfully

allowed, and (b) provide, upon information and belief, Wellmart with the finances necessary to engage in the unlawful financial and referral relationships with prescribing providers:

| Claimant Initials | Claim No. | Drug Name | NDC | Qty | Invoice Price | Allowed Charge (per Fee Schedule) | Variance (Excess Charged) |
|---|---|---|---|---|---|---|---|
| K.G. | 0398874248 | Acetaminophen/ Codeine | 00093015001 | 60 | $26.66 | $17.35 | $9.31 |
| L.P. | 0410414296 | Baclofen | 68462018901 | 120 | $132.20 | $101.76 | $30.44 |
| S.S. | 0439365941 | Cyclobenzaprine | 10702000610 | 90 | $180.07 | $124.03 | $56.04 |
| S.T. | 0398874248 | Cyclobenzaprine | 10702000610 | 30 | $56.69 | $41.34 | $15.35 |
| B.F. | 0401255203 | Cyclobenzaprine | 10702000610 | 30 | $56.69 | $41.34 | $15.35 |
| Q.D. | 0407038397 | Cyclobenzaprine | 10702000610 | 21 | $41.18 | $28.94 | $12.24 |
| I.G. | 0431259696 | Cyclobenzaprine | 69512054110 | 30 | $300.50 | $41.34 | $259.16 |
| C.B. | 0443253851 | Cyclobenzaprine | 10702000610 | 30 | $56.69 | $41.34 | $15.35 |
| M.W. | 0439413329 | Cyclobenzaprine | 10702000610 | 30 | $56.69 | $41.34 | $15.35 |
| S.D. | 0407038397 | Naproxen | 53746019401 | 60 | $218.92 | $171.13 | $47.79 |
| Y.W. | 0392150751 | Naproxen | 68462019005 | 60 | $76.52 | $57.24 | $19.28 |
| A.M. | 0384475745 | Naproxen | 53746019401 | 60 | $218.92 | $171.13 | $47.79 |
| L.L. | 0437939846 | Ibuprofen | 67877032005 | 100 | $56.63 | $41.22 | $15.39 |
| F.F. | 0442640900 | Ibuprofen | 67877032005 | 90 | $50.35 | $37.10 | $13.25 |
| M.C. | 0445325137 | Ibuprofen | 67877032005 | 90 | $50.35 | $37.10 | $13.25 |
| M.A. | 0416323772 | Ibuprofen | 69512060090 | 90 | $703.00 | $558.40 | $144.60 |
| M.J. | 0452224330 | Ibuprofen | 69512080090 | 90 | $703.00 | $558.40 | $144.60 |
| A.H. | 0466822749 | Ibuprofen | 69512060090 | 90 | $703.00 | $558.40 | $144.60 |
| R.R. | 0440062669 | Ibuprofen | 69512060090 | 90 | $703.00 | $558.40 | $144.60 |
| L.P. | 0410414296 | Baclofen | 00832102400 | 15 | $79.13 | $29.65 | $49.48 |
| S.D. | 0407038397 | Tramadol | 10370022111 | 14 | $70.90 | $52.72 | $18.18 |

663. In addition to the fact that most, if not all, of the Allstate Claimants did not require these prescription drugs in the quantities purportedly dispensed by Wellmart, because the charges submitted to Allstate by, or on behalf of, Wellmart in connection with these prescription drugs—and many others—were fraudulent, unlawful, and excessive, Wellmart's reimbursement demands mailed to Allstate in connection with each of the Allstate Claimants are not compensable under New York's No-Fault laws.

664.    To the extent that Allstate was caused to make payments related to these, and other, prescription drugs purportedly dispensed and delivered to Allstate Claimants, Allstate is entitled to recover all such payments made to, or for the benefit of, Wellmart in connection with all such prescription drugs.

665.    Moreover, to the extent that any of the charges submitted in connection with any such prescription drugs remain unpaid, Allstate is under no obligation to make any future payments in connection with those transactions because these prescription drugs (a) were fraudulently and excessively charged, and/or (b) were virtually never medically necessary for the treatment of the Allstate Claimants' accident-related injuries, thus rendering all such charges not compensable under New York's No-Fault laws for each of the reasons detailed above.

### 6.    Wellmart's Unlawful Relationship with Prescribing Providers

666.    Davydov's and Nektalov's scheme depended on Wellmart's ability to bill and collect payment for as many drugs and medications as possible.

667.    The scheme also depended on the willingness of prescribers—like Jacobi—to write prescriptions for the specific products offered by Wellmart.

668.    Because Jacobi was essentially Davydov's employee and under his control, Davydov could simply instruct Jacobi (or other prescribers employed by Epione) to prescribe these products.

669.    By controlling the Queens Village Clinic, Davydov also could ensure that the drugs were dispensed and delivered to patients regardless of whether the patient even wanted them, including the automatic delivery of the drugs to the Queens Village Clinic to be handed directly to patients by the front desk.

670. These measures deprived patients of all meaningful choices, and resulted in many patients receiving drugs and medications, including Compounded Products, that they did not want or need.

671. Davydov's and Nektalov's scheme also relied on aggressive prescription practices with regard to Compounded Products.

672. Indeed, in many cases, a Compounded Product was prescribed on the same day— or within days—of the claimant's initial evaluation with the prescribing provider, including Jacobi, without any trial of more conservative treatment or a commercially available product, as demonstrated in the chart below:

| Claimant Initials | Claim No. | Prescribing Provider | Date of Initial Evaluation | Prescription Date for Compounded Product |
|---|---|---|---|---|
| G.H. | 0458044062 | Michael Y. Jacobi, D.O. | 6/2/2017 | 6/2/2017 |
| C.L. | 0451787303 | Michael Y. Jacobi, D.O. | 3/29/2017 | 3/29/2017 |
| K.G. | 0398874248 | Michael Y. Jacobi, D.O. | 2/2/2016 | 2/2/2016 |
| L.G. | 0406210815 | Michael Y. Jacobi, D.O. | 3/22/2016 | 3/22/2016 |
| M.C. | 0451003305 | Michael Y. Jacobi, D.O. | 4/20/2017 | 4/20/2017 |
| A.C. | 0471841072 | Michael Y. Jacobi, D.O. | 8/24/2017 | 8/24/2017 |
| A.C. | 0460654890 | Michael Y. Jacobi, D.O. | 4/20/2017 | 4/20/2017 |
| K.M. | 0452991268 | Michael Y. Jacobi, D.O. | 4/14/2017 | 4/14/2017 |
| R.R. | 0417691193 | Michael Y. Jacobi, D.O. | 6/16/2016 | 6/16/2016 |
| L.P. | 0410414296 | Michael Y. Jacobi, D.O. | 4/20/2016 | 4/20/2016 |
| F.G. | 0430666677 | Radha Gara, M.D. | 10/18/2016 | 10/18/2016 |
| J.M. | 0460765654 | Claudia Geris, PA | 8/3/2017 | 8/3/2017 |
| A.J. | 0462397141 | Claudia Geris, PA | 7/6/2017 | 7/6/2017 |

| Claimant Initials | Claim No. | Prescribing Provider | Date of Initial Evaluation | Prescription Date for Compounded Product |
|---|---|---|---|---|
| M.B. | 0450361308 | Conrad Cean, M.D. | 4/26/2017 | 4/26/2017 |
| C.F. | 0453972762 | Conrad Cean, M.D. | 4/25/2017 | 4/25/2017 |
| J.G. | 0454552456 | Conrad Cean, M.D. | 5/9/2017 | 5/9/2017 |
| R.D. | 0445301666 | Denny Rodriguez, M.D. | 2/15/2017 | 2/15/2017 |
| J.B. | 0473929610 | Denny Rodriguez, M.D. | 9/18/2017 | 9/18/2017 |
| I.B. | 0473929610 | Denny Rodriguez, M.D. | 9/18/2017 | 9/18/2017 |

673. Given the timing of these prescriptions, it was impossible for the prescribing providers, including Jacobi, to account for the patients' medical needs and tailor the compounds to the specific needs of each patient.

674. The timing of these prescriptions relative to the date of the examination also means that the prescribing providers, including Jacobi, never even attempted any conservative treatment or FDA-approved alternatives prior to prescribing Compounded Products.

675. Indeed, these examples clearly demonstrate that the topical Compounded Products were used early and often without documentation of medical necessity, benefit, or functional improvement.

676. The close timing of the prescriptions for Compounded Products also supports the existence of collusive and/or unlawful financial relationships between Wellmart (and/or its agents) and the prescribing providers, including Jacobi.

677. Specifically, Wellmart (and/or its agents), upon information and belief, conspired with various prescribing providers, including, but not necessarily limited to, Jacobi, to induce the automatic prescription and dispensing of Wellmart's Compounded Products and other drugs.

678. To the extent that the prescribing providers, including, but not necessarily limited to, Jacobi, prescribe Wellmart's Compounded Products and other drugs pursuant to a financial or other arrangement with Wellmart (and/or those working on behalf of Wellmart) that would violate New York's applicable licensing laws, then Wellmart would not be lawfully entitled to seek and collect assigned No-Fault benefits under New York law in connection with the dispensing of these unlawful prescriptions, and it would be inequitable and unjust to allow the Defendants to retain any monies received by Allstate as a result of the No-Fault claim whose underlying services (i.e., the dispensing and delivery of Wellmart's Compounded Products and other drugs) was the product of an unlawful financial arrangement.

### F. BILLING FOR FRAUDULENT MEDICAL SERVICES

679. When treating patients of Epione, Jacobi engaged in numerous unlawful acts, including recommending and administering a battery of excessive and unwarranted examinations, tests, and treatment.

680. Additionally, Jacobi also prescribed medically unnecessary drugs and medications, including Compounded Products and Diclofenac Sodium Gel 3%, which were, in many cases, dispensed to Epione patients by Wellmart.

681. The documents and invoices created and submitted to Allstate by (or on behalf of) Epione routinely misrepresented that the billed-for services were performed in a legitimate and clinically-reasonable manner.

682. However, as explained below, the tests and treatment billed for by Epione were medically unnecessary and excessive.

683. Epione also falsely billed Allstate by misrepresenting the nature and extent of the services that were purportedly provided.

684. As alleged herein, not only has this scheme injured Allstate, but it has also compromised and/or endangered the well-being of Epione's patients by subjecting them to tests and treatment that were not warranted, and to medications that were not proven safe or effective.

685. Because of the misconduct described below, none of Epione's claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

### 1.    Falsely Charged Initial Examinations

686. The initial examination reports submitted to Allstate for patients of Epione were intentionally designed to create a false justification for a battery of tests, treatments, and services to be purportedly provided, and billed for, by providers operating from the Queens Village Clinic, including Epione and APAK.

687. For example, Epione's initial examination reports uniformly contained an identical paragraph that was intended to establish an overarching causal connection to the underlying motor vehicle accident as to *all* subsequent treatment.

688. This boilerplate paragraph, however, was not tailored to the specifics of the particular accident with the exception of the date of accident and whether the patient was a passenger, driver, or pedestrian.

689. Additionally, patients of Epione often were referred, at the time of the initial examination, for magnetic resonance imaging (MRI) as to each area for which the patient complained of pain even though such referrals are premature and inappropriate as MRIs should

only rarely be recommended at initial examinations and should not be used as part of a provider's systematic approach.

690. However, the reports of these MRIs were then used by providers purportedly treating patients of Epione, including Jacobi, to further manufacture a false basis for continued treatment, tests, and services at the Queens Village Clinic.

691. Therefore, it is clear that providers purportedly performing initial examinations on behalf of Epione, including Jacobi, used these examinations as an opportunity to set the stage for the excessive and medically unnecessary protocol of treatment mandated for patients at the Queens Village Clinic.

692. Epione billed for initial patient examinations at high-level codes, including CPT code 99204.

693. However, these charges were false and fraudulent because by using these CPT codes, Epione and Jacobi made several misrepresentations about the nature and extent of these examinations.

694. For example, any charges for examinations submitted under CPT code 99204 must meet the criteria listed below:

| CPT Code | History | Examination | Medical Decision Making | Face to Face Time |
|---|---|---|---|---|
| 99201 | Problem Focused | Problem Focused | Straight forward | 10 minutes |
| 99202 | Expanded Problem Focused | Expanded Problem Focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

695.     Therefore, a charge for an examination classified under CPT code 99204 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, and (c) medical decision making of moderate complexity.

696.     If any of the three (3) key components are not met, CPT code 99204 is not supported.

697.     In the case of such patient examinations, the factors considered to determine the "complexity" of medical decision making when assigning a proper CPT code designation include:

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Straight forward medical decision making (CPT 99201 and 99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT 99203) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT 99204) | Multiple | Moderate | Moderate |
| High complexity decision making (CPT 99205) | Extensive | Extensive | High |

698.     To qualify for a given type of decision making, two (2) of the three (3) elements in the table must be met or exceeded.

699.     The presenting problem(s) warranting CPT code 99204 are also usually of moderate severity.

700.    Additionally, physicians typically spend forty-five (45) minutes of face-to-face time with the patient and/or family when billing under CPT code 99204.

701.    Because the examinations of Epione's patients performed by Jacobi (or someone acting under his direction or control) were actually minimal and insubstantial, the representations about the nature and extent of the services were false, and the charges based on these misrepresentations were likewise false.

702.    Indeed, several claimants testified that Jacobi did not spend anywhere near forty-five (45) minutes of face-to-face time with the claimant during the initial examination.

703.    For instance, Jacobi examined Allstate claimant G.M. (claim no. 0506381474) on June 19, 2018, and then billed for this office visit under CPT code 99204.

704.    According to G.M, the initial examination with Jacobi lasted "15 to 20 minutes."

705.    At this examination, G.M. stated that Jacobi tried "to move her legs and possibly how far [she] could bend."

706.    G.M.'s testimony about the nature and extent of the office visit demonstrates why Epione's charge under CPT code 99204 was false whereas the exam was brief (less than half the required time) and not complex (Jacobi conducted a cursory exam and reported predominantly self-limited soft tissue sprains and strains).

707.    Additionally, Epione billed under CPT code 99204 for an initial examination performed on May 24, 2018 by a physician reportedly employed by Epione for claimant M.T. (claim no. 0502756646).

708.    According to M.T., the initial examination with the physician at Epione lasted "[a]bout 15 minutes."

709. Consistent with M.T.'s statement, the examination report for the May 24, 2018 office visit does not support the use of CPT code 99204.

710. For instance, the report merely checks off routine, predetermined management options, including physical therapy, range of motion and muscle strength testing, and outcome assessment testing, and thus does not evidence any medical decision making of moderate complexity.

711. Moreover, the only medication prescribed (via a pre-printed check-box on the initial examination report) during this examination was Diclofenac Sodium Gel 3%, which, as explained above, is wholly unnecessary and inappropriate for the treatment of traumatic pain.

712. M.T.'s testimony about the nature and extent of the May 24, 2018 office visit demonstrates why Epione's charge under CPT code 99204 was false whereas the examination was brief (less than half the required time) and not complex in terms of medical decision making (the report did not document any complex data to be reviewed and did not involve a moderate risk of complications and/or morbidity or mortality).

713. Epione also billed for an office visit under CPT code 99204 purportedly performed by Jacobi for claimant S.F. (claim no. 0531553857) on January 8, 2019.

714. According to S.F., Jacobi examined S.F. for "[a]bout 25 minutes."

715. S.F.'s testimony about the nature and extent of the January 8, 2019 office visit demonstrates why Epione's charge under CPT code 99204 was false whereas the examination was brief (approximately half the required time) and not complex in terms of scope of medical decision making (Jacobi diagnosed S.F. predominantly with self-limited soft tissue injuries, including sprains, strains, and contusions and recommended that S.F. undergo a protocol of treatment, including physical therapy and range of motion and muscle strength testing).

716.     Therefore, for these claimants, the initial examinations did not support billing under CPT code 99204 as the examinations did not include face-to-face time of forty-five (45) minutes, a comprehensive history, a comprehensive examination, or medical decision-making of moderate complexity.

717.     Accordingly, for these reasons, all of Epione's charges for such services under CPT code 99204 are not compensable as represented.

718.     During the relevant period, Epione submitted and/or caused to be submitted, claims to Allstate based on these records.

719.     The chart annexed at Exhibit 3 identifies all of Epione's patients that purportedly received initial examinations/office visits that were billed at the CPT code 99204 level.

720.     Based on the medical documentation submitted by Epione for each of the patients identified in Exhibit 3, none of the billing containing charges for CPT code 99204 was warranted because the medical documentation submitted to Allstate for each of the patients fails to meet the minimum threshold necessary to bill CPT code 99204.

721.     Because the nature and extent of the examinations under CPT code 99204 were misrepresented, Epione is not entitled to collect payment for such services under New York's No-Fault laws, including, but not limited to, the charges listed in the chart annexed hereto as Exhibit 3.

## 2.     Excessive Physical Therapy and Chiropractic Treatment

722.     Jacobi routinely refers Epione's patients for both physical therapy and chiropractic treatment, which is billed to Allstate by Epione and APAK, respectively.

723.     The physical therapy and chiropractic treatments billed by Epione and APAK were excessive.

724. Patients seen by Jacobi at the Queens Village Clinic had only minor injuries, if any.

725. The minor injuries required only conservative treatment, which involved either physical therapy or chiropractic care, but not both.

726. Nonetheless, patients of the Queens Village Clinic were subjected to months of simultaneous and unnecessary physical therapy and chiropractic treatment during the relevant period.

727. Patients with minor injuries should only receive four (4) to six (6) weeks of physical therapy or chiropractic treatment, usually for a maximum of fifteen (15) or twenty (20) visits.

728. However, Epione and APAK routinely billed for much more than fifteen (15) to twenty (20) visits in connection with each patient.

729. Finally, the documentation submitted to Allstate by Epione and APAK warranted that the physical therapy and chiropractic treatment was medically necessary even though the services were not effective and the patients showed no overall clinical improvement.

730. However, Epione and APAK continued to bill for physical therapy and chiropractic services even though the treatments were not working.

731. Epione's and APAK's bills for these excessive, simultaneous physical therapy and chiropractic services are not compensable under New York's No-Fault laws, including, but not limited to, the charges listed in the charts annexed hereto at Exhibits 4-5.

**3.      Unnecessary Outcome Assessment Testing**

732. Jacobi (or those working under his direction or control) also regularly orders medically unnecessary "outcome assessment testing" for patients of Epione.

733. However, the outcome assessment testing has no clinical utility, and, rather, merely is a way for Jacobi to generate additional billing.

734. Indeed, Epione submits unbundled charges to Allstate for this unnecessary outcome assessment testing.

735. Specifically, Epione routinely billed Allstate for outcome assessment testing under CPT code 99358 in conjunction with follow-up office visits, such as that purportedly provided to patient A.R. (claim no. 052560626):

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Code | Charge s ^ |
|---|---|---|---|---|
| 07/05/2018 | 218-08 HEMPSTEAD AVE; 2nd FLOOR, QUEENS VILLAGE, NY 11429 | Follow up | 99214-25 | $ 92.98 |
| 07/05/2018 | 218-08 HEMPSTEAD AVE; 2nd FLOOR, QUEENS VILLAGE, NY 11429 | Prolonged evaluation and management service of patient case (Outcome Assessment Test) | 99358 | $ 204.41 |

**TOTAL CHARGES TO DATE $ 297.39**

736. This outcome assessment testing, according to documentation submitted to Allstate by Epione in support of these fraudulent charges, consists of "patient questionnaires," including the Oswestry Low Back Pain Disability Questionnaire and Roland Morris Disability Questionnaire, through which the patient reports pain levels and functional abilities.

737. However, such questionnaires are part and parcel of the evaluation and management services and cannot be separately charged because the testing does not have any accompanying supply costs and any work associated with this testing is included in the charge for the evaluation and management service. *See AMA CPT Assistant*, Nov. 2009, Vol. 9, Issue 11.

738. Therefore, Epione improperly and fraudulently unbundled the charges for such medically unnecessary outcome assessment testing from the follow-up office visit.

739. As a result, all of the charges submitted to Allstate by Epione in connection with this outcome assessment testing under CPT code 99358 were medically unnecessary, fraudulently unbundled, and purposely misrepresented, and thus are not compensable under New York's No-

Fault laws, including, but not limited to, the charges listed in the chart annexed hereto at Exhibit 6.

### 4. Fraudulent Range of Motion Testing

740. As noted above, the initial examinations purportedly conducted for patients of Epione routinely recommended that patients undergo range of motion and muscle strength testing as part of a predetermined protocol of treatment listed on Epione's initial examination report forms.

741. However, as explained below, such testing was not medically necessary, and was also conducted in a false and fraudulent manner, generating clinically worthless results.

742. Neither Jacobi nor the providers working under his direction and control review the results of this testing; in fact, the testing did not have any impact on patient care.

743. Rather, this testing was reported and billed as a means to generate additional revenue, and the Defendants had no incentive to legitimately perform this testing or produce accurate results.

744. Range of motion ("ROM") testing is utilized to measure spinal ROM in three planes of motion: sagittal (i.e., extension-flexion), frontal or coronal (i.e., lateral bending to the left and right), and transverse or axial (i.e., rotation).

745. Spinal ROM consists of all three segments of the spine: cervical, thoracic, and lumbar.

746. If a spinal region is found to have two or more impaired motions, then ratings for each ROM impairment are added.

747. In many instances, Jacobi (or those working under his direction and control, including Raytsin) failed to measure ROM in all three required planes of motion when administering spinal ROM of each segment of the spine to patients of Epione.

748.     As a result, the ROM administered for patients of Epione are incomplete and have limited clinical relevance.  This incomplete testing results in an inability to determine the extent of the injury.

749.     Additionally, the results of the ROM testing administered to patients of Epione measuring their shoulder ROM generated incredible results.

750.     Specifically, the results of the ROM testing, if accurate and representative of the patients' actual conditions, would mean that certain patients of Epione could not raise their arms out to their sides or over their heads, which results are indicative of major shoulder injuries that are not otherwise indicated in the patients' medical records.

751.     Indeed, full shoulder abduction ROM is 180 degrees, but the ROM testing results for Allstate Claimants often reported shoulder ROM below 20 degrees.  These results are not legitimate because nothing in the Claimants' medical records indicated severe functional limitations of the shoulder.

752.     Likewise, there were vast discrepancies between the findings of the computerized ROM findings purportedly performed for patients of Epione and the manual ROM findings performed by other providers treating the same patients.

753.     Therefore, it is clear that the ROM testing purportedly performed for patients of Epione was performed below the standard of care and wholly without regard for verifying the accuracy of the measurements.

754.     Even if the spinal ROM testing was performed completely and pursuant to the standard of care, the billing for computerized ROM was still not medically necessary.

755.     The patients' ROM was determined manually during the initial evaluation, yet Epione still billed for computerized ROM even though the prior ROM determination was sufficient.

756.     Epione's bills for computerized ROM testing were false and fraudulent and, therefore, not compensable because Epione improperly and purposely unbundled the charges for these services as a means to artificially inflate the charges submitted to Allstate.

757.     Epione billed for ROM tests under CPT code 95851, which requires a separate written and signed repoort.

758.     In this case, Epione repeatedly billed Allstate for ROM tests under CPT code 95851 even though Jacobi (or those working under his direction and control) never provided a separate written and signed report.

759.     Accordingly, Epione billed Allstate for services that were not rendered as represented.

760.     Epione also falsely billed for ROM tests by submitting charges under CPT code 95851 and CPT code 97750 in connection with computerized muscle testing performed on the same date of service.

761.     Even if the ROM testing was medically necessary, Epione's bills are false and inflated because only CPT code 97750 can be reported and charged.

762.     While ROM testing billed under CPT code 95851 is considered a "separate procedure" under the Fee Schedule, it cannot be billed separately because the testing is an integral component of physicial performace testing, which is charged under CPT code 97750.

763.    Therefore, Epione falsely inflated the billing submitted to Allstate by wrongly charging for ROM testing under CPT code 95851 in conjunction with CPT code 97750 for the same date of service.

764.    Epione attempted to evade this billing prohibition by improperly appending modifier -59 to its charges under CPT code 97750 to make it look like the computerized muscle testing was a wholly distinct service from the ROM testing.

765.    However, this testing was performed in a wholly distinct manner from the ROM testing.  Indeed, the results of the ROM testing and computerized muscle testing are reported on the same print-out produced by the JTech machine used by Epione in performing these tests.

766.    Epione never provided a separate written report relating to these services, and thus provided no explanation supporting the use of modifier -59 with CPT code 97750.

767.    Because Epione's charges for the ROM tests were false and fraudulent, each charge submitted to Allstate by Epione for these tests is not compensable under New York No-Fault law, including, but not limited to, the charges under CPT code 95851 that are listed in the chart annexed hereto at Exhibit 7.

### 5.    Fraudulent Muscle Strength Testing

768.    Manual muscle testing ("MMT") is generally utilized to measure a patient's muscle strength by applying opposing, resistant forces against the body of the patient, who is attempting to move against this force.

769.    Here, Jacobi (or those working under his direction and control, including Raytsin) administered computerized muscle testing for patients of Epione even when a manual determination of a patient's muscle strength was sufficient.

770.    Like the computerized ROM testing wrongly billed by Epione, the computerized muscle testing also did not have any impact on patient care; in fact, there is no indication that Jacobi, or anyone else, ever reviewed the results.

771.    As part of the justification of such testing, the computerized muscle testing report stated that the testing was medically necessary because it was objective computerized testing and establishes a baseline level to work with.

772.    There is no such thing as "objective" computerized muscle testing because the patient's cooperation is required to determine their level of maximum strength, regardless of whether it was done manually or by way of a computer.

773.    A baseline level can be established in the initial or follow-up examination, thus further negating the "medical necessity" of this testing.

774.    Jacobi (or those working under his direction and control) also performed computerized muscle testing for patients of Epione that was incomplete and only indicated a limited number of muscle groups being tested.

775.    By limiting itself to only a small sampling of muscle groups, the computerized muscle testing returns incomplete data, which is clinically flawed.

776.    Jacobi (or those working under his direction and control) documented medically incredible muscle strength testing data: if true, Epione's patients were unable hold their heads erect or hold their trunks erect, which findings were directly contradicted the findings of the patients' clinical examinations.

777.    As a result, these reported computerized muscle testing results are invalid.

778.    The average adult head weighs 8 to 12 pounds, which is the amount of force necessary to support the head when centered directly on top of the spine.

779. When a person moves their head from the center of gravity, however, the cervical spine muscles are necessary to supply the appropriate force to prevent the person's head from dropping down to the chest.

780. Further, in order to for a person to lift their head off of the pillow while lying down (i.e., supine), the cervical flexion strength must exceed the weight of the head.

781. Consequently, if the cervical flexion strength is less than 8 pounds, it is medically unlikely that the patient will be able to lift their head off of a pillow in the supine position.

782. Remarkably, Jacobi (or those working under his direction and control) reported that certain patients undergoing computerized muscle strength testing lacked sufficient cervical muscle strength to simply hold their head up while sitting upright.

783. However, these patients' purported inability to hold their heads up is inconsistent with the clinical medical reports for these same patients.

784. Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for patients of Epione are false and fraudulent.

785. To calculate the pounds of force required for a person to hold their trunk erect (i.e., sit up without assistance, stand up straight) requires a calculation of their body weight multiplied by the percentage of body weight that is in the trunk (35.8-48% of body weight on average).

786. In the patients of Epione who received computerized muscle testing of the trunk, profound muscle weakness was reported to the degree that the patient would be unable to stand up, even though such results were inconsistent with the clinical medical reports for the same patients.

787. Therefore, the computerized muscle testing of the trunk reported and billed for patients of Epione are false and fraudulent.

788. Because the computerized muscle testing was unnecessary, the charges submitted to Allstate by Epione for this testing (i.e., the charges billed by Epione under CPT code 97750) are not compensable under New York No-Fault law, including, but not limited to, the charges listed in the chart annexed hereto at Exhibit 8.

### 6. Medically Unnecessary Electrodiagnostic Testing

789. Electrodiagnostic ("EDX") testing services, such as electromyography ("EMG") studies and nerve conduction velocity ("NCV") studies, also were incorporated into the treatment protocol in place at the Queens Village Clinic, and patients of Epione were routinely subjected to these services regardless of whether they were necessary.

790. The provision of EDX testing services to patients was of great benefit to this scheme to defraud Allstate because (a) the studies are expensive, and (b) the results of the studies could—and would—most often be used to justify the prescription and provision of further unnecessary medical services.

791. NCV studies are non-invasive studies in which peripheral nerves are stimulated with electrical current.

792. NCV studies include "F-Wave" and "H-Reflex" studies.

793. EMG tests measure the electrical activity of muscles, and are often done in connection with NCV studies.

794. An EMG test involves the insertion of a needle into various muscles in the spinal area ("paraspinal muscles"), and in the arms and/or legs to measure electrical activity in each muscle.

795.     EDX testing must never follow a predetermined protocol.  The decision of which nerves and muscles to test in each limb should be tailored to each patient's unique circumstances, and to their unique EDX findings.

796.     In a legitimate clinical setting, the decision of which nerves to study for each patient is based on (a) an evaluation of the patient's history, (b) a detailed neurologic examination of the patient, and (c) the "real time" results obtained during the actual tests.

797.     As a result, the nature and extent of EDX studies should vary from patient to patient.

798.     For example, if an abnormality is found during the tests, further investigation should be undertaken to determine the exact nature of the abnormality and the scope of the problem in terms of the number of nerves involved.

799.     Moreover, the nerves and muscles chosen for EDX testing must depend on each patient's specific complaints, physical examination findings, and prior EDX findings.

800.     However, in certain instances, Epione billed for the testing of excessive nerves that bore no relationship to the patient's complaints.

801.     Additionally, the nature and extent of EDX testing should never be the same for every patient.

802.     Throughout the course of this scheme, Epione deployed EDX testing without any basis in evidence-based guidelines and contrary to the standard of care.

803.     Epione's patients underwent EDX testing when there was no evidence that the patients were suffering from significant neurological dysfunction, bowel or bladder dysfunction, saddle anesthesia (i.e., loss of sensation associated with cauda equina syndrome), or signs of myelopathy—conditions that would have promoted or justified the aggressive and rapid performance of such diagnostic testing.

804.     Not only was such EDX testing unnecessary, but it also (a) inflated the charges submitted to Allstate, and (b) placed the patients at additional—and unwarranted—physical risk of injury and infection.

805.     Moreover, even if the EDX testing was warranted, the testing was still fraudulent because the results were misinterpreted and/or falsely utilized as support to justify the provision of additional—and unneeded—treatment.

806.     For example, the provider performing EMG testing for patients of Epione performed this testing below the standard of care by, according to submitted medical records, routinely asked patients to activate their back muscles while a needle was inserted into the patients' back, which is not a legitimate EMG technique and a clear sign that the provider purportedly administering the EMG test did not know how to properly perform the test.

807.     Overall, the fraudulent nature of the EMG studies purportedly performed for patients of Epione is reflected in their remarkably high positivity rate.

808.     Indeed, essentially 100% of Epione's studies report abnormal finding even though this outcome is not statistically likely in EMG testing, which carries a sensitivity of approximately 75% for radiculopathy and an ever lower sensitivity for radiculopathies causing only pain as opposed to loss of muscle function.

809.     Accordingly, because the EDX tests billed by Epione were excessive, not warranted by the condition of the patient, and conducted in a false and fraudulent manner, all of the charges submitted by Epione in connection with these tests are not compensable under New York's No-Fault laws, including, but not limited to, those charges listed in the chart annexed hereto at Exhibit 9.

### 7. Unnecessary Ultrasound Guidance in Connection with Trigger Point Injections

810. Epione routinely billed Allstate for ultrasound guidance performed in connection with trigger point injections.

811. A trigger point injection is simply an injection of a local anesthetic, sometimes with corticosteroid, into soft tissue structures, usually in the spinal or upper back musculature.

812. A trigger point injection is performed by palpation of the "trigger point" and then direction of the needle into the trigger point itself.

813. Ultrasound guidance is not necessary to perform a trigger point procedure safely and effectively.

814. Therefore, there is no clinical justification to performing a trigger point injection under ultrasound guidance.

815. However, billing for ultrasound guidance is a way to wrongly inflate the charges for this otherwise simple procedure.

816. In fact, the ultrasonic guidance for the trigger point injection is actually more expensive than the trigger point injection itself.

817. Indeed, Epione charged Allstate $262.91 dollars just for wholly unnecessary ultrasound guidance alone under CPT code 76942 while the trigger point injection procedure was charged in the amount of $119.10 as illustrated by the charges submitted to Allstate in connection with claimant R.S. (claim no. 0493041115):

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| 04/18/2018 | 218-08 HEMPSTEAD AVE, 2ND FLOOR, QUEENS VILLAGE, NY 11429 | Trigger point injection (s) >3 ms groups | 20553 | $ 119.10 |
| 04/18/2018 | 218-08 HEMPSTEAD AVE, 2ND FLOOR, QUEENS VILLAGE, NY 11429 | Ultrasound guidance for needle placement | 76942 | $ 262.91 |
| 04/18/2018 | 218-08 HEMPSTEAD AVE, 2ND FLOOR, QUEENS VILLAGE, NY 11429 | Pain management consultation | 99243-25 | $ 181.23 |
| 04/18/2018 | 218-08 HEMPSTEAD AVE, 2ND FLOOR, QUEENS VILLAGE, NY 11429 | Injection, methylprednisolone acetate, 40 mg (Depo-Medrol) | J1030 | $ 15.00 |
| 04/18/2018 | 218-08 HEMPSTEAD AVE, 2ND FLOOR, QUEENS VILLAGE, NY 11429 | Injection, ketorolac or thromethamine, 15 mg | J1885 | $ 10.00 |
| 04/18/2018 | 218-08 HEMPSTEAD AVE, 2ND FLOOR, QUEENS VILLAGE, NY 11429 | Injection, bupivicaine hydrochloride, (0.5% marcaine) | S0020 | $ 10.00 |

**TOTAL CHARGES TO DATE** $ 598.24

818. As a result, all of the charges submitted to Allstate by Epione in connection with this ultrasound guidance under CPT code 76942 were medically unnecessary and thus are not compensable under New York's No-Fault laws, including, but not limited to, the charges listed in the chart annexed hereto at Exhibit 10.

### 8. Specific Examples of Fraudulent Billing for Excessive and Medically Unnecessary Treatment

#### a. *Patient A.R. (claim no. 0502560626)*

819. Patient A.R. was purportedly involved in a motor vehicle accident on May 17, 2018.

820. A.R. was purportedly examined at Epione on May 24, 2018, and the examination was billed to Allstate under high-level CPT code 99204.

821. According to the report of this initial examination, Jacobi referred A.R. for both chiropractic and physical therapy assessments.

822. A.R. purportedly proceeded to receive chiropractic treatment through APAK and physical therapy treatment through Epione simultaneously with treatment often taking place on the same dates of service even though there is no indication for simultaneous treatment from both disciplines.

823.     APAK and Epione billed Allstate for excessive chiropractic and physical therapy treatment.

824.     The report of this initial examination submitted to Allstate included measurements that were purportedly taken of A.R.'s spinal and shoulder ROM.

825.     Nonetheless, on May 31, 2018, Epione billed for computerized ROM testing of A.R.'s spine and shoulders.

826.     However, Jacobi (or someone acting under his direction or control) failed to measure A.R.'s lumbar ROM in all three (3) required planes of motion.

827.     Specifically, the ROM measurements for A.R.'s lumbar spine reported by Epione on May 31, 2018 omitted lumbar rotation and thus were incomplete.

828.     Epione reported similarly false and fraudulent ROM measurements for A.R. on two (2) subsequent occasions on July 11, 2018 and August 2, 2018 by omitting lumbar rotation.

829.     Even if the spinal ROM testing for A.R. was complete, the computerized ROM was not medically necessary because the manual determinations of A.R.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

830.     Additionally, the reported results of the ROM measurements for A.R.'s shoulders on May 31, 2018 are consistent with bilateral frozen shoulders even though such a deficient ROM is not indicated in the report of A.R.'s initial visit at Epione or in the records of other providers purportedly treating A.R., including APAK.

831.     Indeed, in his report of the initial examination of A.R., Jacobi reported that A.R. had a normal ROM in his right shoulder, but the results of the ROM testing for A.R.'s shoulder, including the supposedly asymptomatic right shoulder, were both recorded at less than twenty (20) degrees of abduction on May 31, 2018.

832.     Overall, the results of Epione's computerized ROM testing purportedly performed for A.R. on July 11, 2018 and August 2, 2018 continue to be inconsistent with the shoulder ROM documented by other providers for A.R.

833.     Moreover, Epione also billed for computerized muscle testing for A.R. on May 31, 2018, July 11, 2018, and August 2, 2018.

834.     However, the results of this computerized muscle testing reported by Epione for A.R. were false and fraudulent.

835.     For example, Epione reported incredible results measuring the strength—or lack thereof—of A.R.'s neck and trunk.

836.     If true, Epione's reported results meant that A.R. lacked enough strength to hold his head upright.

837.     Specifically, Epione reported that A.R.'s neck muscles could exert less than five (5) pounds of force, which is far less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

838.     Therefore, based on Epione's reports that A.R. could exert only 3.4 pounds of cervical flexion force on May 31, 2018, 4.7 pounds of cervical flexion force on July 11, 2018, and 3.6 pounds of cervical flexion force on August 2, 2018, A.R. would not have been able to lift his head from a pillow in the supine position.

839.     Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of A.R., which reports did not describe any such profound weakness.

840.     Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for A.R. are false and fraudulent.

841.     Likewise, the computerized muscle testing results reported and billed for by Epione for A.R.'s trunk were also false and fraudulent.

842.     As of May 17, 2018, A.R.'s weight was reported as 190 pounds; therefore, to hold his trunk erect, A.R. required an ability to exert trunk extension force of at least 68.02 pounds, representing 35.8% of A.R.'s body weight.

843.     However, in all three (3) instances, Epione reported that A.R. could only exert between 3.5 and 3.8 pounds of trunk extension force, well below the 68.02 pounds of force required for A.R. to stand upright and support the trunk of his body.

844.     The report of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of A.R. did not contain any description of such profound muscle weakness to the degree that A.R. was unable to stand up.

845.     Therefore, the results of the computerized muscle testing of the trunk reported for A.R. were false and fraudulent.

846.     Additionally, just six (6) weeks following the alleged motor vehicle accident, A.R. purportedly was subjected to excessive electrodiagnostic studies of all four (4) limbs, which studies were billed to Allstate by Epione.

847.     For instance, an excessive number of forty (40) muscles purportedly were tested in this EMG study for A.R.

848.     Likewise, an excessive number of A.R.'s nerves purportedly were tested, including asymptomatic nerves.

849.     The electrodiagnostic study also included the evaluation of motor unit recruitment in the paraspinal musculature for A.R. even though motor unit recruitment cannot be assessed in the paraspinals as it can in other muscles, such as the bicep.

850. Overall, the electrodiagnostic studies purportedly performed for A.R. were not only performed poorly, but were misinterpreted.

851. Epione further billed for outcome assessment testing of A.R. under CPT code 99358 on July 5, 2018, July 31, 2018, and September 20, 2018.

852. Epione's billing for the outcome assessment testing is fraudulent because this service, in addition to having no clinical utility, cannot be charged separately from the follow-up examination, which was also billed for on the same day.

853. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for A.R. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

854. Overall, Allstate was induced to pay at least $6,029.71 to Epione for these false and fraudulent services during the relevant period.

**b.** ***Patient A.C. (claim no. 0471841072)***

855. Patient A.C. was purportedly involved in a motor vehicle accident on August 23, 2017.

856. The very next day, according to bills submitted to Allstate, A.C. initiated treatment with providers at the Queens Village Clinic, including Epione and APAK.

857. A.C. was purportedly examined at Epione on August 24, 2017, and the examination was billed to Allstate under high-level CPT code 99204.

858. According to the report of this initial examination, Jacobi referred A.C. for physical therapy, which A.C. purportedly began receiving that same day on August 24, 2017.

859.     However, in accordance with the treatment protocol established by Davydov for patients of the Queens Village Clinic, A.C. also purportedly was subjected to concurrent chiropractic treatment through APAK.

860.     Indeed, APAK also billed Allstate for an initial examination of A.C. purportedly performed on August 24, 2017 and purported to begin chiropractic treatment that same day.

861.     Indeed, A.C. purportedly proceeded to simultaneously receive physical therapy treatment at Epione and chiropractic treatment through APAK, which services were redundant, excessive, and continued despite consistent documentation in the medical records regarding the lack of efficacy of this treatment.

862.     The report of Jacobi's initial examination submitted to Allstate also included measurements that were purportedly taken of A.C.'s spinal ROM and shoulders.

863.     Nonetheless, on August 31, 2017, Epione billed for computerized ROM testing of A.C.'s spine and bilateral shoulders.

864.     The results of this August 31, 2017 ROM testing purportedly performed for A.C. showed profound deficits to the bilateral shoulder ROM including severe restriction to the right shoulder (of which, according to the report of Jacobi's initial examination, A.C. did not report any complaints) and mechanically impossible results for the left shoulder.

865.     Additionally, Jacobi (or someone acting under his direction or control) failed to measure A.C.'s lumbar ROM in all three (3) required planes of motion.

866.     Specifically, the computerized ROM measurements for A.C.'s lumbar spine reported by Epione on August 31, 2017 omitted lumbar rotation and thus were incomplete.

867.     Epione reported similarly false and fraudulent computerized ROM measurements for A.C. on two (2) subsequent occasions on October 5, 2017 and December 12, 2017 by omitting lumbar rotation.

868.     Even if the spinal ROM testing for A.C. was complete, the computerized ROM was not medically necessary because the manual determinations of A.C.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

869.     Moreover, Epione also billed for computerized muscle testing for A.C. on August 31, 2017, October 5, 2017, and December 12, 2017.

870.     However, the results of this computerized muscle testing reported by Epione for A.C. were false and fraudulent.

871.     For example, Epione reported incredible results measuring the strength—or lack thereof—of A.C.'s neck and trunk.

872.     If true, Epione's reported results meant that that A.C. lacked enough strength to hold his head upright.

873.     Specifically, Epione repeatedly reported that A.C.'s neck muscles could exert less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

874.     For instance, Epione reported that A.C. could only exert 3.5 pounds of cervical flexion force on August 31, 2017, 5.5 pounds of cervical flexion force on October 5, 2017, and 3.2 pounds of cervical flexion force on December 12, 2017, which results, if true, would mean that A.C. would not have been able to lift her head from a pillow in the supine position.

875.     Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of A.C., which reports did not describe any such profound weakness.

876.    Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for A.C. are false and fraudulent.

877.    Likewise, the computerized muscle testing results reported and billed for by Epione for A.C.'s trunk were also false and fraudulent.

878.    According to records submitted to Allstate, A.C.'s weight was reported as 162 pounds; therefore, to hold her trunk erect, A.C. required an ability to exert trunk extension force of at least 58.0 pounds, representing 35.8% of A.C.'s body weight.

879.    However, in all three (3) instances, Epione reported that A.C. could only exert between 4.0 and 7.5 pounds of trunk extension force, well below the 58.0 pounds of force required for A.C. to stand upright and support the trunk of her body.

880.    The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of A.C. did not contain any description of such profound muscle weakness to the degree that A.C. was unable to stand up.

881.    Therefore, the results of the computerized muscle testing of the trunk reported for A.C. were false and fraudulent.

882.    Moreover, Epione billed Allstate for extensive electrodiagnostic testing of A.C. on October 6, 2017.

883.    However, the report of this electrodiagnostic testing reveals a flawed study using improper diagnostic techniques, including motor unit recruitment within the paraspinal musculature.

884.    Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for A.C. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

885.     Overall, Allstate was induced to pay at least $7,099.92 to Epione for these false and fraudulent services during the relevant period.

c.      *Patient C.V. (claim no. 0538351263)*

886.     Patient C.V. was purportedly involved in a motor vehicle accident on March 15, 2019.

887.     C.V. was purportedly examined at Epione on March 28, 2019, and the examination was billed to Allstate under high-level CPT code 99204.

888.     The report of this initial examination submitted to Allstate included measurements that were purportedly taken of C.V.'s spinal ROM.

889.     Nonetheless, on April 17, 2019, Epione billed for computerized ROM testing of C.V.'s spine.

890.     The results of this computerized ROM testing markedly contradict Jacobi's reported findings regarding his previous initial evaluation of C.V.'s spinal ROM.

891.     Specifically, C.V.'s computerized ROM testing results show cervical ROM as 22% of normal even though on March 28, 2019, Jacobi documented that C.V. had full cervical ROM with pain.

892.     Similarly, the report of this April 17, 2019 computerized ROM testing also documented severe restrictions of C.V.'s lumbar ROM, which also did not correlate with Jacobi and Mostovoy's reported findings of their evaluations of C.V.

893.     Moreover, Jacobi (or someone acting under his direction or control) failed to measure C.V.'s lumbar ROM in all three (3) required planes of motion.

894.     Specifically, the ROM measurements for C.V.'s lumbar spine reported by Epione on April 17, 2019 omitted lumbar rotation and thus were incomplete.

895.    Epione reported similarly false and fraudulent ROM measurements for C.V. on two (2) subsequent occasions on May 16, 2019 and June 19, 2019 by omitting lumbar rotation.

896.    Even if the spinal ROM testing for C.V. was complete, the computerized ROM was not medically necessary because the manual determinations of C.V.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

897.    Moreover, Epione also billed for computerized muscle testing for C.V. on April 17, 2019, May 16, 2019, and June 19, 2019.

898.    However, the results of this computerized muscle testing reported by Epione for C.V. were false and fraudulent.

899.    For example, Epione reported incredible results measuring the strength—or lack thereof—of C.V.'s neck and trunk.

900.    If true, Epione's reported results meant that C.V. lacked enough strength to hold his head upright.

901.    Specifically, Epione repeatedly reported that C.V.'s neck muscles could exert no more than 4.1 pounds of force, which is far less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

902.    For instance, based on Epione's reports that C.V. could exert only 4.0 pounds of cervical flexion force on April 17, 2019, 3.6 pounds of cervical flexion force on May 16, 2019, and 3.2 pounds of cervical flexion force on June 19, 2019, C.V. would not have been able to lift his head from a pillow in the supine position.

903.    Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of C.V., which reports did not describe any such profound weakness.

904. Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for C.V. are false and fraudulent.

905. Likewise, the computerized muscle testing results reported and billed for by Epione for C.V.'s trunk were also false and fraudulent.

906. According to records submitted to Allstate, C.V.'s weight was reported as 235 pounds; therefore, to hold his trunk erect, C.V. required an ability to exert trunk extension force of at least 84.13 pounds, representing 35.8% of C.V.'s body weight.

907. However, in all three (3) instances, Epione reported that C.V. could only exert between 3.1 and 4.2 pounds of trunk extension force, well below the 84.13 pounds of force required for C.V. to stand upright and support the trunk of his body.

908. The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of C.V. did not contain any description of such profound muscle weakness to the degree that C.V. was unable to stand up.

909. Therefore, the results of the computerized muscle testing of the trunk reported for C.V. were false and fraudulent.

910. This useless computerized ROM testing, as well as several instances of outcome assessment testing, purportedly performed for C.V. through, and billed by, Epione were unnecessary because they yielded no clinically useful data, were often inaccurate when compared to the reports of the examinations of C.V. purportedly performed within days of the assessments, and were never used to alter the approach to C.V.'s supposed treatment at the Queens Village Clinic.

911. Epione also submitted excessive charges to Allstate for unnecessary electrodiagnostic testing on April 19, 2019.

912. This electrodiagnostic testing purported to evaluate muscles and nerves without any basis in C.V.'s medical records.

913. The results of the electrodiagnostic testing of C.V. also were misinterpreted.

914. For example, the report of this electrodiagnostic testing documented a left L5-S1 radiculopathy based, in part, on reduced recruitment in the paraspinal muscles, even though this is not an accepted technique in electrodiagnostic testing.

915. Further, the diagnosis of radiculopathy resulting from the electrodiagnostic testing does not correlate with the findings in other of C.V.'s medical records, which reported that C.V. did not present with radiating pain.

916. Epione and APAK also billed Allstate for numerous instances of physical therapy and chiropractic treatment purportedly rendered for C.V. that far exceeded what would be considered typical for any musculoskeletal injuries, such as those purportedly sustained by C.V.

917. These physical therapy and chiropractic treatments were purportedly rendered concurrently, often on the very same date of service.

918. Epione and APAK continued to bill Allstate for these excessive physical therapy and chiropractic visits for C.V. even though the documentation accompanying these charges consistently reported no change in C.V.'s overall condition.

919. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for C.V. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### d. *Patient D.M. (claim no. 0471841072)*

920. Patient D.M. was purportedly involved in a motor vehicle accident on August 23, 2017.

921.     D.M. was purportedly examined at Epione the very next day on August 24, 2017, and the examination was billed to Allstate under high-level CPT code 99204.

922.     The report of this initial examination submitted to Allstate included measurements that were purportedly taken of D.M.'s spinal ROM and shoulder ROM.

923.     Nonetheless, on September 13, 2017, Epione billed for computerized ROM testing of D.M.'s spine, which testing purported to show profound restrictions to the spinal axis ROM.

924.     First, Jacobi (or someone acting under his direction or control) failed to measure D.M.'s lumbar ROM in all three (3) required planes of motion.

925.     Specifically, the ROM measurements for D.M.'s lumbar spine reported by Epione on September 13, 2017 omitted lumbar rotation and thus were incomplete.

926.     Epione reported similarly false and fraudulent ROM measurements for D.M. on two (2) subsequent occasions on November 10, 2017 and January 23, 2018 by omitting lumbar rotation.

927.     Even if the spinal ROM testing for D.M. was complete, the computerized ROM testing was not medically necessary because the manual determinations of D.M.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

928.     Additionally, the results of the ROM testing of D.M.'s right shoulder on November 10, 2017 are inconsistent with Jacobi's documented findings regarding D.M.'s right shoulder ROM following an October 18, 2017 follow-up examination of D.M.

929.     Specifically, the results of the November 10, 2017 computerized ROM testing indicate that D.M.'s right shoulder ROM was limited at thirteen (13) degrees abduction.

930.     However, Jacobi previously purported to perform an "empty can test" of D.M.'s right shoulder, which test assesses the rotator cuff and requires the patient's arm to be placed in a

position of ninety (90) degrees of abduction, even though it would be impossible to perform such a test in an individual who could only elevate thirteen (13) degrees.

931.     Moreover, Epione also billed for computerized muscle testing for D.M. on September 13, 2017, November 10, 2017, and January 23, 2018.

932.     However, the results of this computerized muscle testing reported by Epione for D.M. were false and fraudulent.

933.     For example, Epione reported incredible results measuring the strength—or lack thereof—of D.M.'s neck and trunk.

934.     If true, Epione's reported results meant that D.M. lacked enough strength to hold his head upright.

935.     Specifically, Epione repeatedly reported that D.M.'s neck muscles could exert no more than 6.2 pounds of force, well below the eight (8) to twelve (12) pounds of force required to hold the human head upright.

936.     For instance, based on Epione's reports that D.M. could exert only 6.2 pounds of cervical flexion force on September 13, 2017, 3.9 pounds of cervical flexion force on November 10, 2017, and 6.2 pounds of cervical flexion force on January 23, 2018, D.M. would not have been able to lift his head from a pillow in the supine position.

937.     Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of D.M., which reports did not describe any such profound weakness.

938.     Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for D.M. are false and fraudulent.

939.     Likewise, the computerized muscle testing results reported and billed for by Epione for D.M.'s trunk were also false and fraudulent.

940.     As of August 23, 2017, D.M.'s weight was reported as 234 pounds; therefore, to hold his trunk erect, D.M. required an ability to exert trunk extension force of at least 83.77 pounds, representing 35.8% of D.M.'s body weight.

941.     However, in all three (3) instances, Epione reported that D.M. could only exert between 5.2 and 5.6 pounds of trunk extension force, significantly less than the 83.77 pounds of force required for D.M. to stand upright and support the trunk of his body.

942.     The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of D.M. do not contain any description of such profound muscle weakness to the degree that D.M. was unable to stand up.

943.     Therefore, the results of the computerized muscle testing of the trunk reported for D.M. were false and fraudulent.

944.     Epione also billed Allstate for excessive and unnecessary electrodiagnostic testing of D.M. even though this testing is so flawed and of such poor quality that it made no useful contribution whatsoever to D.M.'s course of treatment and merely served as an opportunity to grossly inflate the amounts billed to Allstate in connection with D.M.'s available No-Fault benefits.

945.     Specifically, D.M. was purportedly subjected to electrodiagnostic testing on November 10, 2017, which testing supposedly involved the sampling of more than forty (40) muscles and numerous nerve conductions.

946.    The results of this excessive testing are riddled with errors and misinterpretations, including electrically impossible results that were then used to make incorrect diagnoses demonstrating an inability to accurately interpret the conductions.

947.    For example, based on the results of the electrodiagnostic testing, D.M. was diagnosed with peroneal neuropathy on a nerve that was documented as having a conduction velocity of 322 metres per second (mps), which is approximately eight (8) times the normal conduction velocity and would be an electrical impossibility in the human body.

948.    Additionally, Epione billed for outcome assessment testing of D.M. under CPT code 99358 on December 5, 2017, January 19, 2018, and April 5, 2018 even though there was no indication that the results of this testing were ever reviewed or used in any way in connection with D.M.'s treatment at the Queens Village Clinic.

949.    According to Epione's and APAK's bills, D.M. was also subjected to excessive, simultaneous physical therapy and chiropractic treatments.

950.    Indeed, the amount of manual care purportedly rendered through Epione and APAK as to D.M. was clearly excessive and redundant, and continued despite consistent documentation of lack of efficacy.

951.    Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for D.M. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

952.    Overall, Allstate was induced to pay at least $6,517.16 to Epione for these false and fraudulent services during the relevant period.

### e.    *Patient G.W. (claim no. 0483594024)*

953.    Patient G.W. was purportedly involved in a motor vehicle accident on November 29, 2017.

954.    G.W. was purportedly examined at Epione that very day on November 29, 2017, and the examination was billed Allstate under high-level CPT code 99204.

955.    The report of this initial examination submitted to Allstate included measurements that were purportedly taken of G.W.'s spinal ROM.

956.    Nonetheless, on November 30, 2017, Epione billed for computerized ROM testing of G.W.'s spine.

957.    However, Jacobi (or someone acting under his direction or control) failed to measure G.W.'s lumbar ROM in all three (3) required planes of motion.

958.    Specifically, the ROM measurements for G.W.'s lumbar spine reported by Epione on November 30, 2017 omitted lumbar rotation and thus were incomplete.

959.    Epione reported similarly false and fraudulent ROM measurements for G.W. on a subsequent occasion on February 23, 2018 by omitting lumbar rotation.

960.    Even if the spinal ROM testing for G.W. was complete, the computerized ROM testing was not medically necessary because the manual determinations of G.W.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

961.    The lack of utility of the November 30, 2017 computerized ROM testing is also illustrated by the results—they differ sharply from the documented results of the evaluations purportedly performed just the day prior by both Jacobi and Mostovoy.

962.     Indeed, these three (3) different providers purportedly assessed G.W. within twenty-four (24) hours of each other yet each of the ROM assessments returned remarkably different results.

963.     Moreover, Epione also billed for computerized muscle testing for G.W. on November 30, 2017 and February 23, 2018.

964.     However, the results of this computerized muscle testing reported by Epione for G.W. were false and fraudulent.

965.     For example, Epione reported incredible results measuring the strength—or lack thereof—of G.W.'s neck and trunk.

966.     If true, Epione's reported results meant that G.W. lacked enough strength to hold his head upright.

967.     Specifically, Epione repeatedly reported that G.W.'s neck muscles could exert no more than 4.6 pounds of force, well below the eight (8) to twelve (12) pounds of force required to hold the human head upright.

968.     For instance, based on Epione's report that G.W. could exert only 4.0 pounds of cervical flexion force on November 30, 2017, G.W. would not have been able to lift his head from a pillow in the supine position.

969.     Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of G.W., which reports did not describe any such profound weakness.

970.     Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for G.W. are false and fraudulent.

971.     Likewise, the computerized muscle testing results reported and billed for by Epione for G.W.'s trunk were also false and fraudulent.

972.     Assuming that G.W. weighed at least 150 pounds, D.M. required an ability to exert trunk extension force of at least 53.7 pounds, representing 35.8% of 150 pounds, to hold his trunk erect.

973.     However, Epione reported on November 30, 2017 that G.W. could only exert 3.9 pounds of trunk extension force and on February 23, 2018 that G.W. could only exert 4.2 pounds of trunk extension force, significantly less than the 53.7 pounds of force required for G.W. to stand upright and support the trunk of his body.

974.     The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of G.W. did not contain any description of such profound muscle weakness to the degree that G.W. was unable to stand up.

975.     Therefore, the results of the computerized muscle testing of the trunk reported for G.W. were false and fraudulent.

976.     According to Epione's and APAK's bills, G.W. was subjected to excessive, simultaneous physical therapy and chiropractic treatments.

977.     Epione and APAK continued to bill for these services even though other providers at the Queens Village Clinic found the treatment ineffective.

978.     Epione also billed Allstate for unnecessary electrodiagnostic testing on February 23, 2018.

979.     This electrodiagnostic testing was not indicated because just three (3) days prior, following a purported follow-up examination of G.W. on February 20, 2018, Jacobi documented that G.W. presented with non-radicular symptoms.

980. Contrary to Jacobi's reported findings, G.W. was diagnosed, based on the EMG testing results, with radiculopathy, which finding is clearly erroneous.

981. G.W.'s nerve conduction studies were also interpreted incorrectly.

982. Specifically, the waveforms generated by the nerve conduction studies were routinely mislabeled, resulting in incorrect calculations.

983. Overall, G.W.'s electrodiagnostic testing results are riddled with errors and are worthless.

984. These errors had dangerous consequences: G.W. was referred to Epione for a pain management evaluation (and for possible epidural steroid injections) on the basis of the radiculopathy diagnosis.

985. Epione and APAK also billed for excessive, simultaneous physical therapy and chiropractic treatments.

986. Epione and APAK continued billing for simultaneous physical therapy and chiropractic services even though other providers at the Queens Village Clinic found the treatment ineffective.

987. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for G.W. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

988. Overall, Allstate was induced to pay at least $2,975.53 to Epione for these false and fraudulent services during the relevant period.

f.      *Patient K.M. (claim no. 0525340410)*

989. Patient K.M. was purportedly involved in a motor vehicle accident on November 16, 2018.

990.     Epione billed Allstate for an initial examination of K.M. taking place on November 20, 2018.

991.     The report of this initial examination submitted to Allstate included measurements that were purportedly taken of K.M.'s spinal ROM.

992.     Nonetheless, on November 21, 2018, December 26, 2018, and February 4, 2019, Epione billed for computerized ROM testing of K.M.'s spine.

993.     However, Jacobi (or someone acting under his direction or control) failed to measure K.M.'s lumbar ROM in all three (3) required planes of motion as part of the testing purportedly performed on February 4, 2019.

994.     Specifically, the ROM measurements for K.M.'s lumbar spine reported by Epione on February 4, 2019 omitted lumbar rotation and thus were incomplete.

995.     Even if the spinal ROM testing for K.M. was complete, the computerized ROM testing was not medically necessary because the manual determinations of K.M.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

996.     Additionally, the ROM testing purportedly performed for K.M. also documented profound restrictions to lumbar ROM.

997.     For example, the computerized ROM testing purportedly performed for K.M. on February 4, 2019 reported lumbar flexion that was only 18% of normal and lumbar extension that was only 48% of normal despite Jacobi's consistent documentation of full ROM of the lumbar spine.

998.     Moreover, Epione also billed for computerized muscle testing for K.M. on November 21, 2018, December 26, 2018, and February 4, 2019.

999. However, the results of this computerized muscle testing reported by Epione for K.M. were false and fraudulent.

1000. For example, Epione reported incredible results measuring the strength—or lack thereof—of K.M.'s neck strength.

1001. If true, Epione's reported results meant that K.M. lacked enough strength to hold his head upright.

1002. Specifically, Epione repeatedly reported that K.M.'s neck muscles could exert no more than 4.4 pounds of force, well below the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1003. For instance, based on Epione's reports that K.M. could exert only 3.0 pounds of cervical flexion force on November 21, 2018, 3.8 pounds of cervical flexion force on December 26, 2018, and 4.4 pounds of cervical flexion force on February 4, 2019, K.M. would not have been able to lift her head from a pillow in the supine position.

1004. Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of K.M., which reports did not describe any such profound weakness.

1005. Therefore, the results of the computerized muscle testing results for the cervical spine muscles reported by Epione for K.M. are false and fraudulent.

1006. Likewise, the computerized muscle testing results reported and billed for by Epione for K.M.'s trunk were also false and fraudulent.

1007. According to records submitted to Allstate, K.M. weighed 162 pounds and thus required an ability to exert trunk extension force of at least 58.0 pounds, representing 35.8% of 162 pounds, to hold her trunk erect.

1008. However, Epione reported on February 4, 2019 that K.M. could only exert 4.0 pounds of trunk extension force, significantly less than the 58.0 pounds of force required for G.W. to stand upright and support the trunk of her body.

1009. The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of K.M. did not contain any description of such profound muscle weakness to the degree that K.M. was unable to stand up.

1010. Therefore, the results of the computerized muscle testing of the trunk reported for K.M. were false and fraudulent.

1011. Epione also submitted false and fraudulent charges to Allstate for EMG testing in connection with K.M.

1012. Epione billed for this study despite the absence of any documented radiating symptoms to the lower limbs.

1013. K.M.'s study was also flawed; it wrongly used recruitment of the paraspinal muscles as part of the diagnosis of bilateral lower lumbar radiculopathies.

1014. The results of the study also contradict Jacobi's representations regarding K.M.'s condition.

1015. Epione and APAK also billed for excessive, simultaneous physical therapy and chiropractic treatments even though K.M.'s treatment notes contained contradicting accounts about whether these services were even effective.

1016. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for K.M. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### g.       *Patient K.S. (claim no. 0478611791)*

1017.   Patient K.S. was purportedly involved in a motor vehicle accident on September 26, 2017.

1018.   K.S. was purportedly examined at Epione on October 17, 2017, and the examination was billed to Allstate under high-level CPT code 99204.

1019.   The report of this initial examination submitted to Allstate included measurements that were purportedly taken of K.S.'s spinal and shoulder ROM.

1020.   Nonetheless, on October 26, 2017, Epione billed for computerized ROM testing of K.S.'s spine and bilateral shoulders.

1021.   The results of this ROM testing showed profound bilateral deficits to the shoulder ROM despite the fact that the documentation of K.S.'s purported complaints and condition did not include any right shoulder symptoms.

1022.   Indeed, the shoulder ROM testing results were clearly inaccurate given that they indicate that K.S. was unable to raise his arms above his head even though such severe restrictions are not reflected in the medical records for K.S.

1023.   Similar profound restrictions to the shoulder ROM also were reported in connection with the computerized ROM testing purportedly performed for K.S. on December 11, 2017 and January 23, 2018 despite reports that K.S.'s right shoulder was asymptomatic.

1024.   Further, Jacobi (or someone acting under his direction or control) failed to measure K.S.'s lumbar ROM in all three (3) required planes of motion as part of the testing purportedly performed on October 26, 2017.

1025.   Specifically, the ROM measurements for K.S.'s lumbar spine reported by Epione on October 26, 2017 omitted lumbar rotation and thus were incomplete.

1026. Epione reported similarly false and fraudulent ROM measurements for K.S. on two (2) subsequent occasions on December 11, 2017 and January 23, 2018 by omitting lumbar rotation.

1027. Even if the spinal ROM testing for K.S. was complete, the computerized ROM was not medically necessary because the manual determinations of K.S.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1028. Moreover, Epione also billed for computerized muscle testing for K.S. on October 26, 2017, December 11, 2017, and January 23, 2018.

1029. However, the results of this computerized muscle testing reported by Epione for K.S. were false and fraudulent.

1030. For example, Epione reported incredible results measuring the strength—or lack thereof—of K.S.'s neck and trunk.

1031. If true, Epione's reported results meant that K.S. lacked enough strength to hold his head upright.

1032. Specifically, Epione repeatedly reported that K.S.'s neck muscles could exert no more than 6.5 pounds of force, well below the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1033. For instance, based on Epione's reports that K.S. could exert only 4.4 pounds of cervical flexion force on October 26, 2017, 5.2 pounds of cervical flexion force on December 11, 2017, and 4.9 pounds of cervical flexion force on January 23, 2018, K.S. would not have been able to lift his head from a pillow in the supine position.

1034. Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of K.S., which reports did not describe any such profound weakness.

1035.   Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for K.S. are false and fraudulent.

1036.   Likewise, the computerized muscle testing results reported and billed for by Epione for K.S.'s trunk were also false and fraudulent.

1037.   According to records submitted to Allstate, K.S. weighed 184.9 pounds and thus required an ability to exert trunk extension force of at least 66.19 pounds, representing 35.8% of 184.9 pounds, to hold his trunk erect.

1038.   However, in all three (3) instances, Epione reported that K.S. could only exert between 4.1 and 5.3 pounds of trunk extension force, well below the 66.19 pounds of force required for K.S. to stand upright and support the trunk of his body.

1039.   The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of K.S. do not contain any description of such profound muscle weakness to the degree that K.S. was unable to stand up.  Therefore, the results of the computerized muscle testing of the trunk reported for K.S. were false and fraudulent.

1040.   The computerized ROM and muscle testing produced bogus results indicating that K.S. was unable to perform critical activities of daily living even though K.S.'s other providers documented normal ROM or just mild restrictions during the same period.

1041.   K.S. also underwent excessive physical therapy and chiropractic treatment through Epione and APAK, respectively, at the Queens Village Clinic during the relevant period.

1042.   Indeed, Epione and APAK billed Allstate for physical therapy and chiropractic services purportedly rendered to K.S. on the same dates of service even though the simultaneous provision of physical therapy and chiropractic treatment is not warranted and is outside of the standard of care.

1043.   Epione and APAK purported to continue to subject K.S. to unnecessary physical therapy and chiropractic treatments over the course of many months despite documentation in the progress notes for each discipline that K.S. was showing little signs of improvement, if any, thus demonstrating that the treatment was not effective.

1044.   Jacobi also ordered outcome assessment testing for K.S. that purportedly was performed on January 15, 2018, February 27, 2018, and March 28, 2018 even though this testing had no impact whatsoever on K.S.'s care.

1045.   Epione also billed Allstate for remarkably extensive electrodiagnostic testing purportedly performed in the bilateral upper and lower extremities.

1046.   The results of this testing contain numerous flaws, including documenting reduced recruitment patterns in the paraspinal musculature in both the cervical and lumbar regions, and misinterpretations resulting in an inaccurate and illogical diagnosis of tibial motor nerve axonal neuropathy.

1047.   Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for K.S. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

1048.   Overall, Allstate was induced to pay at least $3,329.58 to Epione for these false and fraudulent services during the relevant period.

### h.   *Patient M.K. (claim no. 0550915888)*

1049.   Patient M.K. was purportedly involved in a motor vehicle accident on June 25, 2019.

1050.   Days later, M.K. purportedly initiated treatment at the Queens Village Clinic.

1051. M.K. was purportedly examined at Epione on June 27, 2019, and the examination was billed by Allstate under high-level CPT code 99204.

1052. Epione then billed for computerized ROM and muscle testing of M.K. on July 1, 2019 even though M.K.'s prior examination at Epione included measurements of M.K.'s ROM, including spinal ROM.

1053. The results of M.K.'s computerized ROM and muscle testing billed by Epione are incorrect and inconsistent with the reported findings of M.K.'s physical examinations; therefore, these tests wholly lack clinical utility.

1054. First, Epione failed to take complete measurements—lumbar ROM needs to be measured in all three (3) planes of motion, but M.K.'s lumbar rotation was never measured, thus making the test incomplete.

1055. Even if the spinal ROM testing for M.K. was complete, the computerized ROM was not medically necessary because the manual determinations of M.K.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1056. Additionally, the ROM assessment purportedly performed on July 1, 2019 reported profound restriction to M.K.'s bilateral shoulder ROM despite the fact that Jacobi did not report any symptoms to M.K.'s left shoulder in his report of the June 27, 2019 examination.

1057. Indeed, the results of the July 1, 2019 ROM testing documented restrictions of twenty-two (22) degrees of abduction on the left side and only twelve (12) degrees of abduction on the right, which findings are not compatible with the ability to raise the arms above one's head.

1058. Thus, despite M.K. apparently reporting no left shoulder pain on June 27, 2019 with no indication from Jacobi of any abnormal ROM on the left side, the computerized ROM testing

purportedly performed for M.K. on July 1, 2019 documented profound restriction to shoulder abduction on both sides, which essentially indicates a bilateral frozen shoulder.

1059.   These strikingly contradictory outcomes between Jacobi's report of M.K.'s alleged condition and the computerized ROM testing results highlight the inaccuracy of the computerized ROM testing.

1060.   Moreover, Epione also billed for computerized muscle testing for M.K. on July 1, 2019, July 31, 2019, and September 9, 2019.

1061.   However, the results of this computerized muscle testing reported by Epione for M.K. were false and fraudulent.

1062.   For example, Epione reported incredible results measuring the strength—or lack thereof—of M.K.'s neck and trunk.

1063.   If true, Epione's reported results meant that M.K. lacked enough strength to hold his head upright.

1064.   Specifically, Epione repeatedly reported that M.K.'s neck muscles could exert no more than 6.3 pounds of force on July 1, 2019 and 5.2 pounds of force on July 31, 2019, less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1065.   For instance, based on Epione's reports that M.K. could exert only 2.9 pounds of cervical flexion strength force on July 1, 2019 and 4.5 pounds of cervical flexion strength force on July 31, 2019, M.K. would not have been able to lift his head from a pillow in the supine position.

1066.   Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of M.K., which reports did not describe any such profound weakness.

1067. Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for M.K. are false and fraudulent.

1068. Likewise, the computerized muscle testing results reported and billed for by Epione for M.K.'s trunk were also false and fraudulent.

1069. According to records submitted to Allstate, M.K. weighed 165 pounds and thus required an ability to exert trunk extension force of at least 59.07 pounds, representing 35.8% of 165 pounds, to hold his trunk erect.

1070. However, Epione reported that M.K. could only exert 4.7 pounds of trunk extension force on July 1, 2019 and 3.5 pounds of trunk extension force on September 9, 2019, which results all were well below the 59.07 pounds of force required for M.K. to stand upright and support the trunk of his body.

1071. The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of M.K. did not contain any description of such profound muscle weakness to the degree that M.K. was unable to stand upright.

1072. Therefore, the results of the computerized muscle testing reported for M.K. were false and fraudulent.

1073. Epione also billed Allstate for excessive physical therapy and chiropractic treatments purportedly rendered to M.K. through Epione and APAK, respectively.

1074. This physical therapy and chiropractic treatment was purportedly performed for M.K. simultaneously, sometimes even on the same date of service, despite consistent documentation from providers at the Queens Village Clinic that the treatments lacked efficacy.

1075. Finally, M.K. also was subjected to excessive and unnecessary electrodiagnostic testing through Epione on August 16, 2019.

1076.   The results of this electrodiagnostic testing reflect numerous flaws in both technique and interpretation.

1077.   For instance, the results of the electrodiagnostic testing contradict Jacobi's findings during a July 30, 2019 follow-up examination purportedly performed for M.K. that M.K. presented with a left foot drop.

1078.   Specifically, the results of this testing graded the left tibialis anterior muscle as normal without denervation, which would be impossible in the face of the supposed left foot drop documented by Jacobi for M.K.

1079.   Additionally, this electrodiagnostic testing purported to evaluate the paraspinal motor units by way of recruitment, which is not an accepted technique.

1080.   Moreover, the nerve conduction studies purportedly performed for M.K. also produced incongruous results.

1081.   Specifically, these nerve conduction studies documented an absent peroneal motor response on both sides and an absent tibial motor response on the right side, but then proceeded to document normal F-waves for those same nerves even though F-waves could not be studied and reported distally with an absent peripheral motor response.

1082.   The waveforms included in the results of this electrodiagnostic testing also are incorrectly marked and identified, thus severely calling into question the technique and interpretation of the Epione provider purportedly conducting and/or interpreting this testing.

1083.   Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for M.K. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

.

### i. *Patient R.S. (claim no. 0493041115)*

1084.   Patient R.S. was allegedly involved in a motor vehicle accident on February 21, 2018.

1085.   Soon after, on February 23, 2018, R.S. purportedly was examined by Jacobi at the Queens Village Clinic.

1086.   Epione then billed for computerized ROM and muscle testing of R.S. on February 26, 2018 even though R.S.'s prior examination at Epione included measurements of R.S.'s ROM, including spinal ROM.

1087.   The results of R.S.'s computerized ROM and muscle testing billed by Epione are incorrect and inconsistent with the reported findings of R.S.'s physical examinations; therefore, these tests wholly lack clinical utility.

1088.   First, Epione failed to take complete measurements—lumbar ROM needs to be measured in all three (3) planes of motion, but R.S.'s lumbar rotation was never measured, thus making the test incomplete.

1089.   Even if the spinal ROM testing for R.S. was complete, the computerized ROM was not medically necessary because the manual determinations of R.S.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1090.   Moreover, Epione also billed for computerized muscle testing for R.S. on February 26, 2018, April 10, 2018, and May 14, 2018.

1091.   However, the results of this computerized muscle testing reported by Epione for R.S. were false and fraudulent.

1092.   For example, Epione reported incredible results measuring the strength—or lack thereof—of R.S.'s neck and trunk.

1093.   If true, Epione's reported results meant that R.S. lacked enough strength to hold his head upright.

1094.   Specifically, Epione repeatedly reported that R.S.'s neck muscles could exert no more than 5.3 pounds of force on February 26, 2018, 3.8 pounds of force on April 10, 2018, and 4.5 pounds of force on May 14, 2018, far less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1095.   For instance, based on Epione's reports that R.S. could exert only 3.9 pounds of cervical flexion strength force on February 26, 2018, 3.4 pounds of cervical flexion strength force on April 10, 2018, and 4.3 pounds of cervical flexion strength force on May 14, 2018, R.S. would not have been able to lift his head from a pillow in the supine position.

1096.   Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of R.S., which reports did not describe any such profound weakness.

1097.   Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for R.S. are false and fraudulent.

1098.   Likewise, the computerized muscle testing results reported and billed for by Epione for R.S.'s trunk were also false and fraudulent.

1099.   According to records submitted to Allstate, R.S. weighed 145 pounds and thus required an ability to exert trunk extension force of at least 51.91 pounds, representing 35.8% of 145 pounds, to hold his trunk erect.

1100.   However, Epione reported that R.S. could only exert 3.6 pounds of trunk extension force on February 26, 2018 and 3.8 pounds of trunk extension force on May 14, 2018, which results

all were well below the 51.91 pounds of force required for R.S. to stand upright and support the trunk of his body.

1101.    The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of R.S. did not contain any description of such profound muscle weakness to the degree that R.S. was unable to stand upright.

1102.    Therefore, the results of the computerized muscle testing reported for R.S. were false and fraudulent.

1103.    Jacobi purported to re-examine R.S. on April 9, 2018, and documented that R.S. allegedly suffered from low-back pain, but did not report any radiation of pain, numbness, or tingling into the legs.

1104.    However, despite these recorded findings that R.S. did not present with any radiating back pain, Epione billed for an electrodiagnostic consultation even though low-back pain without radiation into the lower extremities would not be a reason to perform such a consultation.

1105.    The report of this consultation, in contrast to Jacobi's findings of no radiating pain, recorded that R.S. presented with low back pain radiating into the lower extremities, and on this basis, purported to perform an excessive electrodianostic study.

1106.    In contrast to these findings, the report of a pain management evaluation purportedly conducted of R.S. through Epione on April 18, 2018 continued to document an absence of any radiation symptoms down the legs.

1107.    Remarkably, despite these reported findings that R.S. had no radiation of pain, numbness, or tingling in the legs, the results of the electrodiagnostic testing diagnosed R.S. with bilateral S1 radiculopathy.

1108. However, this diagnosis was rendered through the use of improper electrodiagnostic techniques, including the use of the paraspinal musculature recruitment patterns as part of the diagnostic criteria for radiculopathy.

1109. Overall, an incorrect approach was applied to the excessive electrodiagnostic testing purportedly provided to R.S. through Epione.

1110. Epione also billed for ultrasound-guided trigger point injections purportedly administered to R.S. even though ultrasound guidance is not indicated for trigger point injections and only serves to elevate costs.

1111. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for R.S. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

1112. Overall, Allstate was induced to pay at least $7,533.70 to Epione for these false and fraudulent services during the relevant period.

**j.** *Patient N.G. (claim no. 0513708818)*

1113. Patient N.G. was purportedly involved in a motor vehicle accident on August 16, 2018.

1114. On September 4, 2018, N.G. purportedly initiated a course of treatment at the Queens Village Clinic.

1115. N.G. was purportedly examined at Epione on September 4, 2019, and the examination was billed to Allstate under high-level CPT code 99204.

1116. Epione then billed for computerized ROM and muscle testing of N.G. on September 11, 2018 even though N.G.'s prior examination at Epione included measurements of N.G.'s ROM, including shoulder and spinal ROM.

162

1117. However, the results of this computerized ROM testing strongly contradict Jacobi's purported findings regarding N.G.'s shoulder and spinal ROM conducted days prior.

1118. For instance, Jacobi reported full ROM for N.G.'s left shoulder and restricted ROM for N.G.'s right shoulder.

1119. However, the results of the computerized ROM testing purportedly conducted for N.G. on September 11, 2018 found profound restriction of both of N.G.'s shoulders.

1120. Specifically, the computerized ROM assessment for N.G.'s shoulders indicated that N.G. could only range to a maximum of eighteen (18) degrees in terms of shoulder elevation.

1121. Therefore, according to the results of the computerized ROM testing for N.G.'s shoulders, this patient could not elevate her arms.

1122. The nonfunctionality of N.G.'s shoulders indicated by the results of the September 11, 2018 computerized ROM testing is not documented in the notes of providers at the Queens Village Clinic who purportedly examined N.G., including Jacobi.

1123. There is also significant discord between the recorded findings of N.G.'s purported initial chiropractic examination through APAK and the results of the computerized ROM testing of N.G.'s spine on September 11, 2018.

1124. Specifically, the results of this computerized ROM testing found N.G.'s lumbar spine forward flexion (i.e., bending forward at the waist) restricted to ten (10) degrees, which is a fraction of the percentage necessary to bend forward (i.e., sixty (60) to ninety (90) degrees).

1125. Meanwhile, in contrast, the report of the chiropractic assessment for N.G. recorded the week prior documented that N.G. presented with fifty (50) degrees of forward flexion.

1126. These glaring contradictions between the documented assessments of N.G.'s ROM recorded by providers at the Queens Village Clinic who purportedly examined N.G. and the results

of the computerized ROM purportedly conducted for N.G. only serves to highlight the remarkable inaccuracy of the computerized ROM testing.

1127.   The results of N.G.'s computerized ROM and muscle testing billed by Epione also reflect numerous other hallmarks of lack of clinical utility.

1128.   First, Epione failed to take complete measurements—lumbar ROM needs to be measured in all three (3) planes of motion, but K.G.'s lumbar rotation was never measured, thus making the test incomplete.

1129.   Even if the spinal ROM testing for N.G. was complete, the computerized ROM was not medically necessary because the manual determinations of N.G.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1130.   Moreover, Epione also billed for computerized muscle testing for N.G. on September 11, 2018, October 5, 2018, and November 5, 2018.

1131.   However, the results of this computerized muscle testing reported by Epione for N.G. were false and fraudulent.

1132.   For example, Epione reported incredible results measuring the strength—or lack thereof—of N.G.'s neck and trunk.

1133.   If true, Epione's reported results meant that N.G. lacked enough strength to hold his head upright.

1134.   Specifically, Epione repeatedly reported that N.G.'s neck muscles could exert no more than 4.5 pounds of force on October 5, 2018 and 4.3 pounds of force on November 5, 2018, far less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1135.   For instance, based on Epione's reports that N.G. could exert only 3.1 pounds of cervical flexion force on October 5, 2018 and 3.4 pounds of cervical flexion force on November 5, 2018, N.G. would not have been able to lift his head from a pillow in the supine position.

1136.   Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of N.G., which reports did not describe any such profound weakness.

1137.   Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for N.G. are false and fraudulent.

1138.   Likewise, the computerized muscle testing results reported and billed for by Epione for N.G.'s trunk were also false and fraudulent.

1139.   According to records submitted to Allstate, N.G weighed 133 pounds and thus required an ability to exert trunk extension force of at least 47.61 pounds, representing 35.8% of 133 pounds, to hold her trunk erect.

1140.   However, Epione reported that N.G. could only exert 4.1 pounds of trunk extension force on September 11, 2018, 4.2 pounds of trunk extension force on October 5, 2018, and 3.7 pounds of trunk extension force on November 5, 2018, which results all were well below the 47.61 pounds of force required for N.G. to stand upright and support the trunk of her body.

1141.   The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of N.G. did not contain any description of such profound muscle weakness to the degree that N.G. was unable to stand upright.

1142.   Therefore, the results of the computerized muscle testing reported for N.G. were false and fraudulent.

1143.   Epione billed for electrodiagnostic testing of N.G. at Epione on October 21, 2018.

1144.  Despite Jacobi's repeated documentation of nonradiating pain as to N.G., the results of this electrodiagnostic testing are wrongly interpreted to diagnose N.G. with bilateral radiculopathy and neuropathy.

1145.  Jacobi's report of a follow-up examination purportedly performed for N.G. on November 1, 2018, just eleven (11) days after the flawed electrodiagnostic testing was purportedly conducted, checks the box of a preprinted checklist for such electrodiagnostic testing thus further documenting the lack of communication between Epione providers and the failure to use these testing results to alter N.G.'s treatment plan.

1146.  Epione and APAK also billed for extensive physical therapy and chiropractic visits that were purportedly rendered to N.G. simultaneously, in some instances even on the same date of service, which reflects a pattern of excessive use of such services by Epione providers.

1147.  Epione also billed for outcome assessment testing of N.G. under CPT code 99358 on November 1, 2018, November 27, 2018, and January 10, 2019.

1148.  Epione's billing for the outcome assessment testing is fraudulent because this service, in addition to having no clinical utility, cannot be charged separately from the follow-up examination, which was also billed for on the same day.

1149.  Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for N.G. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

1150.  Overall, Allstate was induced to pay at least $743.60 to Epione for these false and fraudulent services during the relevant period.

### k.  *Patient O.V. (claim no. 0452273386)*

1151.  Patient O.V. was allegedly involved in a motor vehicle accident on April 8, 2017.

166

1152.   Soon after, O.V. purportedly commenced treatment at the Queens Village Clinic.

1153.   O.V. was purportedly examined at Epione on April 20, 2017, and the examination was billed Allstate under high-level CPT code 99204.

1154.   According to the report of this initial examination of O.V., Jacobi recommended that O.V. receive physical therapy and computerized ROM testing.

1155.   Indeed, Epione and APAK billed Allstate for numerous instances of physical therapy and chiropractic care purportedly provided to O.V.

1156.   However, this physical therapy and chiropractic care was often purportedly rendered on the exact same treatment date and continued despite consistent documentation as to the lack of efficacy of the treatment.

1157.   Moreover, many of the physical therapy notes submitted to Allstate pertaining to O.V. did not even bother to indicate whether the treatment had been effective.

1158.   Additionally, the results of O.V.'s computerized ROM and muscle testing purportedly performed for O.V. also were unnecessary and lacked any clinical utility.

1159.   Epione failed to take complete measurements—lumbar ROM needs to be measured in all three (3) planes of motion, but O.V.'s lumbar rotation was never measured, thus making the test incomplete.

1160.   Even if the spinal ROM testing for O.V. was complete, the computerized ROM was not medically necessary because the manual determinations of O.V.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1161.   Moreover, Epione also billed for computerized muscle testing for O.V. on April 25, 2017 and July 7, 2017.

1162.   However, the results of this computerized muscle testing reported by Epione for O.V. were false and fraudulent.

1163.   According to records submitted to Allstate, using the average female weight of 150 pounds, O.V. would require an ability to exert trunk extension force of at least 53.7 pounds, representing 35.8% of 150 pounds, to hold her trunk erect.

1164.   However, Epione reported that O.V. could only exert 6.1 pounds of trunk extension force on April 25, 2017 and 3.8 pounds of trunk extension force on July 7, 2017, which results all were well below the 53.7 pounds of force required for O.V. to stand upright and support the trunk of her body.

1165.   The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of O.V. did not contain any description of such profound muscle weakness to the degree that O.V. was unable to stand upright.

1166.   Therefore, the results of the computerized muscle testing reported for O.V. were false and fraudulent.

1167.   Epione also billed for clinically useless outcome assessment testing purportedly performed for O.V. on June 29, 2017 and August 1, 2017, even though there is no indication that this testing was ever considered in connection with O.V.'s treatment plan at the Queens Village Clinic.

1168.   Epione billed Allstate for excessive and unwarranted electrodiagnostic testing of O.V. on August 22, 2017.

1169.   This electrodiagnostic study of all four (4) of O.V.'s limbs was excessive and purported to perform tests for areas that were asymptomatic.

1170. The results of this unnecessary electrodiagnostic testing were misinterpreted and led to incorrect diagnoses.

1171. For example, O.V. was diagnosed with cervical radiculopathy based, in part, on reduced recruitment of the paraspinal musculature even though this is not an electrodiagnostic technique.

1172. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for O.V. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

1173. Overall, Allstate was induced to pay at least $5,438.14 to Epione for these false and fraudulent services during the relevant period.

### l. *Patient O.F. (claim no. 0553018490)*

1174. Patient O.F. was allegedly involved in a motor vehicle accident on July 11, 2019.

1175. Soon after, O.F. purportedly commenced treatment at the Queens Village Clinic under the guidance of Jacobi.

1176. Jacobi purportedly performed an initial examination of O.F. on July 16, 2019 following which he recommended that O.F. commence physical therapy.

1177. However, at this time, O.F. already had purportedly started receiving chiropractic care through APAK at the Queens Village Clinic.

1178. This simultaneous physical therapy and chiropractic treatment purportedly rendered to O.F. was excessive and unnecessary.

1179. Notably, there is a dramatic lack of concordance among the reports of O.F.'s progress as documented in the physical therapy and chiropractic notes submitted to Allstate by Epione and APAK.

1180. For instance, the chiropractic notes consistently document persistence of symptoms without change while the physical therapy notes eventually document some purported improvement.

1181. Specifically, the physical therapy note dated October 17, 2019 indicates "much improvement in condition" while the chiropractic note for the exact same date of service documents "no change" in O.F.'s condition.

1182. Epione also billed Allstate for unnecessary computerized ROM testing purportedly performed for O.F. at Jacobi's request on three (3) occasions on July 22, 2019, August 29, 2019, and September 26, 2019.

1183. The results of O.F.'s computerized ROM and muscle testing billed by Epione are incorrect and inconsistent with the reported findings of O.F.'s physical examinations; therefore, these tests wholly lack clinical utility.

1184. Epione failed to take complete measurements—lumbar ROM needs to be measured in all three (3) planes of motion, but O.F.'s lumbar rotation was never measured, thus making the test incomplete.

1185. Even if the spinal ROM testing for O.F. was complete, the computerized ROM was not medically necessary because the manual determinations of O.F.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1186. The results of the computerized ROM testing for O.F. also are profoundly inconsistent with the findings documented in reports of certain physical examinations purportedly performed of O.F.

1187.   Specifically, O.F. was purportedly examined by another provider on September 25, 2019 and underwent computerized ROM testing at Epione the following day on September 26, 2019.

1188.   At the September 25, 2019 examination, O.F. purportedly presented with cervical flexion at thirty (30) degrees and cervical extension at forty (40) degrees whereas the results of the computerized ROM testing purportedly performed for O.F. the very next day documented those ranges to be eight (8) degrees and fifteen (15) degrees, respectively.

1189.   Similarly, the report of the September 25, 2019 examination purportedly conducted of O.F. documented lateral bending of thirty-five (35) degrees on the right and twenty-five (25) degrees on the left whereas the computerized ROM testing purportedly performed for O.F. documented these ranges to be thirteen (13) degrees on the right and seventeen (17) degrees on the left.

1190.   Additionally, O.F. purportedly demonstrated rotational movements at the September 25, 2019 examination of sixty (60) degrees to the right and forty (40) degrees to the left while the results of the computerized ROM testing purportedly performed for O.F. documented these ranges as eleven (11) degrees to the right and ten (10) degrees to the left.

1191.   The remarkable discrepancies between the documented findings of O.F.'s range of motion at the September 25, 2019 physical examination purportedly conducted of O.F. and the computerized ROM testing purportedly conducted of O.F. through Epione the very next day demonstrates the futility of the computerized ROM testing given its inaccuracy.

1192.   Moreover, Epione also billed for computerized muscle testing for O.F. on July 22, 2019, August 29, 2019, and September 26, 2019.

1193.   However, the results of this computerized muscle testing reported by Epione for O.F. were false and fraudulent.

1194.   For example, Epione reported incredible results measuring the strength—or lack thereof—of O.F.'s neck and trunk.

1195.   If true, Epione's reported results meant that O.F. lacked enough strength to hold his head upright.

1196.   Specifically, Epione repeatedly reported that O.F.'s neck muscles could exert no more than 4.2 pounds of force on July 22, 2019, 3.9 pounds of force on August 29, 2019, and 4.1 pounds of force on September 26, 2019, far less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1197.   For instance, based on Epione's reports that O.F. could exert only 3.3 pounds of cervical flexion force on July 22, 2019, 3.5 pounds of cervical flexion force on August 29, 2019, and 4.1 pounds of cervical flexion force on September 26, 2019, O.F. would not have been able to lift his head from a pillow in the supine position.

1198.   Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of O.F., which reports did not describe any such profound weakness.

1199.   Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for O.F. are false and fraudulent.

1200.   Likewise, the computerized muscle testing results reported and billed for by Epione for O.F.'s trunk were also false and fraudulent.

1201.  According to records submitted to Allstate, O.F. weighed 220 pounds and thus required an ability to exert trunk extension force of at least 78.76 pounds, representing 35.8% of 220 pounds, to hold his trunk erect.

1202.  However, Epione reported that O.F. could only exert 3.3 pounds of trunk extension force on July 22, 2019, 3.9 pounds of trunk extension force on August 29, 2019, and 3.4 pounds of trunk extension force on September 26, 2019, which results all were well below the 78.76 pounds required for O.F. to stand upright and support the trunk of his body.

1203.  The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of O.F. did not contain any description of such profound muscle weakness to the degree that O.F. was unable to stand upright.

1204.  Therefore, the results of the computerized muscle testing reported for O.F. were false and fraudulent.

1205.  In addition to the computerized ROM testing, Epione also billed Allstate for unnecessary outcome assessment testing that was purportedly conducted for O.F. on September 19, 2019 and October 31, 2019.

1206.  However, the computerized ROM testing and outcome assessment testing carry no clinical utility and did not have any impact on the course of O.F.'s purported treatment at the Queens Village Clinic.

1207.  Epione also billed Allstate for unnecessary electrodiagnostic testing on August 30, 2019.

1208.  Indeed, the report of this electrodiagnostic testing of O.F. fits squarely within the pattern of such inappropriate testing routinely billed to Allstate by Epione in that it was excessive, tested asymptomatic body parts, and was interpreted incorrectly.

1209.   This electrodiagnostic testing of each of O.F.'s limbs was remarkably extensive involving the unnecessary sampling of numerous muscles and the performance of numerous nerve conduction studies that were not indicated, which subjected O.F. to excessive discomfort and risk.

1210.   Additionally, the results of this electrodiagnostic testing were flawed.

1211.   For instance, the report of this electrodiagnostic testing of O.F. made diagnoses based, in part, on evaluation of the recruitment patterns of the paraspinal musculature even though this is not an accepted electrodiagnostic technique.

1212.   Further, the results of this electrodiagnostic testing noted abnormalities in both the flexor carpi radialis and the pronator teres even though it was illogical and redundant to study both of these muscles in this case because these muscles are located only one (1) inch apart and would reflect the same results.

1213.   Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for O.F. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

### m.  *Patient P.A. (claim no. 0488490319)*

1214.   Patient P.A. was involved in an alleged motor vehicle accident on January 13, 2018.

1215.   Just two (2) days later, P.A. purportedly was examined at Epione at the Queens Village Clinic.

1216.   P.A. was purportedly examined at Epione on January 15, 2018, and the examination was billed Allstate under high-level CPT code 99204.

1217.   Computerized ROM testing was ordered for P.A. at this initial visit and billed to Allstate through Epione even though the initial assessment of P.A. purportedly took measurements of P.A.'s ROM.

1218.    Epione then billed for computerized ROM and/or muscle testing of P.A. on January 17, 2018, February 16, 2018, and March 14, 2018 even though P.A.'s prior examination at Epione included measurements of P.A.'s ROM, including spinal ROM.

1219.    Additionally, the computerized ROM and muscle testing purportedly performed for P.A. also were unnecessary and lacked any clinical utility.

1220.    Epione failed to take complete measurements—lumbar ROM needs to be measured in all three (3) planes of motion, but P.A.'s lumbar rotation was never measured, thus making the test incomplete.

1221.    Even if the spinal ROM testing for P.A. was complete, the computerized ROM was not medically necessary because the manual determinations of P.A.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1222.    Moreover, Epione also billed for computerized muscle testing for P.A. on January 17, 2018, February 16, 2018, and March 14, 2018.

1223.    However, the results of this computerized muscle testing reported by Epione for P.A. were false and fraudulent.

1224.    For example, Epione reported incredible results measuring the strength—or lack thereof—of P.A.'s neck and trunk.

1225.    If true, Epione's reported results meant that P.A. lacked enough strength to hold his head upright.

1226.    Specifically, Epione repeatedly reported that P.A.'s neck muscles could exert no more than 6.3 pounds of force on February 16, 2018 and 4.3 pounds of force on March 14, 2018, which results were far less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1227.   For instance, based on Epione's reports that P.A. could exert 5.8 pounds of cervical flexion force on February 16, 2018 and 4.2 pounds of cervical flexion force on March 14, 2018, P.A. would not have been able to lift his head from a pillow in the supine position.

1228.   Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of P.A., which reports did not describe any such profound weakness.

1229.   Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for P.A. are false and fraudulent.

1230.   Likewise, the computerized muscle testing results reported and billed for by Epione for P.A.'s trunk were also false and fraudulent.

1231.   According to records submitted to Allstate, P.A. weighed 210 pounds and thus required an ability to exert trunk extension force of at least 75.18 pounds, representing 35.8% of 210 pounds, to hold his trunk erect.

1232.   However, Epione reported that P.A. could only exert 6.4 pounds of trunk extension force on January 17, 2018, 4.6 pounds of trunk extension force on February 16, 2018, and 3.8 pounds of trunk extension force on March 14, 2018, which results all were well below the 75.18 pounds required for P.A. to stand upright and support the trunk of his body.

1233.   The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of P.A. did not contain any description of such profound muscle weakness to the degree that P.A. was unable to stand upright.

1234.   Therefore, the results of the computerized muscle testing reported for P.A. were false and fraudulent.

1235.   Epione further billed for outcome assessment testing of P.A. under CPT code 99358 on March 12, 2018 and May 10, 2018.

1236.   Epione's billing for the outcome assessment testing is fraudulent because this service, in addition to having no clinical utility, cannot be charged separately from the follow-up examination, which was also billed for on the same day.

1237.   P.A. also was purportedly subjected to excessive and prolonged physical therapy treatment through Epione alongside simultaneous chiropractic care through APAK at the Queens Village Clinic.

1238.   Notably, both the physical therapy and chiropractic treatment notes document little clinical improvement in P.A.'s condition despite months of supposed treatment and even though typically such treatments would be continued only if there was documented improvement.

1239.   Indeed, because it is illogical to continue either physical therapy or chiropractic care for such a long timeframe while documenting lack of efficacy of the treatment, it is clear that the physical therapy and chiropractic care purportedly rendered to P.A. was merely part of the predetermined protocol of treatment implemented at the Queens Village Clinic as a means to inflate the bills submitted to Allstate.

1240.   Epione also billed Allstate for remarkably excessive electrodiagnostic testing of P.A. on February 23, 2018.

1241.   The results of this extensive study were misinterpreted by using the recruitment pattern in the paraspinal muscles to lend to the diagnosis of radiculopathy.

1242.   The interpretation of the H-reflexes recorded as part of this electrodiagnostic testing was also seriously flawed.

1243. Here, the left and right tibial H-reflexes were reported as being identical yet P.A. was diagnosed with a left S1 radiculopathy even though the strongest indicator of S1 radiculopathy is a delayed H-reflex latency.

1244. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for P.A. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

1245. Overall, Allstate was induced to pay at least $4,275.69 to Epione for these false and fraudulent services during the relevant period.

### n. *Patient R.M. (claim no. 0545111825)*

1246. Patient R.M. was involved in an alleged motor vehicle accident on May 9, 2019.

1247. R.M. subsequently purportedly initiated treatment with Epione at the Queens Village Clinic.

1248. R.M. was purportedly examined at Epione on May 16, 2019, and the examination was billed to Allstate under high level CPT code 99204.

1249. At this initial visit, Jacobi purported to document normal cervical spinal ROM for R.M., but, nonetheless, ordered computerized ROM testing of R.M.'s cervical spine as well.

1250. Despite Jacobi's documented findings of normal cervical spine ROM, the results of this computerized ROM testing for R.M. purportedly conducted at Epione on May 20, 2019 found profound restriction to R.M.'s cervical spine ROM, which highlights the test's inaccuracy and futility.

1251. Additionally, the other results of R.M.'s computerized ROM and muscle testing purportedly performed for R.M. on May 20, 2019 and July 22, 2019 also were unnecessary and lacked any clinical utility.

1252.   Epione failed to take complete measurements—lumbar ROM needs to be measured in all three (3) planes of motion, but R.M.'s lumbar rotation was never measured, thus making the test incomplete.

1253.   Even if the spinal ROM testing for R.M. was complete, the computerized ROM testing was not medically necessary because the manual determinations of R.M.'s ROM purportedly rendered in the initial evaluation and follow-up examinations were sufficient.

1254.   Moreover, Epione also billed for computerized muscle testing for R.M. on May 20, 2019 and July 22, 2019.

1255.   However, the results of this computerized muscle testing reported by Epione for R.M. were false and fraudulent.

1256.   For example, Epione reported incredible results measuring the strength—or lack thereof—of R.M.'s neck and/or trunk strength.

1257.   If true, Epione's reported results meant that that R.M. lacked enough strength to hold his head upright.

1258.   Specifically, Epione reported that R.M.'s neck muscles could exert no more than 4.0 pounds of force on May 20, 2019, far less than the eight (8) to twelve (12) pounds of force required to hold the human head upright.

1259.   For instance, based on Epione's report that R.M. could exert only 3.0 pounds of cervical flexion force on May 20, 2019, R.M. would not have been able to lift her head from a pillow in the supine position.

1260.   Notably, however, none of these astonishly poor test results are reflected in Epione's reports of the initial and follow-up examinations of R.M., which reports did not describe any such profound weakness.

1261.   Therefore, the computerized muscle testing results for the cervical spine muscles reported and billed for by Epione for R.M. are false and fraudulent.

1262.   Likewise, the computerized muscle testing results reported and billed for by Epione for R.M.'s trunk were also false and fraudulent.

1263.   According to records submitted to Allstate, R.M weighed 180 pounds and thus required an ability to exert trunk extension force of at least 64.44 pounds, representing 35.8% of 180 pounds, to hold her trunk erect.

1264.   However, Epione reported that R.M. could only exert 3.8 pounds of trunk extension force on May 20, 2019 and 5.0 pounds of trunk extension force on July 22, 2019, which results all were well below the 64.44 pounds of force required for R.M. to stand upright and support the trunk of her body.

1265.   The reports of the initial and follow-up examinations purportedly performed by Jacobi (or someone acting under his direction or control) of R.M. did not contain any description of such profound muscle weakness to the degree that R.M. was unable to stand upright.

1266.   Therefore, the results of the computerized muscle testing reported for R.M. were false and fraudulent.

1267.   On May 16, 2019, R.M. purportedly commenced a course of excessive treatment at the Queens Village Clinic, including both physical therapy and chiropractic care.

1268.   Epione and APAK proceeded to submit charges to Allstate for physical therapy and chiropractic care purportedly rendered to R.M. simulateously, and in some instances, taking place on the same date of service.

1269.   Notably, the notes submitted to Allstate from providers at the Queens Village Clinic purporting to provide treatment to R.M. are contradictory with some documenting improvement and others documenting no change to her clinical case.

1270.   Overall, R.M. purportedly received excessive and unnecessary manual therapy through both Epione and APAK.

1271.   Jacobi also referred R.M. for electrodiagnostic testing at Epione.

1272.   However, the records of this electrodiagnostic testing of R.M. on July 12, 2019 exemplify the inability of the providers at Epione to perform an accurate study.

1273.   First, the report of the electrodiagnostic history and physical evaluation purportedly performed for R.M. at Epione in advance of the electrodiagnostic testing documented neck pain with low-back pain radiating down all four (4) limbs, which finding directly contradicts Jacobi's notes of an examination conducted just days prior indicating that R.M. did not present with any neck pain.

1274.   Despite the absence of any neck or arm complaints, R.M. purportedly was subjected to a four (4) limb electrodiagnostic study, including the sampling of twenty (20) different limb muscles and paraspinal muscles relative to the cervical spine and upper extremities, which was not indicated in a patient who did not have upper extremity symptomology.

1275.   Such an extensive upper extremity electrodiagnostic study absent neck or arm pain is unnecessary and would be quite uncomfortable for the patient.

1276.   R.M. also was purportedly subjected to excessive electrodiagnostic testing of the lower extremities as well.

1277. The electrodiagnostic testing for R.M.'s lower extremities shows a combination of abnormalities that are classic findings seen in a generalized sensorimotor peripheral neuropathy typical of patients with diabetes, such as R.M.

1278. However, the report of this electrodiagnostic testing of R.M. diagnosed R.M. based on the results of this study with bilateral radiculopathies.

1279. This incorrect diagnosis was then used by other providers to justify invasive procedures for R.M., including epidural steroid injections, which would not be indicated for the management of peripheral neuropathy.

1280. Because the testing and treatment billed to Allstate by Epione was excessive, medically unnecessary, and falsely charged, Epione's bills for R.M. are false and fraudulent, and thus are not compensable under New York's No-Fault laws.

## VI. SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

1281. Throughout the course of this entire scheme, Davydov, Nektalov, David, Raytsin, Mumin-Akhunov, Jacobi, and Mostovoy, working through Epione, APAK, and Wellmart, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

1282. Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms,

letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

1283.   Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

1284.   The Defendants either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing patient treatment records and invoices/bills from the PC Defendants and Wellmart to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

A.   **EPIONE ENTERPRISE**

1285.   Jacobi, Davydov, David, Raytsin, and Mumin-Akhunov caused Epione to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Epione mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1286.   Davydov, David, Raytsin, and Mumin-Akhunov's participation in the management and control of Epione, combined with Davydov, David, Raytsin, and Mumin-Akhunov's unlawful receipt of Epione's professional physician fees and profits, rendered Epione completely ineligible for No-Fault reimbursement under New York law.

1287.   Because Epione was, in fact, unlawfully controlled by Davydov, David, Raytsin, and Mumin-Akhunov (persons who were not licensed to practice medicine, or allowed to operate, control, or profit from a professional corporation organized to provide medical services), Jacobi,

Davydov, David, Raytsin, and Mumin-Akhunov purposely caused Epione to make a misrepresentation each and every time that Epione mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

1288.  Moreover, because (a) Davydov, David, Raytsin, and Mumin-Akhunov, as non-physicians, were never lawfully permitted to participate in the operation and management of Epione, (b) Jacobi, Davydov, David, Raytsin, and Mumin-Akhunov caused Epione to seek No-Fault reimbursement from Allstate (even though Epione was not lawfully entitled to such reimbursement), and (c) Epione used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Jacobi, Davydov, David, Raytsin, and Mumin-Akhunov committed mail fraud.

1289.  At all relevant times, Jacobi, Davydov, David, Raytsin, and Mumin-Akhunov knew that Epione (including its employees, owner(s), contractors, and agents), Billing Pros, IBS, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Epione.

1290.  Allstate estimates that the unlawful operation of the Epione enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 11 and incorporated herein by reference as if set forth in its entirety.

### B.    APAK ENTERPRISE

1291.  Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov caused APAK to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that APAK mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1292.   Davydov, David, Raytsin, and Mumin-Akhunov's participation in the management and control of APAK, combined with Davydov, David, Raytsin, and Mumin-Akhunov's unlawful receipt of APAK's professional chiropractic fees and profits, rendered APAK completely ineligible for No-Fault reimbursement under New York law.

1293.   Because APAK was, in fact, unlawfully controlled by Davydov, David, Raytsin, and Mumin-Akhunov (persons who were not licensed to practice chiropractic, or allowed to operate, control, or profit from a professional corporation organized to provide chiropractic services), Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov purposely caused APAK to make a misrepresentation each and every time that APAK mailed (or was caused to mail) a document to Allstate claiming eligibility for reimbursement.

1294.   Moreover, because (a) Davydov, David, Raytsin, and Mumin-Akhunov, as non-chiropractors, were never lawfully permitted to participate in the operation and management of APAK, (b) Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov caused APAK to seek No-Fault reimbursement from Allstate (even though APAK was not lawfully entitled to such reimbursement), and (c) APAK used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov committed mail fraud.

1295.   At all relevant times, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov knew that APAK (including its employees, owner(s), contractors, and agents), Billing Pros, Practice Wiz, IBS, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) APAK.

1296.  Allstate estimates that the unlawful operation of the APAK enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 12 and incorporated herein by reference as if set forth in its entirety.

C.  **WELLMART ENTERPRISE**

1297.  Throughout the course of this entire scheme, Davydov, Nektalov, and Jacobi (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

1298.  Davydov and Nektalov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from Wellmart to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1299.  Davydov and Nektalov caused Wellmart to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Wellmart mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1300.  Davydov and Nektalov's participation in the operation and management of Wellmart, which included, among other things, (a) directing prescribers to send prescriptions for

medically unnecessary medications to be dispensed, (b) producing and dispensing Compounded Products in violation of applicable regulatory and licensing requirements, (c) dispensing and billing Allstate for Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, and (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, rendered Wellmart completely ineligible for No-Fault reimbursement under New York law.

1301.  As a result of the above-described conduct, Davydov and Nektalov purposely caused Wellmart to make a misrepresentation each and every time that Wellmart mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

1302.  Moreover, because (a) Davydov and Nektalov engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of Wellmart, (b) Davydov and Nektalov caused Wellmart to seek No-Fault reimbursement from Allstate (even though Wellmart was not lawfully entitled to such reimbursement), and (c) Wellmart used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Davydov and Nektalov committed mail fraud.

1303.  Jacobi also purposely caused Wellmart to make misrepresentations when Wellmart mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement for drugs and medications, including Compounded Products, that were purportedly dispensed and delivered by Wellmart pursuant to a prescription written (or caused to be written) by Jacobi (or someone acting under his direction or control) through (a) the writing of prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be purportedly dispensed and delivered by Wellmart, (b) the creation and submission of records and notes for medically unnecessary and excessive treatment, tests, and services through Epione that

purportedly justified prescriptions written by Jacobi (or someone acting under his direction or control) for drugs and medications, including Compounded Products, that were billed for by Wellmart, and (c) the creation and submission of one or more peer-review or IME rebuttal through Epione that falsely justified the necessity of the medications and drugs, including Compounded Products, that were billed for by Wellmart.

1304.    As a result of the above-described conduct, Jacobi purposely caused Wellmart to make a misrepresentation each and every time that Wellmart mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement for drugs and medications, including Compounded Products, pursuant to a prescription written (or caused to be written) by Jacobi.

1305.    Moreover, because (a) Jacobi engaged in (or caused) the above-described unlawful conduct, (b) Jacobi caused Wellmart to seek No-Fault reimbursement from Allstate (even though Wellmart was not lawfully entitled to such reimbursement), and (c) Wellmart used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Jacobi committed mail fraud.

1306.    At all relevant times, Davydov, Nektalov, and Jacobi knew that Wellmart (including its employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimants' attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Wellmart.

1307.    Allstate estimates that the unlawful operation of the Wellmart enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 13 and incorporated herein by reference as if set forth in its entirety.

### D. IBS ENTERPRISE

1308.  David knowingly used IBS to exert control over the operation and management of Epione and APAK, including their finances.

1309.  In furtherance of the operation and management of the IBS enterprise, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' medical records and invoices/bills from Epione and/or APAK to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1310.  As explained above, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov caused Epione and/or APAK to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Epione and APAK mailed (or were caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1311.  As a result of the above-described conduct, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov purposely caused Epione and/or APAK to make a misrepresentation each and every time that Epione and APAK mailed (or were caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement even though, at all relevant times, Epione and APAK were not entitled to such reimbursement under New York law.

1312.  Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov also caused IBS to use the U.S. Mail in the course of conducting its business of providing marketing, advertising, and/or promotional services (or in the course of purporting to provide marketing, advertising, promotional, or other services) to Epione and APAK even though any such marketing, advertising, or promotional services were, in reality, a smokescreen concealing David's

involvement in expanding and controlling Epione and APAK's businesses, including his personal enrichment from the operation of the Epione and APAK enterprises.

1313.   At all relevant times, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov knew that IBS, Billing Pros, Practice Wiz, Epione, APAK (including their employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimants' attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Epione and/or APAK.

1314.   These payments issued by Allstate through the U.S. Mail in reliance on the false and fraudulent documentation mailed by (or on behalf of) Epione and APAK were diverted, in part, to IBS for the benefit of one or more of the Manager Defendants through certain transactions engaged in between Epione and APAK and IBS, including transactions arising out of commercially unreasonable agreements for the provision of marketing, advertising, and/or promotional services with IBS.

1315.   As a result of the above-described conduct, it is clear that Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov committed mail fraud in the furtherance of the operation and management of the IBS enterprise.

1316.   Allstate estimates that the unlawful operation of the IBS enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 14 and incorporated herein by reference as if set forth in their entirety.

## E. BILLING PROS ENTERPRISE

1317.   Davydov and Mumin-Akhunov knowingly used Billing Pros to exert control over the operation and management of Epione and APAK, including their finances.

1318.   In furtherance of the operation and management of the Billing Pros enterprise, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' medical records and invoices/bills from Epione and/or APAK to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1319.   As explained above, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov caused Epione and/or APAK to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that Epione and APAK mailed (or were caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1320.   As a result of the above-described conduct, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov purposely caused Epione and/or APAK to make a misrepresentation each and every time that Epione and APAK mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement even though, at all relevant times, Epione and APAK were not entitled to such reimbursement under New York law.

1321.   Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov also caused Billing Pros to use the U.S. Mail in the course of conducting its business of providing billing and collection services (or in the course of purporting to provide billing, collection, or other services) to Epione and APAK even though the agreements between Billing Pros and the PC Defendants

were purposely structured to give Mumin-Akhunov control over these entities and their finances and to enrich Mumin-Akhunov at the expense of Epione and APAK.

1322.  At all relevant times, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov knew that Billing Pros, IBS, Practice Wiz, Epione, APAK (including their employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate Claimants' attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) Epione and/or APAK.

1323.  These payments issued by Allstate through the U.S. Mail in reliance on the false and fraudulent documentation mailed by (or on behalf of) Epione and APAK were diverted, in part, to Billing Pros for the benefit of one or more of the Manager Defendants through certain transactions engaged in between Epione and APAK and Billing Pros.

1324.  As a result of the above-described conduct, it is clear that Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov committed mail fraud in the furtherance of the operation and management of the Billing Pros enterprise.

1325.  Allstate estimates that the unlawful operation of the Billing Pros enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 15 and incorporated herein by reference as if set forth in its entirety.

### F.    PRACTICE WIZ ENTERPRISE

1326.  Davydov knowingly used Practice Wiz to exert control over the operation and management of APAK, including this defendant's finances.

1327. In furtherance of the operation and management of the Practice Wiz enterprise, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing Allstate Claimants' medical records and invoices/bills from APAK to be mailed to Allstate (and/or counsel for claimants), or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

1328. As explained above, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov caused APAK to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws each time that APAK mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

1329. As a result of the above-described conduct, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov purposely caused APAK to make a misrepresentation each and every time that APAK mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement even though, at all relevant times, APAK was not entitled to such reimbursement under New York law.

1330. Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov also caused Practice Wiz to use the U.S. Mail in the course of conducting its business of providing business consulting services (or in the course of purporting to provide business consulting or other services) to APAK even though any such "business consulting services" were, in reality, a smokescreen concealing Davydov's involvement in expanding and controlling APAK's business, including his personal enrichment from the operation of the APAK enterprise.

1331. At all relevant times, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov knew that Practice Wiz, IBS, Billing Pros, APAK (including their employees, owner(s), contractors, and agents), a customer, an Allstate Claimant, an insurance carrier, an Allstate

Claimants' attorney, other medical provider, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) APAK.

1332.   These payments issued by Allstate through the U.S. Mail in reliance on the false and fraudulent documentation mailed by (or on behalf of) APAK were diverted, in part, to Practice Wiz for the benefit of one or more of the Manager Defendants through certain transactions engaged in between APAK and Practice Wiz and between Practice Wiz and IBS, including transactions under the guise of "business consulting services."

1333.   As a result of the above-described conduct, it is clear that Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov committed mail fraud in the furtherance of the operation and management of the Practice Wiz enterprise.

1334.   Allstate estimates that the unlawful operation of the Practice Wiz enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 16 and incorporated herein by reference as if set forth in its entirety.

## VII.   SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.   THE EPIONE AND APAK ENTERPRISES

1335.   Jacobi and Mostovoy are registered with the State of New York as the sole officer, director, and shareholder of their respective professional corporations, namely Epione and APAK (i.e., the PC Defendants).

1336.  Davydov induced Jacobi and Mostovoy to cause Epione and APAK to operate from the Queens Village Clinic and to cede control over the operation and management of Epione and APAK to the Manager Defendants.

1337.  The documents created and filed with the State of New York related to the PC Defendants deliberately omitted any reference to Davydov, David, Raytsin, and Mumin-Akhunov's—or the Management Companies'—involvement.

1338.  The documents created and filed with the State of New York related to the PC Defendants gave no indication to Allstate or the general public that Davydov, David, Raytsin, and Mumin-Akhunov in any way maintained a controlling interest in Epione and APAK.

1339.  Based on the representations contained within the four corners of the documents filed with State of New York on behalf of the PC Defendants, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Davydov, David, Raytsin, and Mumin-Akhunov's domination of and control over Jacobi, Mostovoy, Epione, and APAK.

1340.  Davydov, David, Raytsin, and Mumin-Akhunov took purposeful steps to conceal their involvement in the day-to-day operations of Epione and/or APAK.  Further, they disguised payments of professional fees and profits (that they otherwise would not be eligible to receive) as legitimate costs for consulting, marketing, and billing services.

1341.  For instance, Davydov, David, and Mumin-Akhunov organized several sham entities—i.e., Management Companies Practice Wiz, IBS, and Billing Pros—for the purposes of controlling Epione and/or APAK and funneling professional fees and profits to themselves for their own personal gain.

1342. The Management Companies were also organized by Davydov, David, and Mumin-Akhunov for the purpose of evading detection and preventing Allstate (or anyone else) from uncovering that Davydov, David, and Mumin-Akhunov operated, controlled, and profited from Epione and APAK.

1343. The purposeful concealment of the Manager Defendants' controlling interests in Epione and APAK allowed Davydov, David, Raytsin, and Mumin-Akhunov to unlawfully control Epione and APAK undetected for a prolonged period.

1344. The Defendants took additional steps to further this scheme by replacing the PC Defendants with "new" PCs named NYC Medical Treatments, P.C. ("NYC Medical") and Oceana Chiropractic, P.C. ("Oceana Chiropractic") , which were also nominally owned on paper by Jacobi and Mostovoy, respectively.

1345. Upon information and belief, the Defendants formed NYC Medical and Oceana Chiropractic as a way to continue collecting No-Fault benefit payments once Epione and APAK came under scrutiny from Allstate.

1346. Indeed, almost immediately after Jacobi and Mostovoy provided testimony on behalf of Epione and APAK, respectively, the new PCs were installed at the Queens Village Clinic to create the appearance that the scheme had ended.

1347. The Defendants took further steps to conceal and continue this scheme by causing Jacobi and Mostovoy to enter into service agreements with another newly-formed company named Billing & Collection, Inc., which is also owned and controlled by Davydov.

1348. Overall, the purposeful concealment of the Manager Defendants' controlling interests in Epione and APAK enabled them to violate New York law while also preventing Allstate from discovering their unlawful acts for a prolonged period.

1349. At all relevant times during the operation of the PC Defendants, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akunov purposely caused the PC Defendants to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to medical services purportedly provided to patients.

1350. Davydov, David, Raytsin, and Mumin-Akhunov used their roles as owners, operators, agents, and/or employees of one or more of the Management Companies to directly participate in the operation and management of the Epione and APAK enterprises.

1351. Raytsin also used her role as a high-level administrative employee of Epione to directly participate in the operation and management of the Epione enterprise.

1352. Because Davydov, David, Raytsin, and Mumin-Akhunov were persons who were not licensed to practice medicine or chiropractic, or allowed to operate, control, or profit from a professional corporation organized to provide professional physician or chiropractic services, and because Epione was organized as a physician-owned professional service corporation and APAK was organized as a chiropractor-owned professional service corporation, Davydov, David, Raytsin, and Mumin-Akhunov were never lawfully entitled to participate in, or in any way direct, the operation and management of the professional corporations.

1353. Accordingly, because Davydov, David, Raytsin, and Mumin-Akhunov unlawfully participated in the operation and management of the PC Defendants throughout the relevant period, Epione and APAK were caused to falsely claim eligibility for No-Fault reimbursement each and every time that they sought No-Fault reimbursement from Allstate.

1354. Further, throughout the relevant period, Jacobi and Mostovoy attested (or caused the attestation) to the medical necessity of the services that they (or persons under their direction

and control) allegedly performed in connection with the PC Defendants' patients, as well as the validity of the charges for such services.

1355.  At all relevant times, Jacobi and Mostovoy, as a duly licensed medical providers, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with each and every other aspect of their oath as a licensed physician and chiropractor, respectively.

1356.  As alleged above, Jacobi and Mostovoy (or those persons working under their control) caused the PC Defendants to create and submit to Allstate treatment records and demands for payment relative to medical services that were (a) unnecessary, (b) fraudulently reported, and/or (c) not actually rendered as represented.

1357.  Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

1358.  Many of these facts—particularly (a) Davydov, David, Raytsin, and Mumin-Akhunov's participation in and control over the operation and management of the PC Defendants and (b) the PC Defendants' unlawful splitting of professional physician and chiropractor fees and profits with Davydov, David, Raytsin, and/or Mumin-Akhunov through transactions between the PC Defendants and the Management Companies—are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1359.  Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

1360. Thus, every time that Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov (along with those individuals working under their control) caused Epione and APAK to submit No-Fault reimbursement demands to Allstate, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov (and those individuals working under their control) necessarily certified that Epione and APAK were, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1361. The full extent of Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov's fraudulent and unlawful acts relative to their control over the Epione and APAK enterprises—including (a) Davydov, David, Raytsin, and Mumin-Akhunov's participation in and control over the operation and management of Epione and APAK, and (b) the unlawful channeling of the PC Defendants' professional proceeds to Davydov, David, Raytsin, and/or Mumin-Akhunov through transactions that were structured between the PC Defendants and the Management Companies—were not, and could not have been, known to Allstate until shortly before it commenced this action.

B.     THE WELLMART ENTERPRISE

1362. At all relevant times during the operation of the Wellmart enterprise, Davydov, Nektalov, Jacobi, and Epione purposely caused Wellmart to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of Wellmart.

1363. At all relevant times, Davydov and Nektalov directly participated in the operation and management of Wellmart.

1364. During the relevant period, Davydov and Nektalov induced Jacobi (or those individuals working under his control) and other medical providers to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, to be dispensed and charged by Wellmart.

1365. Davydov, Nektalov, Jacobi, and Epione (along with those individuals working under their control) purposely concealed the lack of medical necessity for the prescriptions for drugs and medications, including Compounded Products, to be dispensed and charged by Wellmart.

1366. For instance, as alleged herein, through Epione, Jacobi (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) peer-review and IME rebuttals that falsely attested to the medical necessity of drugs and medications, including Compounded Products, that were prescribed by Jacobi (or those working under his direction and control), and purportedly dispensed and delivered by Wellmart, to an Allstate Claimant.

1367. Jacobi (or those working under his direction and control), through Epione, additionally created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of certain drugs and medications, including Compounded Products, that were prescribed by Jacobi (or those working under his direction and control), and purportedly dispensed and delivered by Wellmart, to an Allstate Claimant.

1368. Because Davydov and Nektalov were responsible for causing Wellmart's (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements, (b) dispensing, and billing of Allstate for, Compounded Products and other drugs that were not medically necessary and were completely unjustified as a means of treating

the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including Jacobi, to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Wellmart, Wellmart was caused to falsely claim eligibility for No-Fault reimbursement each and every time that Wellmart sought No-Fault reimbursement from Allstate.

1369. As alleged above, Davydov, Nektalov, and Jacobi (or those persons working under their or their confederates' control) caused Wellmart to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary and (d) falsely charged.

1370. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

1371. Many of these false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1372. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

1373. Thus, every time that Davydov and Nektalov (along with those individuals working under their control) caused Wellmart to submit No-Fault reimbursement demands to Allstate, Davydov and Nektalov (and those individuals working under their control) necessarily certified that Wellmart was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1374. The full extent of Davydov, Nektalov, Jacobi, and Epione's fraudulent and unlawful acts relative to their participation in the Wellmart enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## C. THE MANAGEMENT COMPANY ENTERPRISES

1375. The Management Company Enterprises—i.e., Practice Wiz, IBS, and Billing Pros—were organized by Davydov, David, and Mumin-Akhunov for the purpose of evading detection and preventing Allstate (or anyone else) from uncovering that Davydov, David, Raytsin, and Mumin-Akhunov operated, controlled, and profited from Epione and/or APAK.

1376. Such concealment was necessary to perpetuate and preserve the Defendants' fraudulent scheme, which hinged upon Davydov, David, Raytsin, and Mumin-Akhunov's unlawful exertion of control over the operation and management of Epione and APAK because, at all relevant times, Davydov, David, Raytsin, and Mumin-Akhunov were not licensed to practice medicine or chiropractic in the State of New York, or allowed to operate, control, or profit from a professional corporation organized to provide medical or chiropractic services.

1377. Therefore, because Epione and APAK were organized as physician-owned and chiropractor-owned professional service corporations, respectively, Davydov, David, Raytsin, and Mumin-Akhunov were never lawfully entitled to participate in, or in any way direct, the operation and management of either of the PC Defendants.

1378.   Therefore, to circumvent this prohibition, Davydov, David, and Mumin-Akhunov used Practice Wiz, IBS, and/or Billing Pros to unlawfully exert such control and siphon the professional fees and profits of Epione and/or APAK for their own personal use and benefit in violation of New York law.

1379.   Overall, Davydov, David, and Mumin-Akhunov intentionally used their respective Management Companies to disguise payments from the PC Defendants (including payments representing professional medical fees and profits that they otherwise would not be eligible to receive) as legitimate costs for consulting, marketing, and billing services even where the Management Companies provided no meaningful services or anything else of value to the PC Defendants.

1380.   Therefore, Practice Wiz, IBS, and Billing Pros were each used to lend an air of false legitimacy to the transactions between the Management Company Enterprises and Epione and/or APAK when, in fact, Practice Wiz, IBS, and Billing Pros were intentionally used as tools to conceal Davydov, David, Raytsin, and Mumin-Akhunov's control over Epione and/or APAK and the channeling of monies from one or more of these Defendants to Davydov, David, Raytsin, and/or Mumin-Akhunov.

1381.   It is clear, then, that Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov took purposeful steps to conceal Davydov, David, Raytsin, and Mumin-Akhunov's involvement in the day-to-day operations of one or more of the PC Defendants.

1382.   Consequently, Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov's purposeful concealment of Davydov, David, Raytsin, and Mumin-Akhunov's controlling interests in Epione and APAK allowed Davydov, David, Raytsin, and Mumin-Akhunov to unlawfully control Epione and APAK undetected.

1383.  The documents created and filed with the State of New York related to the PC Defendants deliberately omitted any reference to Davydov, David, Raytsin, and Mumin-Akhunov's—or the Management Companies'—involvement and thus gave no indication to Allstate or the general public that Davydov, David, Raytsin, and Mumin-Akhunov in any way maintained a controlling interest in Epione and APAK.

1384.  At all relevant times, Jacobi and Mostovoy, as a duly licensed medical providers, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with each and every other aspect of their oath as a licensed physician or chiropractor.

1385.  Many of these facts—particularly (a) Davydov, David, Raytsin, and Mumin-Akhunov's participation in and control over the operation and management of Epione and APAK, and (b) the PC Defendants' unlawful splitting of professional medical fees and profits with Davydov, David, Raytsin, and/or Mumin-Akhunov through transactions between the PC Defendants and the Management Company Enterprises—are not readily evident within the four corners of the documents submitted to Allstate by the PC Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1386.  Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

1387.  Based on the above-described conduct, every time that Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov (along with those individuals working under their control) caused Epione and/or APAK to submit No-Fault reimbursement demands to Allstate,

Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov (and those individuals working under their control) necessarily certified that the PC Defendants were, in all respects, eligible to be reimbursed under New York's No-Fault laws.

1388.  The full extent of Jacobi, Mostovoy, Davydov, David, Raytsin, and Mumin-Akhunov's fraudulent and unlawful acts relative to their participation in the Management Company Enterprises—including (a) Davydov, David, Raytsin, and Mumin-Akhunov's participation in and control over the operation and management of Epione and/or APAK through the Management Company Enterprises, and (b) the unlawful channeling of the PC Defendants' professional proceeds to Davydov, David, Raytsin, and/or Mumin-Akhunov through transactions that were structured between the PC Defendants and the Management Company Enterprises— were not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII.  ALLSTATE'S JUSTIFIABLE RELIANCE

1389.  Each claim submitted to Allstate by (or on behalf of) Epione, APAK, and Wellmart was verified pursuant to Insurance Law § 403.

1390.  At all relevant times, Jacobi and Mostovoy, as duly licensed medical providers, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with each and every other aspect of their oath as a licensed medical professional.

1391.  To induce Allstate to promptly pay Epione, APAK, and Wellmart's patient invoices, the Defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that Epione, APAK, and Wellmart were eligible to be reimbursed under New York's No-Fault laws.

1392. Further, to induce Allstate to promptly pay the fraudulent charges for medical services and prescription drug and other pharmacy services purportedly provided to Allstate Claimants, the Defendants hired attorneys and law firms to pursue collection of the fraudulent and/or non-compensable charges from Allstate. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Epione, APAK, and Wellmart's charges are not promptly paid in full.

1393. Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate by (or on behalf of) Epione, APAK, and Wellmart in support of the fraudulent and/or non-compensable charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

1394. At all relevant times, as alleged above, the Defendants concealed from Allstate the truth regarding Epione, APAK, and Wellmart's reimbursement eligibility under New York law.

1395. In reasonable reliance on these misrepresentations, Allstate paid money to Epione, APAK, and Wellmart to its detriment.

1396. Allstate would not have paid these monies had the Defendants provided true and accurate information about Epione, APAK, and Wellmart's reimbursement eligibility under New York law, including (a) Epione, APAK, and Wellmart's No-Fault reimbursement eligibility under N.Y. Insurance Law § 5101, *et seq*., and (b) the fact and necessity of the services purportedly provided to those Allstate Claimants and patients of Epione, APAK, and Wellmart eligible for insurance coverage under an automobile insurance policy issued by Allstate.

1397. As a result, Allstate was caused make No-Fault benefit payments totaling over $1,682,127.00 to Epione, APAK, and Wellmart in reasonable reliance on Epione, APAK, and

Wellmart's false No-Fault claim reimbursement documentation, and their false representations regarding Epione, APAK, and Wellmart's eligibility for reimbursement under New York's No-Fault laws.

## VIII. DAMAGES

1398. The Defendants' pattern of fraudulent and unlawful conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

a. Payments made to Epione Medical, P.C. in connection with first-party ("No-Fault") claims in excess of $821,528.00, the exact amount to be determined at trial. The chart annexed at Exhibit 17, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Epione in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

b. Payments made to APAK Chiropractic, P.C. in connection with first-party ("No-Fault") claims in excess of $434,235.00, the exact amount to be determined at trial. The chart annexed at Exhibit 18, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to APAK in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

c. Payments made to Wellmart Rx, Inc. in connection with first-party ("No-Fault") claims in excess of $426,362.00, the exact amount to be determined at trial. The chart annexed at Exhibit 2, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Wellmart in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

## IX. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EPIONE MEDICAL, P.C. ENTERPRISE
**(Against Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

1399.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1400.  In furtherance of their operation and management of Epione Medical, P.C. ("Epione"), Defendants Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of their scheme to defraud.

1401.  The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 11.

1402.  Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1403.  Policies of insurance were delivered to insurers through the U.S. Mail.

1404.  Payments made by Allstate to Epione were delivered through the U.S. Mail.

1405.  As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to expenses and/or services that were purportedly performed at Epione for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1406.   As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Epione, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

1407.   The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count I Defendants to continue without being detected.

1408.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1409.   By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1410.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Epione for the benefit of the Count I Defendants.

1411.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1412.   Epione constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1413. The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1414. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

1415. The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1416. By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**EPIONE MEDICAL, P.C. ENTERPRISE**
**(Against Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

1417. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1418. Throughout their participation in the operation and management of Epione Medical, P.C. ("Epione"), Defendants Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1419. The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Epione by means of a pattern of racketeering

activity, including numerous instances of mail fraud as set forth in Exhibit 11, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1420. The purpose of the conspiracy was to obtain No-Fault benefit payments from Allstate on behalf of Epione, even though Epione, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

1421. The purpose of the conspiracy was also to seek No-Fault benefit payments from Allstate on behalf of Epione in connection with medical services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1422. The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

1423. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II Defendants' unlawful conduct described herein.

1424. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count II Defendants three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

# COUNT III
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## APAK CHIROPRACTIC, P.C. ENTERPRISE
### (Against Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Stella Raytsin, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)

1425.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1426.  In furtherance of their operation and management of APAK Chiropractic, P.C. ("APAK"), Defendants Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Stella Raytsin, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of their scheme to defraud.

1427.  The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 12.

1428.  Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1429.  Policies of insurance were delivered to insurers through the U.S. Mail.

1430.  Payments made by Allstate to APAK were delivered through the U.S. Mail.

1431.  As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to expenses and/or services that were purportedly performed at APAK for the

212

purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1432.  As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to APAK, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

1433.  The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count III Defendants to continue without being detected.

1434.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1435.  By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1436.  The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to APAK for the benefit of the Count III Defendants.

1437.  Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1438.  APAK constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1439.   The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1440.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

1441.   The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1442.   By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### APAK CHIROPRACTIC, P.C. ENTERPRISE
**(Against Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Stella Raytsin, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

1443.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1444.   Throughout their participation in the operation and management of APAK Chiropractic, P.C. ("APAK"), Defendants Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Stella Raytsin, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1445.   The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of APAK by means of a pattern of racketeering

activity, including numerous instances of mail fraud as set forth in Exhibit 12, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1446. The purpose of the conspiracy was to obtain No-Fault benefit payments from Allstate on behalf of APAK, even though APAK, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

1447. The purpose of the conspiracy was also to seek No-Fault benefit payments from Allstate on behalf of APAK in connection with medical services that were falsely reported, not medically necessary, falsely charged, and in certain instances, never actually rendered.

1448. The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

1449. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

1450. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count IV Defendants three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### WELLMART RX, INC. ENTERPRISE
### (Against Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C.)

1451.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1452.   In furtherance of their operation and management of Wellmart Rx, Inc. ("Wellmart"), Defendants Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C. (collectively, "Count V Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1453.   The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 13.

1454.   Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

1455.   Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1456.   Payments made by Allstate to Wellmart were delivered through the U.S. Mail.

1457.   As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Compounded Products and other drugs dispensed and delivered by Wellmart

for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

1458.   As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Wellmart, for the benefit of one or more of the Count V Defendants, that would not otherwise have been paid.

1459.   The Count V Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count V Defendants to continue perpetrating this scheme without being detected.

1460.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1461.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Wellmart for the benefit of the Count V Defendants.

1462.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1463.   Wellmart constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1464.   The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1465.  Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

1466.  The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1467.  By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### WELLMART RX, INC. ENTERPRISE
### (Against Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C.)

1468.  Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1398 as if fully set forth herein.

1469.  Through their participation in the operation and management of Wellmart Rx, Inc. ("Wellmart"), Defendants Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C. (collectively, "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1470.  The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Wellmart by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 13, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

1471. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Wellmart, even though Wellmart, as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1472. The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1473. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Defendants' unlawful conduct described herein.

1474. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### PRACTICE WIZ, INC. ENTERPRISE
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, and Elena Mumin-Akhunov)**

1475. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1398 as if fully set forth herein.

1476. In furtherance of their operation and management of Practice Wiz, Inc. ("Practice Wiz"), Defendants APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, and Elena Mumin-Akhunov (collectively, "Count VII Defendants") intentionally prepared and mailed (or caused to

be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1477. The Count VII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 16.

1478. Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

1479. Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1480. Payments made by Allstate to APAK Chiropractic, P.C.—the proceeds of which were, in part, diverted to Practice Wiz for the benefit of one or more of the Count VII Defendants— were delivered through the U.S. Mail.

1481. As documented above, the Count VII Defendants repeatedly and intentionally submitted documentation to Allstate for medical expenses and/or services that were purportedly performed at APAK Chiropractic, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable No-Fault laws.

1482. The use of Practice Wiz's agreements with and relationship to APAK Chiropractic, P.C. allowed Simon Davydov to exercise control over the operation and management of APAK Chiropractic, P.C., and further permitted one or more of the Count VII Defendants to share in the professional chiropractic fees and profits collected by APAK Chiropractic, P.C.

1483. The use of Practice Wiz to siphon the professional chiropractic fees and profits from APAK Chiropractic, P.C. to Simon Davydov and Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov for their own personal use and financial gain was unlawful.

1484. Overall, APAK Chiropractic, P.C.'s relationship with Practice Wiz facilitated Simon Davydov's unlawful control over APAK Chiropractic, P.C., and further rendered APAK Chiropractic, P.C. ineligible to seek or collect No-Fault payments.

1485. When the Count VII Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count VII Defendants materially misrepresented APAK Chiropractic, P.C.'s No-Fault reimbursement eligibility under New York law.

1486. As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to APAK Chiropractic, P.C. for the benefit of one or more of the Count VII Defendants that would not otherwise have been paid.

1487. The Count VII Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count VII Defendants to continue perpetrating this scheme without being detected.

1488. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1489. By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related materials in an

ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1490.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to APAK Chiropractic, P.C. for the benefit of one or more of the Count VII Defendants.

1491.   The unlawful activities alleged in this case also had the direct effect of causing these funds, including professional chiropractic fees and profits, to be channeled to Practice Wiz, and then from Practice Wiz to one or more of the Count VII Defendants for their own personal use and financial gain.

1492.   Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1493.   Practice Wiz constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1494.  The Count VII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1495.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

1496.   The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1497.   By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, on behalf of APAK Chiropractic, P.C., together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**PRACTICE WIZ, INC. ENTERPRISE**
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, and Elena Mumin-Akhunov)**

1498.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1398 as if fully set forth herein.

1499.   Through their participation in the operation and management of Practice Wiz, Inc. ("Practice Wiz"), Defendants APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, and Elena Mumin-Akhunov (collectively, "Count VIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1500.   The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Practice Wiz by means of a pattern of racketeering activity through APAK Chiropractic, P.C., including numerous instances of mail fraud as set forth in Exhibit 16, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1501.   The purpose of the conspiracy was to obtain, for Practice Wiz's benefit, No-Fault payments from Allstate on behalf of APAK Chiropractic, P.C., even though APAK Chiropractic, P.C., as a result of the Count VIII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

1502.  The purpose of the conspiracy was also to cause professional chiropractic fees and profits collected by APAK Chiropractic, P.C. to be channeled to Practice Wiz for the benefit of one or more of the Count VIII Defendants.

1503.  The Count VIII Defendants' use of Practice Wiz to funnel professional chiropractic fees and profits from APAK Chiropractic, P.C. to one or more of the Count VIII Defendants was unlawful, and allowed the Count VIII Defendants to exercise control over the operation and management of APAK Chiropractic, P.C., and further permitted one or more of the Count VIII Defendants to share in the professional chiropractic fees and profits collected by APAK Chiropractic, P.C.

1504.  The Count VIII Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1505.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Defendants' unlawful conduct described herein.

1506.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### MBCC SUPPORT LTD. D/B/A BILLING PROS ENTERPRISE
### (Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Elena Mumin-Akhunov, Simon Davydov, Stella Raytsin, and Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov)

1507.  Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1398 as if fully set forth herein.

1508.  In furtherance of their operation and management of MBCC Support Ltd. d/b/a Billing Pros ("Billing Pros"), Defendants Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Elena Mumin-Akhunov, Simon Davydov, Stella Raytsin, and Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov (collectively, "Count IX Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1509.  The Count IX Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 15.

1510.  Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

1511.  Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1512.  Payments made by Allstate to Epione Medical, P.C. and APAK Chiropractic, P.C.—the proceeds of which were, in part, diverted to Billing Pros for the benefit of one or more of the Count IX Defendants—were delivered through the U.S. Mail.

1513.  As documented above, the Count IX Defendants repeatedly and intentionally submitted documentation to Allstate for medical expenses and/or services that were purportedly

performed at Epione Medical, P.C. and APAK Chiropractic, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable No-Fault laws.

1514. The use of Billing Pros' agreements with and relationship to Epione Medical, P.C. and APAK Chiropractic, P.C. allowed Elena Mumin-Akhunov to exercise control over the operation and management of Epione Medical, P.C. and APAK Chiropractic, P.C., and further permitted one or more of the Count IX Defendants to share in the professional medical fees and profits collected by Epione Medical, P.C. and APAK Chiropractic, P.C.

1515. The use of Billing Pros to siphon the professional medical fees and profits from Epione Medical, P.C. and APAK Chiropractic, P.C. to Elena Mumin-Akhunov and Simon Davydov for their own personal use and financial gain was unlawful.

1516. Overall, Epione Medical, P.C. and APAK Chiropractic, P.C.'s relationships with Billing Pros facilitated Elena Mumin-Akhunov's unlawful control over Epione Medical, P.C. and APAK Chiropractic, P.C., and further rendered Epione Medical, P.C. and APAK Chiropractic, P.C. ineligible to seek or collect No-Fault payments.

1517. When the Count IX Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count IX Defendants materially misrepresented Epione Medical, P.C. and APAK Chiropractic, P.C.'s No-Fault reimbursement eligibility under New York law.

1518. As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Epione Medical, P.C. and APAK Chiropractic, P.C. for the benefit of one or more of the Count IX Defendants that would not otherwise have been paid.

1519. The Count IX Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count IX Defendants to continue perpetrating this scheme without being detected.

1520. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1521. By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1522. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Epione Medical, P.C. and APAK Chiropractic, P.C. for the benefit of one or more of the Count IX Defendants.

1523. The unlawful activities alleged in this case also had the direct effect of causing these funds, including professional medical fees and profits, to be channeled to Billing Pros, and then from Billing Pros to one or more of the Count IX Defendants for their own personal use and financial gain.

1524. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1525. Billing Pros constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1526. The Count IX Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1527. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

1528. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1529. By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, on behalf of Epione Medical, P.C. and APAK Chiropractic, P.C., together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**MBCC SUPPORT LTD. D/B/A BILLING PROS ENTERPRISE**
**(Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O.,**
**Aleksandr Mostovoy, D.C., Elena Mumin-Akhunov, Simon Davydov, Stella Raytsin, and**
**Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov)**

1530. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1398 as if fully set forth herein.

1531. Through their participation in the operation and management of MBCC Support Ltd. d/b/a Billing Pros ("Billing Pros"), Defendants Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Elena Mumin-Akhunov, Simon Davydov, Stella Raytsin, and Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov (collectively, "Count X Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1532. The Count X Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Billing Pros by means of a pattern of

racketeering activity through Epione Medical, P.C. and APAK Chiropractic, P.C., including numerous instances of mail fraud as set forth in Exhibit 15, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1533.  The purpose of the conspiracy was to obtain, for Billing Pros' benefit, No-Fault payments from Allstate on behalf of Epione Medical, P.C. and APAK Chiropractic, P.C. even though Epione Medical, P.C. and APAK Chiropractic, P.C., as a result of the Count X Defendants' unlawful conduct, were not eligible to collect such No-Fault payments.

1534.  The purpose of the conspiracy was also to cause professional medical fees and profits collected by Epione Medical, P.C. and APAK Chiropractic, P.C. to be channeled to Billing Pros for the benefit of one or more of the Count X Defendants.

1535.  The Count X Defendants' use of Billing Pros to funnel professional medical fees and profits from Epione Medical, P.C. and APAK Chiropractic, P.C. to one or more of the Count X Defendants was unlawful, and allowed the Count X Defendants to exercise control over the operation and management of Epione Medical, P.C. and APAK Chiropractic, P.C., and further permitted one or more of the Count X Defendants to share in the professional medical fees and profits collected by Epione Medical, P.C. and APAK Chiropractic, P.C.

1536.  The Count X Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1537.  Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Defendants' unlawful conduct described herein.

1538.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count X Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**INNOVATIVE BUSINESS STRATEGIES, INC. ENTERPRISE**
**(Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O.,**
**Aleksandr Mostovoy, D.C., Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov,**
**Simon Davydov, Stella Raytsin, and Elena Mumin-Akhunov)**

1539.  Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1398 as if fully set forth herein.

1540.  In furtherance of their operation and management of Innovative Business Strategies, Inc. ("IBS"), Defendants Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Simon Davydov, Stella Raytsin, and Elena Mumin-Akhunov (collectively, "Count XI Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

1541.  The Count XI Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

1542.  Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review

rebuttals, other No-Fault claim reimbursement documents, letters, and/or requests for payment were routinely delivered to Allstate through the U.S. Mail.

1543.  Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

1544.  Payments made by Allstate to Epione Medical, P.C. and APAK Chiropractic, P.C.—the proceeds of which were, in part, diverted to IBS for the benefit of one or more of the Count XI Defendants—were delivered through the U.S. Mail.

1545.  As documented above, the Count XI Defendants repeatedly and intentionally submitted documentation to Allstate for medical expenses and/or services that were purportedly performed at Epione Medical, P.C. and APAK Chiropractic, P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable No-Fault laws.

1546.  The use of IBS's agreements with and relationship to Epione Medical, P.C. and APAK Chiropractic, P.C. allowed Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov to exercise control over the operation and management of Epione Medical, P.C. and APAK Chiropractic, P.C., and further permitted one or more of the Count XI Defendants to share in the professional fees and profits collected by Epione Medical, P.C. and APAK Chiropractic, P.C.

1547.  The use of IBS to siphon the professional medical fees and profits from Epione Medical, P.C. and APAK Chiropractic, P.C. to Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov for his own personal use and financial gain was unlawful.

1548.  Overall, Epione Medical, P.C. and APAK Chiropractic, P.C.'s relationships with IBS facilitated Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov's unlawful control

over Epione Medical, P.C. and APAK Chiropractic, P.C., and further rendered Epione Medical, P.C. and APAK Chiropractic, P.C. ineligible to seek or collect No-Fault payments.

1549.  When the Count XI Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count XI Defendants materially misrepresented Epione Medical, P.C. and APAK Chiropractic, P.C.'s No-Fault reimbursement eligibility under New York law.

1550.  As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Epione Medical, P.C. and APAK Chiropractic, P.C. for the benefit of one or more of the Count XI Defendants that would not otherwise have been paid.

1551.  The Count XI Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count XI Defendants to continue perpetrating this scheme without being detected.

1552.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1553.  By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related materials in an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1554. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Epione Medical, P.C. and APAK Chiropractic, P.C. for the benefit of one or more of the Count XI Defendants.

1555. The unlawful activities alleged in this case also had the direct effect of causing these funds, including professional medical fees and profits, to be channeled to IBS, and then from IBS to one or more of the Count XI Defendants for their own personal use and financial gain.

1556. Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1557. IBS constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1558. The Count XI Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

1559. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

1560. The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1561. By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, on behalf of Epione Medical, P.C. and APAK Chiropractic, P.C., together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## INNOVATIVE BUSINESS STRATEGIES, INC. ENTERPRISE
**(Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Simon Davydov, Stella Raytsin, and Elena Mumin-Akhunov)**

1562.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 1398 as if fully set forth herein.

1563.   Through their participation in the operation and management of Innovative Business Strategies, Inc. ("IBS"), Defendants Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Simon Davydov, Stella Raytsin, and Elena Mumin-Akhunov (collectively, "Count XII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

1564.   The Count XII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of IBS by means of a pattern of racketeering activity through Epione Medical, P.C. and APAK Chiropractic, P.C., including numerous instances of mail fraud as set forth in Exhibit 14, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

1565.   The purpose of the conspiracy was to obtain, for IBS's benefit, No-Fault payments from Allstate on behalf of Epione Medical, P.C. and APAK Chiropractic, P.C., even though Epione Medical, P.C. and APAK Chiropractic, P.C., as a result of the Count XII Defendants' unlawful conduct, were not eligible to collect such No-Fault payments.

1566.   The purpose of the conspiracy was also to cause professional medical fees and profits collected by Epione Medical, P.C. and APAK Chiropractic, P.C. to be channeled to IBS for the benefit of one or more of the Count XII Defendants.

1567.   The Count XII Defendants' use of IBS to funnel professional medical fees and profits from Epione Medical, P.C. and APAK Chiropractic, P.C. to one or more of the Count XII Defendants was unlawful, and allowed the Count XII Defendants to exercise control over the operation and management of Epione Medical, P.C. and APAK Chiropractic, P.C., and further permitted one or more of the Count XII Defendants to share in the professional medical fees and profits collected by Epione Medical, P.C. and APAK Chiropractic, P.C.

1568.   The Count XII Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1569.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Defendants' unlawful conduct described herein.

1570.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XIII
### COMMON LAW FRAUD
**(Against Epione Medical, P.C., Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

1571.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1572. Epione Medical, P.C., Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count XIII Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

1573. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that Epione Medical, P.C. ("Epione") was properly licensed and therefore eligible to seek and collect No-Fault benefit payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though Epione was unlawfully owned and controlled by non-physicians; and (b) in every claim, the representation that Epione was eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the tests and treatment purportedly provided to Allstate claimants when, in fact, Epione was not eligible to seek or collect No-Fault benefit payments for these services because they were (i) not medically necessary, (ii) provided pursuant to a predetermined protocol, (iii) not rendered as represented (if rendered at all), (iv) intentionally inflated or misrepresented to justify the continuation of medical treatment, (v) provided by an individual who was not employed by Epione, and (vi) purposely designed to financially enrich the non-physicians at the expense of patient care.

1574. The Count XIII Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate

to pay charges submitted by (or on behalf of) Epione that were not compensable under New York's No-Fault laws.

1575. Allstate reasonably relied, to its detriment, upon the Count XIII Defendants' material misrepresentations concerning Epione's eligibility to receive No-Fault reimbursement when making payments for medical services purportedly provided to patients through Epione.

1576. Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $821,528.00 in connection with fraudulent bills submitted by the Count XIII Defendants through Epione.

**COUNT XIV**
**COMMON LAW FRAUD**
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

1577. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1578. APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count XIV Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for chiropractic services under New York's No-Fault laws.

1579. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that APAK Chiropractic, P.C. ("APAK") was properly licensed and therefore eligible to seek and collect No-Fault benefit

payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though APAK was unlawfully owned and controlled by non-chiropractors.

1580.   The Count XIV Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) APAK that were not compensable under New York's No-Fault laws.

1581.   Allstate reasonably relied, to its detriment, upon the Count XIV Defendants' material misrepresentations concerning APAK's eligibility to receive No-Fault reimbursement when making payments for medical services purportedly provided to patients through APAK.

1582.   Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $434,235.00 in connection with fraudulent bills submitted by the Count XIV Defendants through APAK.

**COUNT XV**
**COMMON LAW FRAUD**
**(Against Wellmart Rx, Inc., Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta,**
**Michael Y. Jacobi, D.O., and Epione Medical, P.C.)**

1583.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1584.   Wellmart Rx, Inc., Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C. (collectively, "Count XV Defendants") intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for pharmacy services under New York's No-Fault laws.

1585.   The false and fraudulent statements of material fact and acts of fraudulent concealment include representations made in every claim that Wellmart Rx, Inc. ("Wellmart") was

eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the Compounded Products and other medications purportedly dispensed to Allstate claimants when, in fact, Wellmart was not eligible to seek or collect No-Fault benefit payments for these medications because they were (i) not medically necessary, (ii) prescribed according to financial relationships between the pharmacy and the prescribing providers, (iii) repeatedly dispensed in excessive amounts that were harmful to patients, (iv) charged at inflated amounts and not billed in accordance with the fee schedule, (v) never specifically formulated for individual patients, and (vi) mass produced and dispensed in violation of applicable regulatory and licensing requirements.

1586. The Count XV Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) Wellmart that were not compensable under New York's No-Fault laws.

1587. Allstate reasonably relied, to its detriment, upon the Count XV Defendants' material misrepresentations concerning Wellmart's eligibility to receive No-Fault reimbursement when making payments for pharmacy services purportedly provided to Allstate Claimants through Wellmart.

1588. Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault benefit payments totaling over $426,362.00 in connection with fraudulent bills submitted by the Count XV Defendants through Wellmart.

## COUNT XVI
## UNJUST ENRICHMENT
**(Against Epione Medical, P.C., Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

1589.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1590.  As detailed above, Epione Medical, P.C., Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count XVI Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1591.  The Count XVI Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) Epione Medical, P.C.

1592.  The payments received by the Count XVI Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1593.  The Count XVI Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

1594.  By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count XVI Defendants have been unjustly enriched in an amount totaling $821,528.00, the exact amount to be determined at trial.

## COUNT XVII
### UNJUST ENRICHMENT
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

1595.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1596. As detailed above, APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros (collectively, "Count XVII Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1597. The Count XVII Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) APAK Chiropractic, P.C.

1598. The payments received by the Count XVII Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1599. The Count XVII Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

1600. By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count XVII Defendants have been unjustly enriched in an amount totaling $434,235.00, the exact amount to be determined at trial.

## COUNT XVIII
## UNJUST ENRICHMENT
**(Against Wellmart Rx, Inc., Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C.)**

1601. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1602. As detailed above Wellmart Rx, Inc., Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C. (collectively, "Count XVIII

Defendants") have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

1603.   The Count XVIII Defendants have been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) Wellmart Rx, Inc.

1604.   The payments received by the Count XVIII Defendants constituted a benefit that they voluntarily and willingly accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme.

1605.   The Count XVIII Defendants' retention of Allstate's payments violates fundamental principles of justice, equity, and good conscience.

1606.   By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Count XVIII Defendants have been unjustly enriched in an amount totaling $426,362.00, the exact amount to be determined at trial.

## COUNT XIX
### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Epione Medical, P.C.)

1607.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 1398 as if set forth fully herein.

1608.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional medical services in New York.

1609.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Simon Davydov, Stella Raytsin, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, and Elena Mumin-Akhunov), (c) unlawful sharing of professional physician fees

with one or more non-physician, (d) billing for medically unnecessary tests and treatment, and (e) billing for tests and treatment provided by individuals who were not employed by Epione Medical, P.C., Epione Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional medical services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to Epione Medical, P.C. by its patients.

1610.   Epione Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1611.   Epione Medical, P.C. continues to challenge Allstate's prior claim denials.

1612.   Epione Medical, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1613.   A justifiable controversy exists between Allstate and Epione Medical, P.C. because Epione Medical, P.C. rejects Allstate's ability to deny such claims.

1614.   Allstate has no adequate remedy at law.

1615.   Epione Medical, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Epione Medical, P.C.

1616.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that Epione Medical, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and controlled by one or

more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) sought payment for medically unnecessary treatment and tests, and (e) sought payment for treatment and tests provided by individuals who were not employed by Epione Medical, P.C., and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XX**
**DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202**
**(Against APAK Chiropractic, P.C.)**

1617.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1 through 1398 as if set forth fully herein.

1618.  To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide professional chiropractic services in New York.

1619.  In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-chiropractor (i.e., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, and Elena Mumin-Akhunov), (c) unlawful sharing of professional chiropractic fees with one or more non-chiropractor, and (d) billing for tests and treatment provided by individuals who were not employed by APAK Chiropractic, P.C., APAK Chiropractic, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional medical services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to APAK Chiropractic, P.C. by its patients.

1620.    APAK Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1621.    APAK Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1622.    APAK Chiropractic, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1623.    A justifiable controversy exists between Allstate and APAK Chiropractic, P.C. because APAK Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1624.    Allstate has no adequate remedy at law.

1625.    APAK Chiropractic, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by APAK Chiropractic, P.C.

1626.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that APAK Chiropractic, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and controlled by one or more non-chiropractor, (c) engaged in the unlawful sharing of fees derived from the provision of professional chiropractic services, and (d) sought payment for treatment and tests provided by individuals who were not employed by APAK Chiropractic, P.C., and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXI
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Wellmart Rx, Inc.)

1627.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 1398 as if set forth fully herein.

1628.  To be eligible to receive assigned No-Fault benefits, an assignee provider of medical services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide medical services in New York.

1629.  In view of its (a) producing and dispensing of Compounded Products in violation of applicable regulatory and licensing requirements (including, without limitation, those regulations and licensing requirements concerning unlawful financial and other arrangements with prescribing providers, and the manufacturing of compounded medications), (b) dispensing and billing of Allstate for Compounded Products and other drugs that were not medically necessary and that were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (c) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (d) charging of Allstate for Compounded Products and other drugs at grossly excessive rates, and (e) maintaining unlawful relationships with and inducing, through financial means or otherwise, prescribing providers, including Michael Y. Jacobi, D.O. and Epione Medical, P.C., to furnish prescriptions for medically unnecessary drugs and medications, including Compounded Products, that were to be filled exclusively by Wellmart Rx, Inc., Wellmart Rx, Inc. was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

1630.  Wellmart Rx, Inc. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1631.  Wellmart Rx, Inc. continues to challenge Allstate's prior claim denials.

1632.   Wellmart Rx, Inc. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1633.   A justifiable controversy exists between Allstate and Wellmart Rx, Inc. because Wellmart Rx, Inc. rejects Allstate's ability to deny such claims.

1634.   Allstate has no adequate remedy at law.

1635.   Wellmart Rx, Inc. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay any past, present, or future No-Fault claims submitted by Wellmart Rx, Inc.

1636.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that Wellmart Rx, Inc. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any past, present, or future bills that have been submitted to Allstate by, or on behalf of, Wellmart Rx, Inc. seeking payment under New York's No-Fault laws.

## X.   DEMAND FOR RELIEF

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EPIONE MEDICAL, P.C. ENTERPRISE
**(Against Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.    AWARD Allstate's actual and consequential damages to be established at trial;

b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.       GRANT injunctive relief enjoining the Count I Defendants from engaging in the

wrongful conduct alleged in the Complaint; and

d.       GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### EPIONE MEDICAL, P.C. ENTERPRISE
**(Against Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.       AWARD Allstate's actual and consequential damages to be established at trial;

b.       AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

c.       GRANT injunctive relief enjoining the Count II Defendants from engaging in the

wrongful conduct alleged in the Complaint; and

d.       GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### APAK CHIROPRACTIC, P.C. ENTERPRISE
**(Against Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Stella Raytsin, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.       AWARD Allstate's actual and consequential damages to be established at trial;

b.       AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs,

and attorneys' fees;

c.       GRANT injunctive relief enjoining the Count III Defendants from engaging in the

wrongful conduct alleged in the Complaint; and

d.     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### APAK CHIROPRACTIC, P.C. ENTERPRISE
**(Against Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Stella Raytsin, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.     AWARD Allstate's actual and consequential damages to be established at trial;

b.     AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.     GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.     GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### WELLMART RX, INC. ENTERPRISE
**(Against Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C.)**

a.     AWARD Allstate's actual and consequential damages to be established at trial;

b.     AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.     GRANT injunctive relief enjoining the Count V Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### WELLMART RX, INC. ENTERPRISE
**(Against Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C.)**

    a.    AWARD Allstate's actual and consequential damages to be established at trial;

    b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

    c.    GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

    d.    GRANT all other relief this Court deems just.


## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### PRACTICE WIZ, INC. ENTERPRISE
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, and Elena Mumin-Akhunov)**

    a.    AWARD Allstate's actual and consequential damages to be established at trial;

    b.    AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

    c.    GRANT injunctive relief enjoining the Count VII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

    d.    GRANT all other relief this Court deems just.


## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### PRACTICE WIZ, INC. ENTERPRISE
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, and Elena Mumin-Akhunov)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count VIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### MBCC SUPPORT LTD. D/B/A BILLING PROS ENTERPRISE
**(Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Elena Mumin-Akhunov, Simon Davydov, Stella Raytsin, and Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count IX Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### MBCC SUPPORT LTD. D/B/A BILLING PROS ENTERPRISE
**(Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Elena Mumin-Akhunov, Simon Davydov, Stella Raytsin, and Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count X Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### INNOVATIVE BUSINESS STRATEGIES, INC. ENTERPRISE
**(Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Simon Davydov, Stella Raytsin, and Elena Mumin-Akhunov)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count XI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### INNOVATIVE BUSINESS STRATEGIES, INC. ENTERPRISE
**(Against Epione Medical, P.C., APAK Chiropractic, P.C., Michael Y. Jacobi, D.O., Aleksandr Mostovoy, D.C., Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Simon Davydov, Stella Raytsin, and Elena Mumin-Akhunov)**

a.      AWARD Allstate's actual and consequential damages to be established at trial;

b.      AWARD Allstate's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c.      GRANT injunctive relief enjoining the Count XII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d.      GRANT all other relief this Court deems just.

## COUNT XIII
## COMMON LAW FRAUD
**(Against Epione Medical, P.C., Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

## COUNT XIV
## COMMON LAW FRAUD
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

## COUNT XV
## COMMON LAW FRAUD
**(Against Wellmart Rx, Inc., Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C.)**

a.      AWARD Allstate's actual and consequential damages to be established at trial; and

b.      GRANT all other relief this Court deems just.

## COUNT XVI
## UNJUST ENRICHMENT
**(Against Epione Medical, P.C., Michael Y. Jacobi, D.O., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Stella Raytsin, Elena Mumin-Akhunov, Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.       AWARD Allstate's actual and consequential damages to be established at trial; and

b.       GRANT all other relief this Court deems just.

## COUNT XVII
## UNJUST ENRICHMENT
**(Against APAK Chiropractic, P.C., Aleksandr Mostovoy, D.C., Simon Davydov, Emanuel David a/k/a Emanuel Davydov a/k/a Emik Davydov, Elena Mumin-Akhunov, Practice Wiz, Inc., Innovative Business Strategies, Inc., and MBCC Support Ltd. d/b/a Billing Pros)**

a.       AWARD Allstate's actual and consequential damages to be established at trial; and

b.       GRANT all other relief this Court deems just.

## COUNT XVIII
## UNJUST ENRICHMENT
**(Against Wellmart Rx, Inc., Simon Davydov, Ruslan Nektalov a/k/a Russ Nekta, Michael Y. Jacobi, D.O., and Epione Medical, P.C.)**

a.       AWARD Allstate's actual and consequential damages to be established at trial; and

b.       GRANT all other relief this Court deems just.

## COUNT XIX
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
**(Against Epione Medical, P.C.)**

a.       DECLARE that Epione Medical, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state or local licensing requirement necessary to provide professional physician services in New York;

b.       DECLARE that Epione Medical, P.C.'s activities are unlawful;

c.       DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by Epione Medical, P.C.; and

d.       GRANT all other relief this Court deems just.

## COUNT XX
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against APAK Chiropractic, P.C.)

a.      DECLARE that APAK Chiropractic, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-chiropractor, and otherwise operated in violation of at least one New York state or local licensing requirement necessary to provide professional chiropractic services in New York;

b.      DECLARE that APAK Chiropractic, P.C.'s activities are unlawful;

c.      DECLARE that Allstate has no obligation to pay any past, present, or future No-Fault insurance claims submitted by APAK Chiropractic, P.C.; and

d.      GRANT all other relief this Court deems just.

## COUNT XXI
## DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201 and 2202
### (Against Wellmart Rx, Inc.)

a.      DECLARE that Wellmart Rx, Inc., at all relevant times, was caused to be operated in violation of one or more state licensing requirement applicable to pharmacies, thus rendering Wellmart Rx, Inc. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

b.      DECLARE that Wellmart Rx, Inc.'s activities are unlawful;

c.      DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Wellmart Rx, Inc.; and

d.      GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
(347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company*

Dated: July 14, 2021